**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

------------------------------------------------------------

|  |  |  |
|---|---|---|
| : | | |
| : | | |
| **LAURA NEEB,** : | | |
| **Plaintiff,** : | | **CIVIL ACTION NO.** |
| : | | **303CV0307(AVC)** |
| **v.** : | | |
| : | | |
| : | | |
| **UNUM LIFE INSURANCE** : | | |
| **COMPANY OF AMERICA,** : | | **August 3, 2004** |
| : | | |
| **Defendant.** : | | |
| : | | |

------------------------------------------------------------

# Trial Memorandum

The following memorandum lists particular information on the matter of Laura Neeb v. Unum Life Insurance Company of America ("Unum").

**(1)**                                    **Trial Counsel**

For the Plaintiff:                                    Jeffrey Heyel, Esq
                                                  68 Main Street
                                                  Danbury, CT  06810
                                                  (203) 778-1422

For the Defendant:                                   Alexander H. Schwartz  ct 05773
                                                  3695 Post Road, Suite 203
                                                  Southport, CT  06890-0701
                                                  203.255.9829
                                                  alex@ahschwartz.com

**(2)**                                    **Basis for Jurisdiction**

This suit is brought as under federal question jurisdiction. The issue in this matter arises under the Employee Retirement Income Security Act, (hereinafter "ERISA"), Sec. 502(a)(1)(b), 29 U.S.C. 1132 (a)(1)(b).

**(3)**                                           **Type of Forum Sought**

This matter is brought for trial by the court without a jury.

Unum contends that, inasmuch as the court is asked to review its administrative determination, the "trial" is on the papers only.  See #4, post.

**(4)**                                             **Length of Trial**

Plaintiff believes that the trial will not last more than 5 days.

Unum contends that the plaintiff is not entitled to a traditional "trial" of her claim before the court.  Rather, this court will review the administrative record and conduct the functional equivalent of a bench trial on the papers.  Muller v. First Unum Life Insurance Co., 341 F.3d 119, 124 (2d Cir. 2003).  Critchlow v. First Unum Life Ins. Co., 198 F. Supp.2d 318, 322 (W.D.N.Y. 2002), aff'd 340 F.3d 130 (2d Cir. 2003).

**(5)**                                          **Further Proceedings**

Plaintiff does not anticipate any further proceedings prior to trial.

Unum will file a Motion for Judgment on the Administrative Record, along with Proposed Findings of Fact and Conclusions of Law, and a Memorandum of Law in Support of its position that the court should confirm its administrative determination. Should the court deny that motion and in light of the plaintiff's designation of exhibits and witnesses in §§ 8-9, post, Unum will pursue an in limine ruling regarding the scope of the evidence the court will consider at "trial."

**(6)**                                           **Nature of the Case**

**PLAINTIFF'S CLAIMS**

First Cause of Action - The Defendant failed to conduct its long term disability
          Proceedings in a manner consistent with the minimum standards set forth in the Code of Federal Regulations at 29 C.F.R. 2560.503 and did so in a manner so egregious that the defendants conduct should be considered arbitrary and capricious.

**Factual Basis for this Cause of Action:**

The matter of <u>Neeb v. Unum</u> has one cause of action.  Plaintiff contends that the defendant did not process her claim or hear its appeals in compliance set forth in the Code of Federal Regulations at  29 C.F.R. 2560.503.  Plaintiff asserts that there is a legitimate issue of a conflict of interest as the insurer is obliged to pay this claim from funds in its direct control.  Plaintiff further argues was arbitrary and capricious as it violated express provisions of the regulations.  It has been previously held that a defendant's disregard for these regulations is significant and may render its decisions arbitrary and capricious.  <u>Cook v. N.Y. Times Co. Group Long Term Disability Plan,</u> 2004 U.S. Dist. LEXIS 1259  (S.D.N.Y. January 27, 2004).

**First Episode**        Plaintiff Laura Neeb is alleged to suffer from anaphylactic reactions brought on by exposure to red peppers.  Over the course of time, Ms. Neeb's alleged reactions to red peppers became worse in a manner which is characteristic of anaphylactic reactions.  Ms. Neeb was hospitalized numerous times and was diagnosed as having anaphylactic shock in more than one emergency room.

In the fall of 1999, Ms. Neeb sought medical treatment from more than one medical doctor including Dr. Marshall Grodofsky of West Hartford, Connecticut.  The examination by Dr. Grodofsky and its subsequent use by the defendant are a large part of the matter before the court.  Simply stated, Marshall Grodofsky did not test the patient for the condition at issue in this matter – an allergy to red peppers.  Additionally Marshall Grodofsky employed very doubtful medical practices such as not inquiring whether his patient was taking any medications which might alter his test results.  Marshall Grodofsky also did not feel any need to use medical history.  Marshall Grodofsky's work is obviously sloppy and inadequate.

In February of 2000, the plaintiff left her employment with Danbury Hospital and filed for Long Term Disability Benefits from the Defendant on or about February 29, 2000.  The defendant gathered data and  is alleged to have denied the plaintiff's claim on the basis that the Plaintiff had refused to go to Doctor Grodofsky (who was then serving under Unum's payment and direction) for additional treatment.  Such a denial would controvert the 29 C.F.R. 503 – which expressly forbids claim denials for failure to allow an agent of an insurance company to recommend a course of treatment.

The Code of Federal Regulations states that a long term disability insurance claims procedure may not impose a series of fees as a precondition to being permitted to filing a claim for benefits or submitting an appeal for a denial of benefits under ERISA, 29 C.F.R. 2560.503-1(b)(3).

**Second Episode**    Plaintiff subsequently sought the diagnosis and assistance of a well known specialist in the area of environmental medicine and anaphylaxis.  She went to Dr. William Rea of Dallas, Texas.  Dr. Rea conducted extensive testing under controlled circumstances which is alleged to show that the plaintiff suffered from Anaphylaxis.  Dr. Rea also provided information on the reasons for the differences between his information and that of Dr. Grodofsky.  This information was submitted to the defendant by way of administrative appeal.

Under ERISA, an insurance company is allowed to adjudicate appeals on its claims decisions subject to the requirements spelled out in 29 CFR 2560.503.  In order to have the power to administer appeals against its earlier claims decisions, the defendant is required to conduct a new and independent review of the materials and to conduct such a review in a full and impartial manner.  An insurer is also to offer the claimant information on why new information fails to change the claim status and what might be done to cure defects in the claim.  29 C.F.R. 2560.503-1 (f) (1), Juliano v. Health Maintenance Organization of New Jersey, Inc., 221 F.3d 279, 287 (2d Cir. 2000).

Upon receiving the materials from Dr. Rea, Unum is alleged to have issued an appeals ruling stating that it would not review the materials proffered by the plaintiff on the basis that they originated from a specialist in the area of anaphylaxis and because they differed from that previously offered by Dr. Marshall Grodofsky.  The defendant did not even provide the records of Dr. Grodosky's findings to its "independent" physician.  Plaintiff contends that a failure to even consider additional evidence because it may be different is an express violation of the rules set forth in the Code of Federal Regulations.

The respected Jurist Kimba Wood remarked in an opinion that it is simply not enough for the defendant to communicate that they do not believe the information offered by the plaintiff. The defendant must comply with 29 CFR 2560-503-1(f)(1) and do the following: (1) state specifically what are the shortcomings of the information offered on administrative appeal, (2) provide information to the plaintiff on how to cure any defects found in the new information offered. Denial letters which are vague and incomplete are insufficient.  Dawes v. First Unum Life, 1992 U.S. Dist. LEXIS 17426 (S.D.N.Y. 1992).

**Third Episode**        Plaintiff contends that the defendant did not meet the minimum standards for claims adjudication in this denial.

Plaintiff complained of the response to her first appeal and Unum issued a second appellate decision that stated that Dr. Grodofsky stated that he thought that she thought that she had a condition that she did not claim.  Because of Dr. Grodofsky's suppositions, the plaintiff's claim was denied.

Plaintiff contends that such a reliance on unsubstantiated opinions on an independent medical examiner simply does not arise to full and impartial review of the medical record and violates the express standards of the regulations provided in the 29 CFR 2560-503-1(f)(1).  Plaintiff contends that as is the case in the second denial letter, the third letter so vague as to be legally insufficient as a denial of benefits and an inappropriate basis for denying benefits.  See <u>Dawes</u>, Infra, <u>Cook v New York Times</u>, infra.

**Fourth Episode**     Plaintiff submitted a third appeal to the defendant in which she sought benefits under both tiers of her long term disability insurance plain. Plaintiff submitted a third appeal in which she exhaustively complained of the examination by Dr. Grodofsky. Plaintiff provided more than fifty factual examples which challenged the accuracy of Dr. Grodofsky's findings.  Plaintiff additionally provided a sworn deposition from Dr. Grodofsky gathered in the matter of <u>Neeb v. Royal Carribean Cruise Lines</u>. In this deposition, Dr. Grodofsky stated that he did not utilize the plaintiff's medical record, consider the effects of antihistamines on her reactions, or meaningfully interview the patient.  Dr. Grodofsky stated that his diagnosis was based on little more than intuition and supposition. The defendant refused to consider this appeal what-so-ever on the basis that it had previously reviewed the file.

The defendant asserts a somewhat incongruous position in which it states that the claims for second tier benefits should be denied for a lack of administrative exhaustion, while simultaneously asserting that the information and issues brought forth in this appeal should be excluded for reasons of administrative exhaustion.  Plaintiff contends that the third appeal in its entirety should be considered in this matter and provides further discussion of her position in §9 of this memorandum.

## DEFENDANT'S CLAIMS

The plaintiff was employed as a Clinical Staff Auditor at Danbury Health Systems at its facility, Danbury Hospital, in Danbury, Connecticut.  As an employee of Danbury Health Systems, the plaintiff was covered under a long-term disability policy (the "Policy") administered by defendant Unum.  The Policy is subject to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq.  ("ERISA").

On or about December 7, 1999, the plaintiff claimed to be disabled on account of severe allergic reactions (anaphylaxis) and chemical sensitivities to odors, and sought long term disability benefits under the Policy. Thereafter, plaintiff submitted medical documentation which purportedly supported her claim.  Unum conducted a vocational analysis of plaintiff's position and referred the medical information it had received from

the plaintiff to its medical consultants.   After reviewing all the information in the file and receiving the reports of its consultants, Unum determined that the plaintiff did not establish that she was disabled as defined by the terms and conditions of the Policy. Unum thereafter denied the plaintiff's application for benefits.

Plaintiff pursued her administrative appellate remedies.  Unum provided plaintiff with the opportunity to submit further information in support of her position that she was disabled, and Unum reviewed the additional materials plaintiff and her attorney submitted, along with all the other information in the claim file.  On review, on appeal, and on review of its appellate decision, Unum each time upheld its claim decision.

Unum's liability, if any, to the plaintiff is limited to 24 months of benefits, less setoffs to which it may be entitled by virtue of plaintiff's receipt of Social Security Disability Benefits.

"Disability" under the Policy has two definitions, and the definition changes after a recipient is disabled for more than 24 months.  A claimant is "disabled" during the first 24 months if on account of injury or sickness he/she:

cannot perform each of the material duties of his regular occupation;

After benefits have been paid and received for 24 months, a claimant is "disabled:"

if the insured cannot perform each of the material duties of any gainful occupation for which he is reasonably fitted, taking into consideration training, education or experience, as well as prior earnings.

The plaintiff sought benefits and Unum reviewed her application using the first, "pre-24 month" definition of "disability."  Because the issue of plaintiff's "disability" under the second definition was not presented to the administrator, the court is without jurisdiction to review a claim for benefits beyond the first 24 months of benefits. Peterson v. Continental Casualty Company, 282 F.3d 112, 117-118 (2d Cir. 2002).

Finally, as explained more fully below, the Policy contains language that grants Unum discretionary authority to review the plaintiff's claim and determine her eligibility for benefits.  Hence, this court's review of Unum's administrative determination is under the heightened "abuse of discretion" standard.

**(7)**                                        **Trial by Magistrate**

N/A

**(8)**                                    **Witnesses**

Plaintiff seeks to introduce the following witnesses;

(1)     Dr. William Rea;
(2)     Dr. Robban Sica;
(3)     Dr. Larry Harmon.

The plaintiff notes that the District Court has discretion to consider evidence outside of the administrative record.  Muller v. First Unum Life, *infra* at 125.  The Second Circuit Court of appeals has stated that this discretion should not be used without good cause. Some examples of good cause include: (a) purely factual interpretation; (b) a conflict of interest in the defendant 's interest (such as an obligation to pay the insurance out of its own funds as in the instant matter).  In the event that there is a conflict of interest in the defendant's position, the plaintiff need not prove that this conflict affected her directly. DeFelice v American General Int'l Life Assurance Co., 112 F.3d 61, at 66 (2nd Cir. 1997).

**_Defendants' Witnesses:_**

        As the Defendant set forth in §4 of this Joint Trial Memorandum the plaintiff is not entitled to present any live testimony and the court should limit its review of the plaintiff's claim to the administrative record prepared below.

**(9)**                                    **Exhibits**

**Plaintiff's Exhibits:**

The following exhibits shall be introduced:

(1)     The administrative record;
(2)     The Depositions made in anticipation of the trial of Neeb v. Royal Carribean Cruise Lines – which had previously been sent to the  defendant to included in     the administrative record;
(3)     The occupational assessment of Laura Neeb prepared by Dr. Larry
        Harmon – which had been previously submitted to the defendant to
        Included in the administrative record;
(4)     Plaintiff's third administrative appeal – which had been previously submitted to the defendant to be included in the administrative record;

Plaintiff contends that the court should be allowed to examine the administrative record in its entirety and that it is generally appropriate for the court to consider everything that was submitted to the defendant.  Vega v. Nat'l Life, 188 F.3d 287, at 300. (5th Circuit, 1999).  Defendant's contention that it may shield both itself and the administrative record through an appeals rejection should not be granted.  An administrative record should be considered an on-going process and not a static process and should include information brought on an appeal even after rejection.  Bucci v. Blue Cross, 728 F.Supp 728, at 732 (D. Conn 1991) noting that denial is not a static process in Erisa claims processing but rather a continuing process where the defendant should consider information offered to upon administrative appeal.

The plaintiff further contends that the defendant prepared its administrative appeal denials in such a poor fashion that it may not assert that subsequent appeals are barred.  Burke v. Kodak Ret. Income Plan, 336 F.3d 103, at 108 (2nd Cir 2003) U.S. Supreme Court certiorari denied, Kodak Ret. Income Plan v. Burke, 157 L. Ed. 2d 890, 124 S. Ct. 1046 (U.S. 2004), noting that such bars must be expressly and coherently stated to the defendant with an explanation of the consequences of non-compliance.

Plaintiff contends that the entire administrative record submitted to the defendant and not just a portion of that record should be available for review.

**Defendant's Exhibit List**.

Unum submits that the sole evidence the court may rely upon in its determination of the plaintiff's claim is the administrative record that was before the administrator at the time Unum made its challenged decision.  After Unum initially denied plaintiff's claim, it provided her and her attorney with ample opportunities to supplement the data she and her doctors had provided to Unum and Unum had received on its own.  At the time that plaintiff exhausted her administrative remedies, the administrative record was complete.  Therefore, the court cannot consider plaintiff's proposed exhibits 2 and 3 (AR 591-697) because plaintiff did not present them to the administrator during claims process.

Unum completed its appellate review of plaintiff's claim on May 4, 2001.  At that time, it notified plaintiff and her attorney that she had exhausted all her administrative remedies.  Plaintiff did not provide Unum with its proposed "exhibits" until February 10, 2003, more than 21 months **after** plaintiff completed the claims process. The documents that plaintiff now wishes to present to the court did not play any part in Unum's determination on the plaintiff's claim.  Since the court is in effect sitting as an appellate court reviewing Unum's decision, its review cannot involve any information that was not presented to the administrator during the administrative process.  Larsen

<u>v. The Prudential Insurance Company of America</u>, 151 F.Supp. 2d 167, 172 (D.Conn. 2001).

**(10)   TRIAL TO THE COURT**

**PLAINTIFF'S PROPOSED FINDINGS OF FACT**

| | | Source[1] | UACL |
|---|---|---|---|
| 1. | Between 1988 and 1991, the plaintiff was examined by Dr. Jonathan Bell of Danbury, Connecticut.  During the course of several examinations using a scratch test – Dr. Bell determines that Laura Neeb has allergies to ragweed, dust mites, and maple tree pollen.  Dr. Bell does not test Laura Neeb for allergies to red peppers as a test is not readily commercially available. | Unum Doc 235821 <br><br> Pps 153-183, <br><br> Test results <br> 188-190 | 160-190, 153-155 |
| | Dr. Bell treats Ms. Neeb for her asthma and allergies until 1999. | | |
| 2. | In 1991, Laura Neeb has problems with her asthma that Dr. Bell links to ragweed allergies.  Dr. Bell prescribes a program of dust avoidance and recommends that Ms. Neeb use a Hepa Filter | Unum Doc 235821 <br><br> Pps 164-166 | 177-179 |
| 3 | In 1993, Laura Neeb has further problems with breathing which are attributed to her asthma.  Upon Dr. Bell's recommendation, Laura Neeb  is granted a parking spot in the garage at Danbury Hospital to avoid allergens | Unum Doc 235821 <br><br> p. 175 | 168 |

---

[1]  The plaintiff has received the administrative record in documents numbered as Unum Legal Department Document Number 235821 and Unum Legal Department 235837.  This column refers to the pagination used in those documents

[2]  The plaintiff has also noted that there is a numbering scheme noted as "UACL" which seems to approximate the numbering that the defendant is calling "administrative record".

| | | | |
|---|---|---|---|
| 4 | In November 1996, Dr. Alexis Gopal finds acutely exacerbated asthmatic conditions in Laura Neeb. Dr. Gopal begins to treat Ms. Neeb with significantly stronger medications and with the steroid prednisone | Submitted to Unum with the 3rd appeal. | Withheld By defendant |
| 5 | On July 4, 1998, the plaintiff became itchy and flushed while cutting red peppers with a friend. This is subsequently diagnosed as the first episode of anaphylaxis based on red peppers. | Unum Doc 235821 p. 239 | 105 |
| 6 | On July 9, 1998, the plaintiff ate a salad that had been garnished with red peppers. She experiences the following conditions: Flushing of the skin; chest tightening; shortness of breath; and light-headedness. She self administers proventil and benedryl and seeks treatment in the emergency room. | Unum Doc 235821 p. 11 | 332 |
| 7 | On July 9, 1998, the plaintiff is treated in the Emergency Room at Danbury Hospital. A diagnosis of allergic reaction to red peppers is given by Dr. Patrick Broderick, MD. | Unum Doc 235821 p. 64 Unum Doc 235837 p. 432 | 279, 353 |
| 8 | On July 17th, 1998 Dr Jonathan Bell examines the plaintiff and finds that she is suffering from an allergy to Red Peppers that has persisted for a long period of time, which has affected her asthma | Unum Doc 235821 Pps 184-187 | 156-159 |
| 9 | On August 11th, 1998 the plaintiff experiences another reaction to exposure to red peppers. She self administers benedryl. | Unum Doc 235821 p. 7, 25 | 336, 319 |
| 10 | On August 13th,1998, the plaintiff experiences chest tightening after a jar of red peppers is opened in her presence. She self administers benedryl | Unum Doc 235821 p. 25 | 319 |
| 11 | On September 1, 1998, the plaintiff is examined by Dr. Cabral of the Danbury Hospital for her chest tightness. She is given an echo-cardiogram | Unum Doc 235821 p. 148 | 195 |

| | | | |
|---|---|---|---|
| 12 | On March 13, 1999 the plaintiff and her husband Robert embark on a cruise aboard the ship, *Rhapsody of the Seas*. She has numerous allergic reactions to red peppers and is treated in the ship's infirmary for 3 anaphylactic shocks between March 14-18, 1999. The anaphylactic shock episode of March 16 and March 18 require intravenous medication and an overnight stay in the ship's infirmary. | Unum Doc 235821<br><br>p. 157 | 186 |
| 13 | On March 22, 1999, the plaintiff visits her allergist, Dr. Bell of Danbury Connecticut. Dr. Bell diagnosis is anaphylactic shock brought on by exposure to red peppers and an exacerbation of the plaintiff's asthma. | Unum Doc 235821<br><br>p. 155-158 | 185-188 |
| 14 | On March 24, 1999 the plaintiff telephones, Dr Bell complaining of chest tightening and hoarseness. Dr. Bell prescribes the anti-histimines Claritin and Benedryl. Dr. Bell also sends the plaintiff a pamphlet on food avoidance | Unum Doc 235821<br><br>p. 155 | 185 |
| 15 | On May 3, 1999, the plaintiff is extensively tested and examined by Dr. William Johns and Dr. Cabral of the Danbury Hospital Cardiology Department and her results are further examined by Dr. David Copen of the Yale University Hospital. The plaintiff is found not to have any heart ailments but food allergies are listed as a secondary diagnosis for her chest tightness problem. | Unum Doc 235821<br><br>Pps 101-145 | 202-246 |
| 16 | On July 9, 1999 the plaintiff is treated by Dr. Patrick Broderick of the Danbury Hospital Emergency Medical Department. She is admitted to the hospital after being exposed to red pepper. She is diagnosed with anaphylaxis brought on by exposure to red peppers | Unum Doc 235821<br><br>p. 80-81 | 262-263 |
| 17 | On September 17, 1999 the plaintiff becomes hoarse and experiences throat tightening when exposed to red peppers | Unum Doc 235821<br><br>p. 26 | 317 |
| 18 | On September 30, 1999, the plaintiff experiences throat tightening, hoarseness and lumps while in the cafeteria at Danbury Hospital | Unum Doc 235821<br><br>p. 26 | 317 |
| 19 | On October 19, 1999, the plaintiff experiences an allergic reaction to cooking odors coming from the hospital cafeteria located below her office – she is obliged to leave work | Unum Doc 235821<br><br>p. 26 | 317 |

| 20 | On October 26, 1999, the plaintiff experiences an allergic reaction to cooking odors emanating from the hospital cafeteria located below her office – she is obliged to leave work | Unum Doc 235821<br><br>p. 26 | 317 |
| 21 | On October 27, 1999, the plaintiff asks her supervisor Mark Moreau to work at home as a result of problems that she has been having with the cooking odors emanating from the hospital cafeteria. | Unum Doc 235821<br><br>p. 26 | 317 |
| 22 | On October 28, 1999 the plaintiff is treated in the emergency room at Hartford Hospital after being exposed to red peppers. | Unum Doc 235821<br><br>p. 10 | 333 |
| 23 | On October 29, 1999 the plaintiff contacts her allergist Dr. Bell and requests to see Dr. Adrianne Buffaloe, MD in New York.  Dr.  Bell notes the call in his files and a subsequent call that he receives from the Danbury Hospital protesting that Dr. Buffaloe is out of network and her fees will not be paid by the hospital | Unum Doc 235821<br><br>p. 154 | 189 |
| 24 | Dr. Buffaloe's file is not in the administrative record.  There are references to the file being present and under review – when the plaintiff called to inquire if her file was complete – she was informed that the file was under review.  It is unclear if the file was lost, not included, or unavailable. | Unum Doc 235837<br><br>p. 423 | 362 |
| 25 | The plaintiff is examined by Marshall Grodofsky of Connecticut Allergy in West Hartford, Connecticut on November 17, 1999. | Unum Doc 235821<br><br>p. 215<br><br>Unum Doc 235837<br><br>p. 160 | 128, 625 |
| 26 | Dr. Grodofsky interviews the plaintiff very quickly and records notes of approximately 45 words | Unum Doc 235821<br><br>p. 218 | 125 |

12

| | | |
|---|---|---|
| 27 | Dr. Grodofsky performs his assessment of the plaintiff without inquiring as to whether or not the plaintiff is taking medication such as anti-histimines which are known to alter scratch test results. | Unum Doc 611, 125 235837 174 Unum Doc 235821 218 |
| 28 | Dr. Grodofsky did use any prior medical history in preparing his opinion and diagnosis | Unum Doc 613-617 235837 p. 169-172 |
| 29 | Dr. Grodofsky did not test the plaintiff for an allergy to red peppers in his office | Unum Doc 608 235837 p. 177 |
| 30 | Dr. Grodofsky took a blood sample to use for a modified Rast Test | Unum Doc 608 235837 p. 177 |
| 31 | Dr. Grodofsky ordered a Blood test for Allergies (Modified RAST test) for the following items:<br>- Shrimp<br>- Tomato<br>- Potato<br>- Cayenne Pepper<br>- Green Pepper<br><br>Dr. Grodofsky neither sought nor received a blood test for an allergic reaction to red peppers | Unum Doc 130 235821 p. 213 |
| 32 | Dr. Grodofsky stated that he sent the plaintiff's blood sample for testing at the Medical Center of Virginia in Richmond Virginia on December 9, 1999 | Unum Doc 634 235837 p. 151 |

13

| 33 | Dr. Grodofsky received a receipt for a sample of the plaintiff blood to be tested with a RAST assay from the Medical Center of Virginia on December 9, 1999 | Unum Doc 129 235821 p. 214 |
| 34 | On December 8, 1999 – Dr. Grodofsky received the results of a modified RAST test from a lab in suburban Washington DC. Dr. Grodofsky received the results from a different lab before he sent out the sample of the plaintiff's blood | Unum Doc 130 235821 p. 213 |
| 35 | On appeal, the plaintiff protested the use of any form of *MODIFIED* RAST as they have been deemed unreliable by British Authorities and have been strongly criticized by British Authorities | Unum Doc 685 235837 p. 100 |
| 36 | Plaintiff leaves Dr. Grodofsky's office without paying for the appointment from her own funds after Grodofsky demands to treat the patient rather than merely render a second opinion as had been the original arrangement. Dr. Grodofsky is out of network for the plaintiff's health plan. The appointment is approximately 45 minutes long | Unum Doc 625-628 235837 pps 160-163 |
| 37 | Dr. Grodofsky renders an opinion on his visit without the plaintiff. Despite the fact, that Dr. Grodofsky has neither tested the defendant for her allergic reaction nor availed himself of any medical history, | Unum Doc 133-137 235821 Pps 207-210 |
| 38 | Dr. Grodofsky states that he "possibly" regarded this opinion as irrelevant | Unum Doc 617 235837 p. 168 |
| 39 | On December 7th, 1999, the plaintiff takes a three month leave of absence from her employment at Danbury Hospital citing her recent allergic episodes. This date is listed on her application as the date of her initial disability | Unum Doc 3 235821 p. 339 |
| 40 | On January 4th, 2000 the defendant is examined by Dr. Robban Sica a medical doctor, practicing in the area of environmental medicine. Dr. Sica performs extensive tests on the plaintiff in the hopes of finding multiple chemical sensitivity disorder but instead finds elevated IgE levels characteristic of allergy. | Unum Doc 24 235821 p. 319 |

| | | | |
|---|---|---|---|
| 41 | On February 10, 2000, Romulo Salazar of the Danbury Health Systems files a claim for long term disability insurance with Unum on behalf of the plaintiff, Laura Neeb. | Unum Doc 235821 P. 341 | 2 |
| 42 | Danbury Hospital submits a description of Laura Neeb's duties which require her to perform her functions at Danbury Hospital. Mark Moreau who is the plaintiff's supervisor at the hospital states that it would be unable to make work place accommodations to her condition. | Unum Doc # 235821 P. 339 | 4 |
| 43 | Defendant performs an occupational assessment of the plaintiff's position as a clinical nurse auditor at Danbury Hospital. Defendant finds that the plaintiff's position involves significant pulling and lifting with weights in excess of twenty pounds.

The Defendant's occupational assessment through its description of duties "pulling cart in medical records department" suggests that the job must be performed at Danbury Hospital | Unum Doc # 235821 P. 338, pps 306-311 | 5, 32-37 |
| 44 | Dr. Sica's materials are examined by Unum Employee Jeanne Flaherty and not by an RN named Aliberti. Ms. Flaherty throughout the administrative record is referred to as a "Senior Disability Benefits Specialist" and appears to not possess any title indicating medical training. Despite any apparent training in reading medical information, Ms. Flaherty makes repeated references to the word "chemical" and appears to be attempting to turn the claim into a matter of multiple chemical sensitivity disorder rather than anaphylaxis. Further clarification is sought. | Unum Doc 235821 p. 312-313 | 29-30 |
| 45 | Jeanne Flaherty speaks with Romulo Salazar of Danbury Hospital foundation and is informed that Mr. Salazar believes that the plaintiff may be away from work for a period of a year. | Unum Doc 235821 p. 312 | 30 |
| 46 | On February 23, 2000 the plaintiff is hospitalized at the Lower Keys Hospital in Key West, Florida. She is examined by Dr. Roger Stratt. She has self administered Anti-Histimines with an epipen | | |

| | | |
|---|---|---|
| 47 | April 11, 2000 – Unum employee Shannon Haskell notifies the plaintiff that she will be the new Senior Disability Benefits Specialist for her claim | Unum Doc 235837<br><br>p. 442 | 343 |
| 48 | On May 10th, 2000, Dr. Grodofsky was faxed materials by Unum. Dr. Grodofsky was given responsibility for "objectively" analyzing this information | Unum Doc 235837<br><br>P 15 | 767 |
| 49 | On May 24th, 2000 Unum had a "roundtable" discussion of the plaintiff's claim where it was determined that because she did not see Unum's Doctor for a continuing course of treatment that she should be denied disability benefits.  "Phone call to Dr. Grodofsky confirms that he was not supportive of disability"<br><br>There is neither record of whom attended this conference nor any other information other than a call was made to Grodofsky | Unum Doc 235837<br><br>p. 17,398 | 768, 387 |
| 50 | On June 23rd a second roundtable was held without any indication of whom was to attend.  The narrative content was "date last payment made – none" and "need to make claim decision"  no other information from this roundtable discussion seems to have been recorded | Unum Doc 235837<br><br>p.395, 392 | 390, 393 |
| 51 | On July 1, 2000 Unum's Senior Disability Specialist Shannon Haskell telephoned Romulo Salazar of the Danbury Hospital to inform him that no evidence existed to support Ms. Neeb's claim and to tell him that she would not be available for his calls since she would be out of the office.  She got a message that said a cell phone was down and did not pursue the matter further | Unum Doc 235837<br><br>p. 390, 388 | 395, 397 |
| 52 | On July 1, 2000 a letter of denial is written by Senior Disability Specialist Shannon Haskell stating that the plaintiff is to be denied benefits because she has not pursued a course of treatment at her own expense under the direction of Dr. Grodofsky.  Dr. Grodofsky is listed as a physician in the employment of Unum | Unum Doc 235837<br><br>Pps 384-387 | 398-401 |

| 53 | On July 3, 2000 – Unum's Senior Disability Specialist received a review of her letter of July 1st in which she denied the plaintiff's benefits.  Ms. Labonte is apparently, also, not a licensed Medical Professional but some sort of supervisor to Shannon Haskell. A dialogue takes place as to how best to bolster the authority of the opinion by referring to the Doctor of Record's (Dr. McBride) specialty – which is known to neither.  After a third individual named "janio" is consulted it is determined that Dr. McBride specializes in occupational medicine not environmental medicine. | Unum Doc  402 235837<br><br>p. 383 |
|---|---|---|
| | Sharon Labonte then "oks" the rejection letter | |
| | Labonte instructs Haskell to ignore data from Dr. Rea in Texas as it was prepared after the time of the plaintiff's application for long term disability benefits. | |
| 54 | On July 7, 2000 Shannon Haskell states in her notes that "she is not a medical expert" and she must rely upon medical doctors. | Unum Doc  409 235837 |
| | Upon receiving a request from the plaintiff to examine the files sent to UNUM by Rea in Texas, Haskell informs the plaintiff that UNUM did not have these files (which was true as these files had been earmarked for Dr. Grodofsky's  review) | p. 376 |
| | Haskell requests that the plaintiff provide UNUM with another copy of Dr. Rea's medical data at great expense ($2 per page) or face the loss of her appeal | |
| 55 | Plaintiff hires Law Firm Febrello & Conti of Torrington Connecticut and requests that a copy of the administrative record be sent to her lawyers. | Unum Doc  412 235837<br><br>p. 373 |

| | | | |
|---|---|---|---|
| 56 | On August 21, 2000 Unum finds its copy of Dr. Rea's Data and a copy is sent to the plaintiff.  Dr. Rea's data has specific tests for red peppers and is done with the assistance of prior medical history, complete and thorough interviewing over the course of three weeks and the tests are done in control circumstances.  Dr. Rea finds that the plaintiff is suffering from an anaphylactic reaction to exposure to red peppers. | Unum Doc 235837<br><br>Pps 267-371<br><br>Opinion Letter<br><br>231-233 | 414-517, 552-554 |
| 57 | On September 26, 2000 the plaintiff formally requests an appeal to her claim and formally seeks to introduce the material provided by Dr. Rea.  She also requests that the materials offered from her 3 emergency room visits, and Dr. Sica also be reviewed. | Unum Doc 235837<br><br>225-230 | 555-560 |
| 58 | On October 2, 2000 Unum's Senior Disability Benefits Specialist Shannon Haskell acknowledges that she has received the plaintiff's request for an appeal | 224 | 561 |

| | | |
|---|---|---|
| 59 | On October 18, 2000 Unum hires a physician to "independently" review the data offered by Dr. Rea.  Dr. Broda is not given and thus does not read the materials relied upon by Unum from Dr. Grodofsky.  As a result, Dr. Broda does not know that Dr Grodofsky did not: | Unum Doc 235837 <br><br> Pps 221 - 222 <br><br> 563-564 |

-utilize any medical history in preparing his work;

- that Dr. Grodofsky had lost control of the blood control samples used in his blood test and received his results prior to shipping out the serum sample;

- that Dr Grodofsky utilized a test that has been outlawed in Great Britain and even strongly criticized by Unum;

- that Dr. Grodofsky did not adjust his tests for medications used by the plaintiff;

-that Dr. Grodofsky had not been paid for his work and regarded his work product as irrelevant and meaningless at the time it was prepared

- that Dr. Grodofsky never tested the plaintiff for an allergy to red peppers

Based on information that Unum said orally that it possessed, Dr. Broda stated that he did not believe that the Dr. Rea's data could overturn whatever information the defendant claimed to possess. Dr Broda's examination was incomplete because it did not examine the entire file but only the data offered by the plaintiff from Dr. Rea.  By accepting Dr. McBride's oral statement at face value, Dr. Broda failed to perform and examination that was either independed

| | | |
|---|---|---|
| 60 | Unum issues its first administrative appeals rejection letter.  The letter is written by Shannon Haskell who now hold the title of lead customer care specialist.  It offers no advice on how the defendant may improve her information other than to repeat the demand that Dr Grodofsky, a physician in Unum's employment be allowed to treat the defendant at her own expense | Unum Doc 235837 <br><br> 217-220 <br><br> 565-568 |
| 61 | November 7, 2000 Shannon Haskell sends her letter to Sharon Labonte for approval. | Unum Doc 235837 <br><br> p. 217 <br><br> 568 |

| | | | |
|---|---|---|---|
| 62 | November 14, 2000 Plaintiff requests a second appeal and receives a letter from Sandy Kaszerman, Lead Appeals Specialist, acknowledging her request | Unum Doc 235837 p. 214 | 571 |
| 63 | On January 22, 2001 Sandy Kaszerman, Lead Appeals Specialist for Unum issues a second administrative appeals denial.  No supporting analysis of any kind is recorded in the administrative record.  In this denial, Kaszerman repeats the demand the plaintiff undergo treatment at the direction of Marshall Grodofsky, offers no notice on how to cure the plaintiff's condition and he introduces a new theory of the defendant's illness as a grounds for denial even though this theory is both unsubstantiated and not at issue in the claim | Unum Doc 235837 p. 199 - 201 | 584-586 |
| 64 | On September 26, 2002, the Law Offices of Michael Tobin submit an occupational assessment of Laura Neeb's employability to the defendant for inclusion in the administrative record. | Unum Doc 235837 p. 132 | 563 |
| 65 | On February 13, 2003 Unum receives a third appeal and a copy of a deposition from Marshall Grodofsky, in which Grodofsky confesses to his sloppy work product.  The plaintiff brings up numerous new grounds for challenging the defendants previous rulings | Unum Doc 235837 88-114 | 671-697 |
| 66 | On February 28, 2003 Lead Appeals Specialist Sandy Kaszerman issues a letter to the third appeal stating that he considers the matter closed and administratively exhausted | Unum Doc 235837 87 | 698 |

## PLAINTIFF'S PROPOSED APPLICATIONS OF FACT AND LAW

1    The plaintiff argues that this claim is governed under the Employee Retirement Income Security Act of 1974 (ERISA) 29 U.S.C. 1165 (a) (1) (b).

2    Under §502(a)(1)(b) of ERISA, the plaintiff may bring an action in a federal court to seek payment of disability insurance

3    Claimant submitted her claim to the UNUM Life Insurance Company of America on February 29, 2000.  Claimant sought long-term disability coverage as the result of a series of episodes of anaphylaxis brought on by exposure to red peppers.

4    The plaintiff contends that under ERISA, Congress has authorized
     the Secretary of Labor to promulgate regulations governing the
     administration of benefits such as the ones sought in the instant
     matter.

5    The regulations governing the processing of a long-term disability
     insurance claim are found in the Code of Federal Regulations at 29
     CFR 2560.503.

6    Failure to comply with the Regulations governing claims for
     Welfare Benefits due under ERISA is significant and should result
     in a verdict for the plaintiff if shown to be true. <u>Cook v. N.Y. Times
     Co. Group Long Term Disability Plan,</u> 2004 U.S. Dist. LEXIS
     1259  (S.D.N.Y. January 27, 2004).

7    The Regulations found at 29 CFR 2560.503 prohibit the following
     conduct in processing long-term disability insurance claims

     - an insurer may not demand a series of treatments or fees under the
     defendant's direction at a claimants expense as a threshold
     condition to awarding a claim for Long Term Disability Insurance
     29 C.F.R. 2560.503(b)(3)

8    That Marshall Grodofsky was a physician in the employment of the          400
     defendant (UACL 400) and that any program of treatment directed
     by Marshall Grodofsky was also under the defendant's supervision

9    That the defendant specifically denied the plaintiff the benefit of       400
     payment of her long-term disability for failing to pursue a course of
     treatment at the direction of a physician (Marshall Grodofsky) in
     the defendant's employment.  This denial occurred in the original
     denial of benefits and is specifically stated in the initial request for
     benefits (UACL 400)

10   In the plaintiff's 1st administrative appeal  that she is again denied     566
     benefits for failing to submit to a series of treatments at her own
     expense under the direction of the defendant's employee. Marshall
     Grodofsky (UACL 566).

11   In the plaintiff's second administrative appeal that she is denied         580
     benefits for failing to seek a course of treatments at her own
     expense at the direction of a physician (Marshall Grodofsky) in the
     defendants employment (UACL 580)

12    In the plaintiff's third appeal in which she alerted the defendant          698
      was seeking to direct a series of treatments in contravention to the
      requirements of the rules found in the code of federal regulations at
      29 CFR 2560.503-1(b)(3) – that the defendant simply chose not to
      read the appeal at all (UACL 698)

13    On three separate occasions, the defendant demanded a course of
      additional treatments at the plaintiff's expense under the direction
      of a physician controlled by the defendant.  That such conduct was
      in violation of the regulations established in 29 CFR 2560.503-
      1(b)(3).

14    A plaintiff may appeal a denial of long term disability benefits with
      new medical evidence. 29 CFR 2560.503-1(f)(1)

15    That upon receiving new medical evidence on an appeal to a denial
      of long term disability benefit claims under 29 CFR 2560.503-
      1(f)(1)  that the defendant must provide for a review that has the
      following characteristics:

      (1) it is conducted independently;
      (2) it reviews all of the medical evidence in the case

16    That upon the plaintiff's first appeal that the examination of the file          564
      by Dr. Lawrence Broda was incomplete because Dr. Broda was not
      provided the files relied upon for the rejection of benefits. (UACL
      564).  Because Dr. Broda does not receive access to the entire files
      he does not see the inadequacy of Marshall Grodofsky's diagnosis.
      Dr. Broda's examination of the new evidence is incomplete

17    Dr. Broda receives oral direction from the defendant as to the          564
      nature of the information available.  Dr. Broda also receives
      direction on the expected result of his examination and his
      examination is not independent.

18    The defendant's use of Dr. Broda for a review of the new
      information provided by the defendant was neither independent or
      complete and is not in compliance with the standards of review
      required in the code of federal regulations

19    The defendant did not independently review the file at all on the
      second and third administrative appeals

20    The defendant did not meet its obligation to provide for
      independent, thorough, and complete review of the plaintiff's
      appeals upon the introduction of new medical evidence under 29
      CFR 2560.503

21    Should the defendant choose to reject the defendant's administrative appeals it most provide a more substantial basis for the denial other than to say "I don't believe you".  It must provide objective proof of its position. The defendant must also offer advice on how the defendant may cure defects in the new information provided <u>Dawes v. First Unum Life</u>, 1992 U.S. Dist. LEXIS 17426 (S.D.N.Y. 1992) ,<u>Cook v. New York Times</u>, *infra*.

22    In its rejection of her first appeal, Unum states that it does not believe evidence offered by the plaintiff because it originates with a specialist "with a large practice". (UACL 565-567).  No specific or objective reason is stated for the denial of benefits and no information is provided on how the defendant may cure deficiencies in the evidence provided                    565-567

23    In its second denial, the defendant states the plaintiff states that it does not believe the plaintiff more profoundly by stating that the plaintiff should seek psychiatric help. (UACL 580)  The defendant then fails to offer an further objective basis on which the defendant is denying the claim. No information is provided on how the defendant may cure deficiencies in the evidence provided                    580

24    The Code of Federal Regulations imposes a duty of consistency on the defendant in the way it requires proof. 29 C.F.R. 2560.503(b)(5).

25    UNUM rejects the nearly 100 pages of test data in favor of the information offered by Dr. Grodofsky even though the evidence offered by Dr. Grodofsky is far weaker and suffers from the following specific objections on the plaintiff's third administrative appeal  Dr. Grodofsky's deposition reveals the following defects with Dr. Grodofsky's file:                    615-647

      1.  Dr. Grodofsky never availed himself of the plaintiff's medical history

      2. Dr. Grodofsky did not talk to the plaintiff in any great detail

      3. Dr. Grodofsky "possibly regarded" his opinion as irrelevant

      4. That Dr. Grodofsky did not test the plaintiff in his office for an allergy to red peppers.

26    Review of information provided by Dr. Grodofsky shows that Dr. Grodofsky never used a blood test for Red Peppers                    130

| | | |
|---|---|---|
| 27 | A review of the dates that information was logged in Dr. Grodofsky's records shows that Dr. Grodofsky probably lost control of the plaintiff's blood samples – as he shows that he received results from his tests prior to sending out the samples | 128-131 |
| 28 | Plaintiff contends that Dr. Grodofsky's information was so weak that to use it to refute the well documented evidence offered by Dr. Rea was an inconsistent treatment of information and was in violation of the regulations governing the processing of Long Term Disability Claims and Appeals. | |
| 29 | The plaintiff believes that it shows enough violations of the code of federal regulations standards to warrant court review. | |
| 30 | Upon reviewing the materials presented, the court finds that a review of the administrative record in its entirety is justified | |
| 31 | Upon the courts thorough review, it is found that the defendant did not process the plaintiffs information and the court finds for the plaintiff | |

## DEFENDANT'S PROPOSED FINDINGS OF FACT

Source[3]

| | | |
|---|---|---|
| 1. | On February 10, 2000, plaintiff's employer, Danbury Health Systems, ("DHS") filed a claim with Unum for long term disability benefits on plaintiff's behalf. | 002 |
| 2. | In its application, DHS described plaintiff's position as a Clinical Staff Auditor.  That position required a RN certification with 4 years clinical/nursing experience, and its duties involved working with medical records, comparing them to billed information/codes. The primary function of her position was to perform and report compliance audit results.  The physical requirements of plaintiff's position were sedentary. | 003-05 |

---

[3]  Numerical references are to the Administrative Record Unum compiled during the plaintiff's application for benefits under the Policy.

3.   Robban A. Sica, M.D. had been treating plaintiff since December 28,    023-024
     1999.  Sica provided a Physician's Disability Statement to Unum that
     described plaintiff's symptoms as dypsena, shortness of breath;
     hoarseness; severe allergic reactions (anaphylaxis) and chemical
     sensitivities.   She stated,  "Chemical odors at work intolerable to
     patient due to exacerbation of above symptoms.....Treatment =
     replacement of thyroid deficiencies, reduction of allergens/chemical
     exposure & eventual desensitization....Patient should not be exposed
     to inhalants and volatile chemical odors."

4.   Along with Disability Statement, Dr. Sica sent Unum his office visit    014-20
     notes from 12/28/99 through 2/1/00.  Those notes indicate plaintiff
     was "anxious," but "needed less sleep since on thyroid [medication].
     Her lungs were clear; she had normal heart rhythm; and her
     musculoskeletal system was "grossly w[ithin] normal] l[imits].  On
     January 1, 2000, he noted that her "allergies [were] improving."

5.   Plaintiff provided Unum with an Employee's Disability Statement in     025-26
     which she described her condition.  In it, she indicated that although
     she had been suffering from allergic reactions for some time, her
     allergic reactions, shortness of breath and fatigue had increased.
     since September 1999.

     Plaintiff also identified the physicians with whom she had treated and
     the dates of her treatment, as follows: Elyssa Harte ND 4/99 - 11/99;
     Andrenne Buffaloe 11/8/99; Robban Sica, M.D. 12/28/99 - date;
     Marshall Grodofsky 11/29/99

6.   Unum performed its first medical review of the plaintiff's claim on     030
     February 21, 2000.  Florence Aliberti, RN, noted "claimant had
     symptoms of dyspnea, S[hortness] O[f] B[reath], hoarseness, severe
     allergic reactions (Anaphylaxis) and chemical sensitivities which were
     exacerbated in 9/99.  A[ttending] P[hysician] reports the chemical
     odors at work intolerable to patient due to exacerbation of above
     symptoms."  T[reatment] plan includes replacement of adrenal and
     thyroid deficiencies, reduction of allergens/chemical exposure &
     eventual desensitation [sic]."  Aliberti noted that Dr. Sica had imposed
     restrictions and limitations of" no exposure to inhalants & volatile
     chemical odors" and commented that those restrictions and limitations
     "[N]eed further clarification."

7.    On February 24, Jeanne Flaherty, a Disability Benefit Specialist,    031
      spoke with Romulo Salazar of DHS' Human Resources Department.
      Salazar indicated plaintiff had a tentative return to work date of March
      20, 2000, was not aware of plaintiff's complaints of chemical odors,
      and indicated that plaintiff requested a leave of absence.

8.    Flaherty obtained descriptions of the regular and material functions of    032-36
      plaintiff's job from the Department of Labor's Dictionary of
      Occupational Titles.

9.    On February 25, 2000, Flaherty requested that Bruce Hoffman, a    038
      Certified Rehabilitation Counselor, perform a review of plaintiff's
      employment position.  Doing so, Hoffman stated that plaintiff's
      position was of sedentary to medium physical capacity, requiring
      lifting/carrying up to 10 pounds.  He provided Flaherty with a tentative
      opinion that plaintiff could complete the material sedentary duties of
      alternative nursing occupations.

10.  On February 28, 2000, Flaherty spoke directly with plaintiff about her        042-048
     condition and its history.  Plaintiff told Flaherty that she was suing a
     cruise line because it had repeatedly served her food that brought
     about allergic reactions even after she informed the line about her
     claimed allergies.

     Plaintiff also described to Flaherty the events that led to her leaving
     her employment with DHS.  She claimed that in September, 1999 she
     changed her office to one that previously had been a smoking lounge.
     She believed that she could still smell smoke in room, and that
     exacerbated her allergies "because tobacco is a pepper family
     member."   After she moved her office, she went home "several
     times" because she could smell odors from the hospital kitchen, got
     hives and shortness of breath, even though her office was "several
     floors" above the hospital kitchen.

     Plaintiff also stated that she was out of work all of November 1999,
     returned to work on November 29, but struggled the whole week with
     fatigue.  On December 6, 1999 she went to the hospital cafeteria for a
     bagel and started itching all over.  She never returned to work.

     Plaintiff contended that now, she "can't go any place where there is
     cooking.  Odors send her into anaphylactic reaction....Had a reaction
     last week in Florida walking outside a restaurant."

     Plaintiff described her primary care physician, Dr: Robban Sica, as
     someone who "believes in homeopathic remedies" and told Flaherty
     that she "will be disabled for many years."

11.  On February 29, 2000, Flaherty requested plaintiff's medical records        051-52
     from all plaintiff's physicians.

12.  On March 6, 2000, plaintiff told Unum that she recently had suffered         056-57
     another allergic reaction, this time at the grocery store, because of an
     "aroma in the air."

13.  Unum received Dr. Sica's treatment records.  They were the same as          65-79
     those initially submitted with the plaintiff's claim.

14.  On March 22, 2000, plaintiff told Flaherty that she was going to Texas       83
     to be treated by Dr. William Rea of the Environmental Health Center
     in Dallas.  Plaintiff said that the testing alone will be 3 weeks.

27

15.    Elizabeth Harte, a naturopathic doctor, provided Unum with her notes  87-104
of the plaintiff's treatment.

16.    Marshall Grodofsky, M.D., of the Connecticut Asthma and Allergy  110-11
Center, LLC, provided his notes and records of plaintiff's treatment.

In his notes, he wrote:

> 6 episodes of anaphylaxis after eating "peppers." Initial
> reaction following red pepper handling. Acute hives and
> respiratory problems.... Seen by Jonathan Bell....Spells of
> bronchospasm helped by Albuterol....4 days after initial event
> served salad with red peppers - acute breathing difficulty and
> anaphylaxis w/ decreased BP. Benadryl + steroid &
> adrenaline. Started course of steroids.... 8 months later took
> cruise had anaphylactic reaction after eating steak marinated
> with peppers and 2nd reaction following hot dog ingestion.
> Difficulty breathing. 3rd episode ate shrimp, steak and
> potatoes. Reaction last June had anaphylactic reaction
> following shrimp. 2 weeks ago reaction following breathing
> peppers. Anaphylaxis again...

> In September changed office complaining of fresh paint and
> odors. More frequent spells of mouth lesions plus throat
> discomfort. These spells have been linked to pepper exposure.
> Recently cutting tomatoes...associated skin reaction. Itching in
> mouth and skin history after eating potatoes. Peak/Flow metes
> measurement 350-500.

17.    Dr. Grodofsky took samples of plaintiff's blood for laboratory analysis  112
of beta Tryptase levels, a measure of mast cell activation which is, in
turn, an indicator of a recent anaphylactic reaction. When he received
the results of the analysis, Dr. Grodofsky wrote on the report, "these
are normal results."

18.   Dr. Grodofsky also provided Unum with a report he issued to Alexis      117-20
      Gopal, M.D. of DHS.   In that report, Dr. Grodofsky wrote:

> I evaluated Laura Neeb....at the request of Dr. Gottlieb, the
> Medical Director for Foundation Medical Insurance for the
> employees at Danbury Hospital....[she] reports a long history of
> environmental intolerance...seasonal allergy symptoms and
> mild asthma symptoms in the past that motivated her
> evaluation by Dr. Jonathan Bell and Dr. Jeffrey Miller. She had
> worked in [their] office before starting work at Danbury
> Hospital.
>
> The initial episode [of anaphylaxis] occurred in March 1998.
> She was served some red peppers and developed some hives
> and respiratory distress and was treated with antihistamines
> and albuterol spray which she had for her asthma.  Four days
> later, she ate a salad that had red peppers in it and had more
> severe distress with drop in blood pressure requiring an
> emergency room visit.
>
> She, unfortunately, took a cruise and on this cruise was
> exposed to the ingestion of peppers with steak and peppers in
> her food on three separate occasions leading to severe
> anaphylactic reactions.  She reports a reaction following
> ingesting of a hotdog and a reaction after ingestion of shrimp.
> She feels that the reaction might have been triggered by
> inhalant exposure to pepper antigen from cooking of food on
> the ship. Recently,  reactions occurred with inhalant exposure
> to cooking peppers where she feels that she had difficulty
> breathing and swelling apparently associated with exposure to
> the fumes of the peppers at a conference event where she ate
> no food.

It is difficult to quantify the frequency of these "allergy spells" with the complaints of mouth inflammation because it does not appear to be documented by physicians and again there was some inconsistency in history in figuring out whether there is a specific trigger that seems to set off the reaction although Mrs. Neeb reports significant chemical sensitivity with a variety of fumes causing dramatic irritation and discomfort for her.

She was referred in to see us to try and clarify the extent of the... reactions particularly in light of the multiple episodes of anaphylaxis.

On exam I found her to be a perfectly healthy- appearing adult in no distress....she had clear chest findings with no sign of airway inflammation and no wheezing or lung consolidation.

Pulmonary function tests done in the office showed a vital capacity of 112% predicted, an FEV1 of 111% predicted, and an FEF 25-75 of 100 % predicted with a flow volume loop that really showed no evidence of any airflow obstruction. We later repeated her [spirometry tests] during the visit because she started complaining of mouth swelling although I was not able to notice any observable change in her lips or tongue and the lung function tests were essentially unchanged with an increase in the FEF 25-75 to 107% predicted.

Scratch testing was done of a variety of inhalant and food allergens. Skin tests showed reaction to ragweed pollen only. Skin test to tomatoes, potatoes, milk, egg, wheat, corn, soy, peanut, brazil nut, almond, shrimp, lobster and scallops were all unreactive arguing against a IgE-mediated reactivity to these specific food antigens.

My impressions after reviewing the history is that it is clear that Mrs. Neeb is quite anxious about these recurring spells. The apparent spells of anaphylaxis have not been clearly defined or explained...The history of recurrent reactivity, though, suggested to me the possibility of a non-IgE-mediated mechanism....I requested that blood be drawn and sent...to measure [the] chemical ...released ...after anaphylactic triggering.

A peak flow meter was recommended and I  recommended that we monitor breathing on a daily basis to see if there are any fluctuations in the peak/flow.  I urged Mrs. Neeb to take medications preventatively to try to break the cycle of the airway reactivity.

117-120

We will reevaluate in six weeks' time and will review our findings at that point....Ruling out clear pathophysiologic patterns that could be causing some of the symptoms will allow us to address the anxiety related complaints as well in the future.

19.    Unum received records from Dr. Jonathan Bell.  In an evaluation plaintiff had undergone on October 2, 1991, Dr. Bell wrote,

161-167

Multiple nonspecific irritants such as cigarette smoke, paint, mothballs, incense, perfumes, etc.  trigger chest tightness and laryngitis/hoarseness.  For the past 2-3 years episodic chest tightness has occurred that responds to bronchodialators.  Wheezing has never been documented but peak flow measurements have been documented to improve after use of a bronchodialator medication.

20.    Dr. Grodofsky did not work for Unum and was not a Unum employee.  Plaintiff sought treatment from him independently of her application for long term disability benefits from Unum.

025; 110; 120; 376.

21.    Unum also received a letter Dr. Bell wrote to Danbury Hospital on June 26, 1993 in which he stated that

168

Mrs.  Neeb is very sensitive to irritating fumes such as exhaust fumes from automobiles.  When she is in the Hospital parking garage, the exhaust fumes exacerbate her asthma and result in chest tightness.  Therefore, it is a medical necessity for Ms. Neeb to avoid parking in the Hospital garage.

22.    Unum also received all reports and records generated by Drs. Miller and Bell of plaintiff's care and treatment from May 1990 through November 1999.

175-189

31

23. Unum also received treatment records of plaintiff's May 3, 1999 admission to the Danbury Hospital Emergency Room complaining of radiating chest discomfort.  The treating doctor noted that she did not demonstrate any shortness of breath, diaphoresis or nausea.    196-212

24. After plaintiff's May 3, 1999 admission to Danbury Hospital, she underwent cardiac catherization and an echocardiogram.  Each was normal.    220; 261

25. Unum received a Danbury Hospital Emergency Room Report from July 9, 1998.  Plaintiff complained of an allergic reaction to red peppers.  She was observed and released after 2 hours.    263

26. Unum received a Danbury Hospital Emergency Room Report from June 14, 1999.  Plaintiff had eaten shellfish and "thinks may have developed allergic rash; complains of throat tightness and difficult breathing."  The records indicate plaintiff demonstrated stable vital signs, pulse oxygenation of 97% on room air, clear lungs, pharynx, no soft tissue swelling.    265

27. Unum also received records from Lower Keys Medical Center regarding plaintiff's admission on February 23, 2000.  Those records indicate that plaintiff was not in any respiratory distress, demonstrated normal blood chemistry, and left the hospital against medical advice.    267-278

28. Unum also received records from Hartford Hospital Emergency Room regarding plaintiff admission on October 28, 1999.   She was given an epi pen and Benadryl and released.    283-85

29. On March 16, 2000, plaintiff provided an 8 page narrative that described her condition and her history.  In part, she wrote that, "since I left work, I stay away places, where I would get the odor of food."  Her social activities "consist of going to church, visiting close family and friends who know my situation." (AR 320).   "Being home is a very control [sic] environment I did much better." (AR 313)    312-321

30. On or about March 31, 2000, Dr. Sica referred plaintiff to Dr. William Rea in Dallas, Texas for treatment.    326

31. Unum assigned Shannon Haskell, a Disability Benefits Specialist, to plaintiff's claim in April 2000.    343

32.     Also on April 11, 2000, Unum's medical consultants performed a full    349-355
        medical review of all the information in plaintiff's file.  Sharon
        Davenport, a registered nurse, provided the following summary of that
        information:

                Clmt has been seen by multiple physicians with treatments
                consisting of meds, inhalers, immunosuppressive treatment.
                Dr.  Sica has recently also diagnosed with adrenal
                insufficiency.  It is unknown if she is following with
                endocrinologist.  At present she is seeking treatment in Texas
                with Dr.  Rea.  Clmt apparently sought consultation with Dr.
                Buffaloe in NY - state as "environmental specialist" per Clmt.;
                who according to E. Harte wanted to r[ule]/o[ut]
                MCS(?multiple chemical sensitivities) - records not in file.
                Clmt was sent to Dr.  Grodofsky for second opinion - she was
                scheduled to return for follow up visit but did not -- unknown
                why not.  At the time of medical review, there is no objective
                verification of R[estrictions] &L[imitation]'s based on
                diagnostic or other medical information.  Discussed with Dr.
                McBride-referred for his review.

        AR 349

33.     On April 20, 2000, plaintiff spoke with Haskell and told her that she    361-62
        would be in treatment with Dr. Rea for "a couple of months."

34.    Another Unum medical consultant reviewed the medical information in 370-373 plaintiff's file.  On May 1, 2000, Robert MacBride, M.D., Associate Medical Director, issued his review of those materials.  He concluded that

> The information on file suggests to me that Dr.  Grodofsky may have been on the right track in addressing the anxiety components in this claim.  While we cannot at this distance diagnose conditions, generically, the presentation of this claimant would be clinically consistent with that of the diagnostic label of multiple chemical sensitivities syndrome. This is a controversial entity, which some clinicians feel also resembles and overlaps with other functional somatic syndromes, such as fibromyalgia/chronic fatigue syndrome (note the claimant is also complaining of fatigue and achiness).  It characteristically has typical dramatic psychological responses to minimal chemical odor exposure, often at very minute concentrations.  Some researchers have invoked the theory that such episodes could reflect examples of a conditioned reflex (i.e. the recognition or detection of an odor triggering a cascade response physiologically but not mediated by physical immune complex triggers normally associated with true immune syndromes.
>
> It is possible or even likely that the claimant actually believes she has and exhibits significant apparent anaphylactic responses, which could be convincing to her family, friends, associates and attending physicians.  If present, this clearly could pose a significant dilemma in assessing the actual level of impairment.  It is worrisome that the claimant, rather than returning to Dr.  Grodofsky, has chosen to be seen by yet another physician in Texas.

34

I am also concerned that litigation may be having an impact, since we know that it is occurring with respect to the cruise ship incident.

Claim Suggestion:

One way of attempting to clarifying all of this would be to speak directly with Dr. Grodofsky who posed the question in the first place of a significant anxiety component. It is likely of significance that the claimant did not return for follow up evaluation with Dr. Grodofsky. Dr. Grodofsky admittedly has not formally labeled the claimant with MCSS, but he has also not seen the claimant in follow up as planned.

I will attempt to reach Dr. Grodofsky to discuss this claim.

35. On May 5, 2000, Drs. MacBride and Grodofsky spoke, and Dr. MacBride wrote a letter to Dr. Grodofsky that recounted their discussion. In part, Dr. MacBride wrote:                    375-76

You confirmed that there has been no physiological or immunological basis uncovered for her reported symptoms and that her primary problem has not been allergies. You confirmed, as well, that all of her testing has essentially been normal and that there are no physical findings of impairment.

You further indicated that a possible reason for her discontinuation of follow up with you was that you had explained at some length to Ms. Neeb that there was no objective evidence that there was anything immunologically wrong with her and that she might benefit from a psychiatric assessment/intervention.

We also discussed the application of the controversial term multiple chemical sensitivity syndrome, which you acknowledged has no scientifically accepted, objective pathophysiological basis. You indicated that Ms. Neeb now believes that this is in fact her diagnosis and this may explain her search for distant treatment.

36.    On May 15, 2000, Shannon Haskell received a letter from Dr. William    381-83
       Rea, or Dallas, Texas, in which he wrote, in part:

>    Mrs.  Neeb is currently being treated for anaphylaxis with
>    laryngeal edema, fatigue, fibromyalgia, immune deregulation,
>    chemical sensitivity, food sensitivity and asthma....The
>    primary goal of our treatment is avoidance of inciting agents.
>    When exposed to any inciting agent, the patient experience
>    life threatening anaphylaxis, shortness of breath, fatigue,
>    disorientation, difficulty in concentrating and thinking, and
>    incapacitating fatigue.  Her symptoms and medical condition
>    are very incapacitating both physically and mentally.  Her
>    condition is very unstable and will not be able to engage in
>    any type of work-related activity.  It is in my medical opinion
>    that this patient is still disabled and is unable to engage in any
>    type of work.

37.    On May 24, 2000, Nurse Davenport asked Dr. MacBride to review     388
       plaintiff's claim in light of Dr. Rea's May 15 letter.

38.    Dr. MacBride completed an updated file review that included Dr.     389
       Rea's opinions.  On June 7, 2000, he wrote

>    Dr.  Rea describes unconventional/controversial treatment
>    and his observations stand in stark contrast to that of Dr.
>    Grodofsky.  Dr.  Grodofsky had concluded that there has been
>    no physiological or immune basis uncovered for this
>    claimant's symptomatology.
>
>    This claimant appears to be caught up in a belief system
>    conundrum not uncommon to those who present as the
>    multiple chemical sensitivities syndrome (i.e. environmental
>    intolerance) - one of the functional somatic syndromes.  There
>    appears, from the records on file, to be a significant and
>    continuing iatrogenic component to this claimant's situation
>    and dilemma.  This is compounded by the claimant's rejection
>    of Dr.  Grodofsky's advice to seek psychiatric assessment
>    after he concluded his scientifically based assessment of her
>    complaints.  Unfortunately this would appear to preclude an
>    effective and practical approach to her situation at this time.

> There would appear also to be no benefit or indication for attempting to discuss the claimant's situation with Dr. Rea who appears to have a fixed and unconventional but highly visible approach to such situations backed up by a large clinic devoted to this unconventional treatment regime.

39. Haskell presented plaintiff's claim during a "Roundtable Review" among other disability benefits specialists. The conclusion of that review was "No objective evidence; denial."            393

40. Haskell thereafter prepared a draft letter to plaintiff that described Unum's decision on her claim. Before she sent it, however, Haskell asked another Unum employee, Sharon Labonte, to review the letter. Labonte reviewed Haskell's letter, concurred with the decision and made suggestions which Haskell incorporated into the letter Unum sent to the plaintiff.            402

41.  By letter dated July 1, 2000, Haskell wrote to plaintiff to inform her that Unum was denying her claim.  In that letter, Haskell wrote:

>   According to the policy under which you are covered:
>
>   You are disabled when Unum determines that:
>
>   you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
>
>   •     you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.
>
>   The occupation of a RN contains many different jobs that require different skills, different levels of physical capacity and are found in multiple environments.  To be disabled from the occupation of a nurse, you need to be unable to perform the duties of any nursing occupation, not just the specific nursing job you performed with Danbury Health Systems.
>
>   Our review of the medical information in your file has found that you would not be disabled from performing all types of nursing occupations.
>
>   The Attending Physician's Statement received by Dr. Sica indicates your primary diagnosis as allergies.  He noted your restrictions and limitations as "patient should not be exposed to inhalants and volatile chemical odors."
>
>   These restrictions and limitations ... would not preclude you from performing all types of nursing occupations.
>
>   On November 29, 1999, Dr. Marshall Grodofsky who specializes in Asthma and Allergy treatment performed an evaluation.  In his evaluation he noted that 'it is difficult to quantify the frequency of these 'allergy spells' with the complaints of mouth inflammation as it does not appear to be documented by physicians and again there was some inconsistency in history in figuring out whether there is a specific trigger that seems to set off the reactions.

At that time lung function testing was done which showed no evidence of any airflow obstruction.  It was noted that the testing was repeated due to your complaints of mouth swelling.

Dr. Grodofsky  indicated he was not able to observe any mouth swelling and the repeated testing was essentially unchanged.  Additionally scratch testing was performed to a variety of inhalant as well as food allergens and all except for ragweed was negative.

It was Dr. Grodofsky's recommendation that some specific blood tests be done as well as a peak flow monitor to monitor your breathing.  He requested a reevaluation in 6 weeks and noted "ruling out clear pathophysiologic patterns that could be causing some of these symptoms will allow us to address the anxiety related complaints as well in the future.

One of Unum's on-site physicians whose specialty is               405
Occupational Medicine contacted Dr. Grodofsky to obtain some additional information from him.  During their conversation Dr. Grodofsky confirmed that there had been no physiological or immunological basis uncovered for your reported symptoms.  He further indicated that all testing had been essentially normal and there were no physical finding of impairment.  It was Dr. Grodofsky's opinion that you had not followed-up with him as directed because he informed you that there was no objective evidence that there was anything immunologically wrong and that you might benefit additionally from a psychiatric assessment.

Based on this information, when you stopped working in December of 1999, there was no objective support you were unable to perform the duties of any type of nursing occupation.  Dr. Grodofsky treated you just prior to your reported December 6, 1999 date of disability and found no objective evidence for any disabling conditions.

Our review has found that we agree with Dr. Grodofsky's    404
opinion and recommendations.  Your contract requires that
you have the most appropriate treatment for your condition.
You contract states:

Regular care means:

•      you personally visit a doctor as frequently as is
medically required, according to generally accepted medical
standards, to effectively manage and treat your disabling
condition(s); and

•      *you are receiving the most appropriate treatment and
care, which confirms with generally accepted medical
standards, for your disabling condition(s) by a doctor whose
specialty or experience is the most appropriate for your
disabling condition(s), according to generally accepted
medical standards.*

Dr. Grodofsky specializes in the treatment of asthma and
allergies, which is what you were claiming disability for.  It is
our opinion that the treatment recommendations made by Dr.
Grodofsky would be considered the most appropriate for your
treatment.  You did not follow-up with Dr. Grodofsky as
recommended which we feel would have been the most
appropriate treatment for your condition.

Haskell also invited plaintiff to provide Unum with any new, additional
medical information not already in the claim file that would support her
claim, and informed her of her right to request a review of the
decision.

42.   On July 15, 2000, Haskell spoke with plaintiff by telephone.  Plaintiff    409-10
informed her that she disagreed with Unum's decision and would be
filing an appeal.  About Dr. Grodofsky, she said that  "he treated her
badly.  She got violently ill and he lied to her about what was in the
test....and her current doctor said he's a 'quack.'"

43.   Unum thereafter received plaintiff's medical records from Dr. Rea's    419-517
facility.  Much of those records were duplicates of records Unum
already had received from plaintiff's other physicians and care
providers.

40

44.     On September 26, 2000, Dr. Rea provided Unum with a report of his       550-554
        findings and a summary of his treatment.   He diagnosed plaintiff with
        "chronic asthma, anaphylaxis, anaphylaxis to foods, inhalant
        sensitivities, fibromyalgia, fatigue, immune deregulation,
        dysautonomia and chemical sensitivity."  He stated that "the primary
        goal of our treatment is strict and total avoidance of inciting
        agents....Her condition is very unstable and will not be able to engage
        in any type of work-related activity.  It is in my medical opinion that
        this patient is still disabled and is unable to engage in any type of
        work."

45.     Dr. Rea also completed an Estimated Functional Capacities Form in      550-51
        which he indicated that plaintiff had the capacity for 3 hours of
        sedentary and 1 hour of light activity per day.  He concluded that

            The patient suffers from debilitating fatigue and life
            threatening anaphylaxis when exposed to specific food odors,
            petrochemicals, solvents, pesticides, perfumes, fragrances
            from laundry detergent or fabric softeners, cigarette smoke,
            cleaners, disinfectants, inks, etc.

46.     Plaintiff also wrote to Unum to appeal from its decision.  In part, she   555-60
        wrote to Haskell that,

            Your [sic] right, I can work, but I need to work in a safe
            environment, where I do not have to deal with food odors and
            other odors that taxes [sic] my system.  There is no such
            place as far as I know.  The only safe place for me right now
            is my home."

        AR 555

47.    Unum had another physician review all the medical materials in      563-64
       plaintiff's file.  On October 18, 2000, Dr. Lawrence Broda summarized
       those materials.

> 52 yo RN clinical auditor out of work since 12/7/99 with chronic
> asthma, anaphylaxis to "foods," inhalant sensitivity,
> fibromyalgia, immune deregulation, chemical sensitivity.  Seen
> by several allergists, immunologist and a "naturopathic"
> physician...has been on several meds for chronic treatment of
> her asthma which appears controlled and has not required
> hospitalization....only 1 ER visit revealed wheezing, none
> presented as stridor, and she was treated with standard care
> for allergic reaction w/o hospitalization. ...Her exam,
> P[ulmonary] F[unction] T[ests] were normal; scratch testing
> done to a variety of inhalants and food allergens revealed only
> reaction to ragweed.  Skin tests to a variety of foods including
> tomatoes/potatoes, peanuts, shrimp, scallops were all non
> reactive indicating and arguing against IGE mediated
> reactivity.  Non IGE mediated reactivity usually causes
> G[astro]I[ntestinal] symptoms and not resp[iratory] problems.
>
> Conversation previously between Dr. MacBride and Dr.
> Grodofsky confirmed the absence of immunologic basis for her
> symptoms and that psychiatric assessment might benefit...
> subsequently evaluated by several other doctors, most notably
> Dr. William Rea....he found skin reactions to several foods,
> molds, pollens and "chemicals" and has prescribed a
> cornucopia of treatment....most of which is out of the
> mainstream therapy for allergic reactions.  While avoidance
> therapy is reasonable she has not required ER eval or
> hosp[ital] evaluation except for the previously mentioned ER
> visits and these were after ingestion or
>
> touching peppers. The finding of + skin testing doesn't prove
> nor correlate with symptomatic food allergies.  Certainly she
> hasn't required excessive treatment for other inhalants, irritants
> or foods.  There would be also very little difference in
> environmental make up of a house as opposed to an office
> setting.  Medical evidence doesn't support reversal of the
> denial

48.    Haskell thereafter prepared a draft letter to plaintiff that described    568
       Unum's decision on plaintiff's appeal and again asked Sharon
       Labonte to review the letter.  Labonte concurred with the letter as
       drafted.

49.    On November 7, 2000, Haskell sent a letter to plaintiff informing her of    569-71
       Unum's decision on her appeal.  In that letter, Haskell reiterated what
       Unum had written in its initial denial letter.  Addressing plaintiff's
       treatment with Dr. Rea, Haskell wrote:

              You have recently submitted a letter appealing the original
              denial along with medical records from Dr. William Rea as well
              as various Emergency Room reports.  This additional
              information has been reviewed by our medical department and
              determined to be insufficient to reverse our prior decision.  In
              terms of the Emergency Room visits, three out of four of those
              took place prior to your date of disability, indicating that you
              were able to maintain the performance of your occupational
              duties.  Although we understand that you have undergone
              significant treatment with Dr. Rea, a majority of which is out of
              the mainstream therapy for allergic reactions, this does not
              reverse our opinion that as of your last day of work there was
              no objective evidence to support your inability to continue
              working.

50.    Haskell forwarded plaintiff's claim and file to the Quality Review    569
       Section within Unum for an impartial review of her claim.

51.    Unum assigned Sandy Kaserman, Lead Appeal Specialist, to perform    574
       a review of the Unum's decision on the plaintiff's claim.

52.    On December 12, 2000, William Conti, Esq. wrote to Kaserman    577
       requesting an appeal of its November 7 decision.

43

53.    On January 22, 2001, Kaserman informed Atty. Conti that Unum was    579-581
upholding the denial of the plaintiff's claim.  Kaserman wrote, in part,
that :

> An independent review of your client's claim has been
> conducted.  According to the claim file, a medical review was
> completed on 4/11/00.  It was noted that your client ceased
> working as a Clinical Auditor Registered Nurse (RN) on
> 12/7/99 due to allergies.  The attending physician's statement
> completed by Dr.  Sica indicated a diagnosis of allergies with
> restrictions and limitations that noted your client should not be
> exposed to inhalants and volatile chemicals.  Symptoms of
> dyspnea, shortness of breath, hoarseness, anaphylaxis and
> chemicals were reported.  The conclusion of the review
> revealed that the objective medical data provided by multiple
> providers did not support the restrictions and limitations noted.
> It was further stated that it was unclear at that time if a
> pulmonologist or an endocrinologist for the related symptoms
> was treating your client.
>
> Additional information was provided, and a subsequent
> medical review was completed on 5/1/00....The medical data
> supports care from several allergists over the past 10 years
> for reported asthma and food allergy symptoms.  It was noted
> that your client was seen by an allergist, Dr. Grodofsky, for a
> second opinion.  A thorough assessment was conducted,
> which included allergy testing, and it was discovered that your
> client only appeared to have documented allergic reaction
> responses by skin testing to ragweed.  The RAST testing was
> also reported as negative.  Dr. Grodofsky recommended a
> follow-up in 6 weeks, and the records indicate that your client
> did not follow-up with that recommendation, and instead was
> being assessed by Dr. Rea in Texas.  The conclusion of the

review revealed that based on the complexity of the condition due to various theories regarding a definitive diagnosis and treatment, it was recommended that Dr. Grodofsky be contacted to discuss the results of the assessment

A letter was sent to Dr. Grodofsky on 5/5/00 which summarized the telephone contact that took place with our in house medical resource to further clarify the diagnosis, tests results and related restrictions and limitations.  The letter noted that the medical resource noted an interpretation of your client's records suggested that thorough testing had not revealed the presence of an immune basis for the symptoms. The exception was a ragweed sensitivity, which could explain seasonal rhinitis but not her reported ten year history of asthma and life threatening anaphylactic reactions.  It was noted that Dr. Grodofsky confirmed that there has been no physiological or immunological basis uncovered for her reported symptoms, and that her primary problem has not been allergies.  It was also confirmed that all of the testing has essentially been normal, and there were no physical findings or impairment.  Dr. Grodofsky indicated that the possible reason that your client did not follow up with him was due to the fact that he told your client that there were no objective findings to indicate that there was anything immunologically wrong with her, and that she might benefit from a psychiatric evaluation. The application of the controversial term of multiple chemical sensitivity syndrome was discussed, and it was agreed that there was no scientifically accepted objective pathophysiological basis.

A letter was sent to Dr. Rea to obtain the results of the assessment and to attempt to understand your client's medical condition and related restrictions and limitations.

A medical review was completed on 6/7/00.  It was noted that the results of Dr. Rea's examination and observations stand in stark contrast to that of Dr. Grodofsky.  Further discussion with Dr. Rea was not done as it was noted that Dr. Rea appeared to have a fixed and unconventional but highly visible approach to such situations, backed by a large clinic devoted to this unconventional treatment regimen.

579-81

The claim was appropriately denied on 7/1/00, due to the lack of medical evidence to support restrictions and limitations that would prevent work in your client's own occupation.

Subsequent to the denial, additional medical information was provided and a medical review was completed on 10/18/00. The results of the review revealed that the medical data did not support disability, and the previous medical review done on 6/7/00 was accurate

Based on a lack of substantive objective medical evidence to support restrictions and limitations to preclude work capacity, the denial will be upheld.

54.    On February 27, 2001, Kaserman agreed to Atty. Conti's request to perform an additional review of plaintiff's claim.                                        588

55.    On May 4, 2001 Kaserman informed Atty. Conti that since                         591

we have not received any additional information that would change that 01/22/01 determination...we find that our previous decision to deny further benefits was correct and we are upholding the determination.  This represents the final review of your file, and therefore, you have exhausted all administrative remedies in regard to your appeal for disability benefits.

56.    On February 13, 2003, plaintiff submitted an additional "appeal" in which she provided a copy of a deposition Dr. Grodofsky gave on June 13, 2001, (AR 647-97); and an Occupational Assessment Report prepared on September 6, 2001 by Larry Harmon, PhD for Kelsay D. Patterson, Esq. of Coral Gables, Florida (AR 655-69)..          592-697

57.    On February 28, 2003, Kaserman responded to plaintiff's "appeal," by    698
writing to her attorney,

> as noted in the correspondence dated May 4, 2001, that review
> represented the final appellate review of the claim denial, and
> all administrative remedies in regard to the appeal for disability
> benefits were exhausted at that time.  No further appellate
> reviews will take place, and the correspondence dated
> February 10, 2003, as well as any further correspondence
> submitted, will be filed in the claim file, and no response will be
> completed.

58.    The Policy contains the following language:    748

> This policy is delivered in and is governed by the laws of the
> governing jurisdiction and to the extent applicable by tho
> Employee Retirement Income Security Act of 1974 (ERISA)
> and any amendments.  **When making a benefit
> determination under the policy, Unum has discretionary
> authority to determine your eligibility for benefits and to
> interpret the terms and provisions of the policy.**

(Emphasis added)

59.    The Policy contains the following language:    741

> You are disabled when Unum determines that:
>
> •      you are **limited** from performing the **material and
> substantial duties** of your **regular occupation** due to
> **sickness or injury;** and
>
> •      you have a 20% or more loss in your **indexed monthly
> earnings** due to the same sickness or injury.

(Emphasis in original)

60.    The Policy contains the following language:    741

> **Limited** means what you cannot or are unable to do.

(Emphasis in original)

61.    The Policy contains the following language:                741

        **Material and substantial** duties means duties that:

        •    are normally required for the performance of your regular occupation; and
        •    cannot be reasonably omitted or modified.

(Emphasis in original)

62.    The Policy contains the following language:                741

        **Regular occupation** means the occupation you are routinely performing when your disability begins.  Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.
(Emphasis in original)

63.    The Policy contains the following language:                740

        **Sickness** means an illness or disease.  Disability must begin while you are covered under this plan.
(Emphasis in original)

64.    The Policy contains the following language:                740

        **Injury** means a bodily injury that is the direct result of an accident and not related to any other cause.  Disability must begin while you are covered under the plan.
(Emphasis in original)

**DEFENDANT'S PROPOSED CONCLUSIONS OF LAW**

1.    This court has jurisdiction over the plaintiff's complaint pursuant to the provisions of the Employee Retirement Income Security Act ("ERISA") 29 U.S.C. §1001 *et seq*. as the dispute arises under an employee welfare benefit plan, 29 U.S.C. §1002(1).

2.    Prior to 10, 2000, plaintiff was employed by Danbury Health Systems, ("DHS"), as a Clinical Staff Auditor.

3.    At all relevant times, DHS provided its employees, including the plaintiff, with long-term disability insurance coverage under a policy (the "Policy) issued by Unum Life Insurance Company of America. ("Unum").

4.    Under the Supreme Court decision in Firestone Rubber Company v. Bruch, 489 U.S. 101, 115 (1989), a decision of an ERISA appeals committee is to be reviewed *de novo* unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

5.     The Policy states:

> This policy is delivered in and is governed by the laws of the governing jurisdiction and to the extent applicable by the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments.  When making a benefit determination under the policy, Unum has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy.

This language is sufficient to invoke a court's deferential review of Unum's decision.  Maniatty v. UnumProvident Corporation, et al., 218 F.Supp. 2d 500 (S.D.N.Y. 2002), aff'd, 62 Fed. Appx. 413, 2003 U.S. App. LEXIS 9383, cert. den. __ U.S. __, 157 L. Ed. 2d 310, 124 S. Ct. 431, 2003 U.S. LEXIS 7719, 72 U.S.L.W. 3280 (2003); Pulvers v. First Unum Life Insurance Company, 210 F.3d 89, 92 (2d Cir. 2000) (language granting administrator "discretionary authority to determine ... eligibility for benefits and to interpret the terms and provisions of the policy" is of a kind that "generally prompts the arbitrary and capricious standard of review."); Short v. Unum Life Insurance Company of America,  2003 U.S. Dist. LEXIS 22327 (D. Conn. 2003);  Rosenthal v. First Unum Life Insurance Co., 2002 U.S. Dist. LEXIS 8365, *15-*16 (S.D.N.Y May 9, 2002);  Kocsis v. Standard Insurance Company, 142 F.Supp. 2d 241,251-52 (D. Conn. 2001) (reservation of right to determine eligibility for insurance, entitlement to benefits, amount of benefits and sufficiency of amount of information triggers discretionary review.)

6.     Where the written benefit plan documents give the administrator discretionary authority to determine eligibility for benefits, a court will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious.  Pagan v. NYNEX Pension Plan, 52 F.3d 438, 441 (2d Cir. 1995).

7.     In reviewing an ERISA claim in which the administrator's conduct is judged by the arbitrary and capricious standard, the court's examination of the facts of the case is limited to reviewing the administrative record compiled below.  Miller v. United Welfare Fund, 72 F.3d 1066, 1071 (2d Cir. 1995).  In a deferential review case such as this, "a district court reviewing an ERISA denial of benefits is effectively functioning in an appellate capacity because it is precluded from considering new evidence" Larsen v. The Prudential Insurance Company of America, 151 F.Supp. 2d 167, 172 (D.Conn. 2001).  The scope of a court's review is "very narrow."  Celardo v. Greater New York Auto. Dealers Health & Welfare Trust, 318 F.3d 142, 146 (2d Cir. 2003);

8.    A denial of benefits is "arbitrary and capricious" if the decision to deny benefits was without reason, was unsupported by substantial evidence, or was erroneous as a matter of law.  <u>Pagan</u>, 52 F.3d. at 442.  "Substantial evidence" means such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision-maker; it requires more than a scintilla, but is less than a preponderance of the evidence.  <u>Kocsis</u>, 142 F.Supp. 2d at 252.  "Where both the plan administrator and a spurned claimant offer rational, though conflicting, interpretations of plan provisions, the administrator's interpretation **must** be allowed to control."  <u>Pulvers v. First UNUM Life Insurance Co.</u>, 210 F.3d 89, 92-93 (2d Cir. 2000)(emphasis added).

9.    Under the deferential standard, the court is "not free to substitute its own judgment for that of the plan's administrator as if it were considering the issue of eligibility anew."  <u>Kocsis</u> at 252.  Thus, the court may not upset a reasonable interpretation of the administrator.  <u>Jordan v. Retirement Commission of Rensselear Polytechnic Inst.</u>, 46 F.3d 1264, 1271 (2d Cir. 1995).

10.    The court has reviewed the administrative record Unum prepared during its review of the plaintiff's claim and is satisfied that plaintiff has not sustained her burden of proof regarding disability.  The plaintiff claims that she was disabled from performing the material duties as a nurse because of allergic reactions (anaphylaxis) and chemical sensitivities.   The administrative record also demonstrates that plaintiff was treated for over a decade before February 2000 for the symptoms of allergies, (AR 161-68), and there is no objective data in the record to explain why in February 2000 she no longer was able to work in her regular occupation.

One doctor who treated her, Marshall Grodofsky, an allergy specialist, performed tests and was unable to obtain objective proof that plaintiff was suffering from allergic reactions, even though she reported one was occurring during Grodofsky's examination.  (AR 118-19).  Indeed, a blood test Dr. Grodofsky performed indicated that plaintiff's reaction, if one was occurring, was not physiologically-based.  (AR 112).  Dr. Grodofsky went so far as to state that there was "no physiological or immunological basis...for [plaintiff's] reported symptoms and that ....all of her testing has essentially been normal and that there are no physical findings of impairment."  (AR 375-76).

Dr. Grodofsky explained those facts to the plaintiff, suggested that she might benefit from a psychiatric assessment or intervention, but plaintiff never returned for the treatment he recommended nor did she seek the treatment Dr. Grodofsky recommended from any other health care provider.  Rather, plaintiff sought treatment from Dr. William Rea, in Dallas, Texas, a physician whose treatment Robert MacBride M.D., one of Unum's medical consultants who examined plaintiff's medical records, described as "unconventional/ controversial."  (AR 389).  Dr. MacBride concluded that plaintiff's failure to follow Dr. Grodofsky's advice "after he concluded his scientifically-based assessment of her complaint...would appear to preclude an effective and practical approach to her situation at this time" and contributed to the "iatrogenic component to this claimant's situation and dilemma."  (AR 389). Another physician-consultant Unum requested review plaintiff's file agreed with Dr. MacBride and noted that Dr. Rea had prescribed a "cornucopia of treatment...most of which is out of the mainstream therapy for allergic reactions." (AR 563-4).

Dr. MacBride believed that the plaintiff's condition was significantly "iatrogenic," or physician-induced.  (AR 389).  The record is thus clear that Unum ultimately opted to credit the vocational analysis of Bruce Hoffman and

and controversial opinions of Dr. Rea.   Unum acted within its rights in assessing the credibility of the evidence presented to it; and doing so was neither arbitrary nor capricious conduct by an ERISA administrator.  See, <u>Short</u>, supra. at *32.  Indeed, it is exactly what an ERISA administrator should do.  To be sure, the Supreme Court expressly has held that an ERISA administrator may credit reliable evidence and reject without explanation the opinion of a claimant's treating physician that conflicts with such evidence.  <u>The Black & Decker Disability Plan v. Nord</u>, __U.S.__, 123 S. Ct. 1965, 1972, 155 L. Ed. 2d 1034 (2003).

Moreover, it is not arbitrary, capricious or even unreasonable for a plan administrator to demand objective evidence to support the existence and nature of claimed restrictions and limitations.  While plaintiff's self-reported symptoms and subjective reports are relevant in considering whether to grant benefits, plan administrators are not obligated to accord special weight to those subjective reports.

Furthermore, plaintiff provided Unum with no objective information or evidence to show that because of her allergic reactions she could not perform the material duties of her position.  Indeed, she agreed that she could work; she just claimed that she could not work where there were "odors."  (AR 555).  The plaintiff thus has provided no countervailing or contradictory evidence to rebut Unum's conclusion.

As one court recently noted, a claimant's own assessment of her own capacities is not a sufficient basis on which to ground a claim for ERISA benefits.  <u>Maniatty</u>, <u>supra</u>.  In that case, the plaintiff claimed that the language of the policy itself did not require her to produce objective medical evidence of her disability and required Unum to credit her own statements of her disabilities.   The court, however, disagreed.  Commenting, Judge Rakoff held:

> the very concept of proof connotes objectivity....It is hardly unreasonable for the administrator to require an objective component to such proof.  To hold otherwise, to require administrators to provide benefits based solely upon subjective complaints of claimants, without more, would result in insurance companies paying virtually all claims.

See also, <u>Coffman v. Metropolitan Life Insurance Co.</u>,  217 F. Supp. 2d 715, 732 (D. W.Va. 2002); The First Circuit is in accord with the Second Circuit on this point.  <u>Boardman v. The Prudential Life Ins. Co. of America</u> , 337 F.3d 9 (2003), as are many other courts throughout the country.  See, e.g.  <u>Wertheim v. Hartford Life Insurance</u> Co., 2003 US. Dist. LEXIS 10807 (E.D. Va. 2003); <u>Williams v. Unum Life Insurance Company of America</u>, 250 F. Supp. 2d 641, 648 (E.D. Va. 2003); <u>Martin v. Continental Casualty Company</u>, 96 F. Supp.2d 983, 992-94 (N.D. Cal. 2000).

11.    Trustees of ERISA benefit plans are required to maintain and preserve their plan's assets, not to waste them.  See, e.g. <u>New York State Teamsters Conference Pension and Retirement Fund v. Boening Brothers, Inc. et al.</u>, 92 F.3d 127, 131 (2d Cir 1996); see also, <u>Central States, Southeast & Southwest Areas Pension Fund et al. v. Central Transport, Inc.</u>, 472 U.S. 559, 572 (1985).  Requiring a level of objective proof to support claimed restrictions and limitations is consistent with the duties and responsibilities of a claims administrator.  The Court will likewise apply that standard to this case.

12.    Having reviewed the administrative record, the court is satisfied that Unum did not act arbitrarily or capriciously in administering the plaintiff's claim.  Unum's analysis of plaintiff's case involved independent input from at least nine people:  two nurses, a vocational analyst, four disability analysts and two physicians, one who specialized in occupational medicine.  Each time a consultant reviewed plaintiff's claim, the consultant examined all of plaintiff's medical records, many of which went back to the early 1990's, as well as any further medical data plaintiff, her attorney or her doctors felt would support her claim.

Judge Hall's decision in Kocsis, supra, can apply with equal force in examining the facts presented in this case.

> In short, the record demonstrates that [Unum] conducted a thorough review of the medical records of the plaintiff and the opinions of his treating physicians...and arrived at a decision, on the basis of the standards in the [Policy], with which the plaintiff and perhaps his treating physicians disagree.  This disagreement, however, does not render [Unum's] denial of benefits erroneous as a matter of law or otherwise arbitrary or capricious.  Regardless of how another reasonable mind might have arrived at a decision on the plaintiff's eligibility for disability benefits...the court is not free to substitute its own judgment, or that of another medical professional, for that of [Unum], as the Plan's administrator, as if the court were considering the plaintiff's eligibility anew.  The court can not, and in this instance will not, upset a reasonable interpretation by the Plan's administrator.

142 F. Supp. 2d 253.

13.    Based on all the information in the file, the court has determined that the plaintiff has not satisfied her burden of proving disability.  Nor has she demonstrated that Unum acted arbitrarily or capriciously in denying her claim for long term disability benefits.  Judgment therefore shall enter for the defendant confirming its administrative determination, and the clerk is directed to close this file.

LAURA NEEB


BY:     _____
           Jeffrey R. Heyel, Esq.
           68 Main Street
           Danbury, CT  06810
           Fed. Bar No. ct19554


UNUM LIFE INSURANCE COMPANY OF AMERICA


By:     _____
           Alexander H. Schwartz  ct 05773
           3695 Post Road, Suite 203
           Southport, CT  06890-0701
           203.255.9829
           203.255.9839 (fax)
           alex@ahschwartz.com