## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| | x | |
| LAURA NEEB, | x | |
| Plaintiff, | x | |
| | x | 3 03 CV 0307 (AVC) |
| vs. | x | |
| | x | |
| UNUM LIFE INSURANCE COMPANY | x | |
| OF AMERICA | x | |
| Defendant | x | |
| | x | September 17, 2004 |

### DEFENDANT'S PROPOSED FINDINGS OF FACT
### AND CONCLUSIONS OF LAW
### SUBMITTED IN CONJUNCTION WITH ITS
### MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

### I.    PROPOSED FINDING OF FACT                                    SOURCE

| | | |
|---|---|---|
| 1 | On February 10, 2000, plaintiff's employer, Danbury Health Systems, Inc., ("DHS") submitted an application on her behalf to Unum Life Insurance Company of America ("Unum") claiming benefits under long term disability policy No. 521885 001 (the "Policy"). | 002; 758-59 |
| 2 | As a DHS employee on February 10, 2000, plaintiff was eligible to claim benefits under the Policy. | 754; 747 |
| 3 | Along with the application, DHS submitted the following information:<br><br>•    a "Position Description" of DHS;<br>•    a "Job Analysis" form completed by Mark Moreau, a DHS employee;<br>•    Records and reports from Robban A. Sica, MD regarding plaintiff's care and treatment from 12/28/99 through 2/1/00 | 003<br>004-05<br><br>006-024 |

| 4 | The DHS "Position Description" defined plaintiff's job as "clinical staff auditor," indicated that it required a Registered Nurse's certification with 4 years clinical/nursing experience, and required its holder to work with medical records and compare them to billed information and codes.  The primary function of the position was to perform and report compliance audits for DHS | 003 |
|---|---|---|
| 5 | The "Job Analysis" described the physical requirements of a Clinical Staff Auditor as occasional balancing, stooping, kneeling crouching, reaching, climbing stairs;  Pushing a cart from Medical records weighing 20 pounds; lifting files and books between 2 to 5 pounds.  Frequent sitting and reading documentation and emails. | 004-05 |
| 6 | The "Physician's Statement" Dr. Sica submitted indicated that plaintiff's demonstrated symptoms of: "dyspnea, shortness of breath; hoarseness; severe allergic reactions (anaphylaxis) and chemical sensitivities."  "First visit 12/28/99."<br><br>Dr. Sica indicated that plaintiff was disabled as of 12/6/99 by "chemical odors at work intolerable to patient due to exacerbation of above symptoms."<br><br>Dr. Sica stated that plaintiff's restrictions and limitations were as follows:  "Patient should not be exposed to inhalants and volatile chemical odors."  He stated that her prognosis was "guarded" prognosis and did not expect "fundamental changes" in her condition for 5-6 months. | 023-24 |
| 7 | Dr. Sica submitted an office note of 12/28/99 in which he noticed that plaintiff's lungs were clear; normal heart rhythm; normal musculoskeletal examination. | 14 |
| 8 | Dr. Sica submitted an office note of 1/11/00 in which he wrote that plaintiff was "Improved; needing less sleep since on thyroid [medications]; less sensitive; allergic reactions less severe...allergies improving. | 19-20 |
| 9 | Dr. Sica submitted an office note of 2/1/00 in which he wrote that "Breathing worse Peak flow 450-550;  severe pain in upper R posterior rib cage; using inhaler regularly; CXR at primary MD negative; gets worse as day goes on.  Stopped using wheat." | 22 |

2

| 10 | Plaintiff submitted an "Employee's Disability Statement." In it, she identified her position as "RN-Clinical Auditor." She described the condition causing her disability as increasing "allergic reactions, S[hortness] O[f] B[reath], fatigue since Sept. (allergic reactions started before Sept. Several anaphylactic reactions." She stated that she first noticed increased symptoms in Sept 99. According to plaintiff, she was unable to work because "SOB; hoarseness, extreme fatigue; severe allergic reactions (anaphylaxis) and chemical sensitivities." <br><br> Plaintiff identified her treating doctors as: Elyssa Harte ND 4/99 - 11/99 of Norwalk, CT; Andrenne Buffaloe of NYC 11/8/99; Robban Sica, Orange CT 12/28/99 - date; and Marshall Grodofsky W. Hartford 11/29/99. | |
| 11 | Unum received plaintiff's claim on February 18, 2000 and assigned the claim to Jeanne Flaherty, a Unum Disability Benefits Specialist | 029 |
| 12 | On February 21, 2000, Flaherty consulted with Florence Aliberti, an on-site registered nurse at Unum, to attempt to understand plaintiff's restrictions and limitations of "no exposure to inhalents [sic] & volatile chemical odors." Aliberti could not provide Flaherty with a conclusion, and advised her that plaintiff's symptoms, restrictions and limitations "need further clarification." | 030 |
| 13 | On February 24, 2000, Flaherty spoke with Romulo Salazar at DHS to gather further information. Salazar told Flaherty that he was not aware of any problem plaintiff had with chemical odors; that she had requested a leave of absence because of her illness, and had an expected return to work date of 3/28/00. | 031 |
| 14 | Unum referred an analysis of plaintiff's job to a Certified Rehabilitation Counselor, Bruce Hoffman. Hoffman analyzed plaintiff's position as Clinical Staff Auditor using 3 descriptions from the Department of Labor Dictionary of Occupational Titles: Audit Clerk Clerical; Medical-Record Administrator; Nurse, General Duty. Hoffman classified the position sedentary to medium work requiring lifting and carrying of up to 10 pounds constantly. Hoffman wrote: <br><br>     Additional frequent physical demands include: reaching, handling, fingering, talking, hearing, near acuity, color vision and feeling. A tentative review of claimant's transferrable skills would indicate clmt could compete the material duties of sedentary alternative nursing occupations. | 032-38 |

| 15 | Flaherty spoke with plaintiff by telephone on February 29, 2000. In that conversation, plaintiff provided a narrative of her condition, as Flaherty recorded, as follows: |  |
|---|---|---|

> Food allergy to pepper began 7/98 on July 4th weekend. ...cutting peppers, hand turned red, got hives, benadryl. Lost voice, began feeling better next day. the following Thurs at business lunch - red peppers on Ceasar salad, changed fork. Within 1/2 hour was in hosp with severe anaphylactic reaction. Throat closes, can't swallow - has trouble breathing. In March 1999 went on cruise w/family members. On cruise, 3/15, she ate a steak and had analphylactic [sic] reaction, spent night in infirmary.... two days later again she was served something marinated in peppers and had another severe reaction. Happened a 3d time while on cruise. On last day of cruise, she found a pepper in her egg. Has legal action against cruise....Now also allergic to add'l foods due to "leaky gut syndrome." Food she ate on cruise chemicals leaked through the gut into her system and body has developed antibodies. Foods such as shrimp. Was allergic to scallops from 9 years ago.

> In June '99 ate shrimp and ended in hospital w/severe reaction. Does not have severe reactions to other foods. Wheat allergy suspected. Allergies to dust mites and ragweed also.

> In Sept changed office to 6th floor used to be smoking lounge for psych unit....she constantly told her boss she could smell smoke in room. Thinks this exaggerated her allergies because tobacco is also a pepper family member. Several times ...went home because she could smell odors from kitchen. Office was several floors above the kitchen...She would get sick from smell when cooking with pepper family -- would get hives, tight in breathing.

> .....10/28 had allergic reaction again....Told boss she could not stay in office, each reaction getting worse & worse. Allowed her to work from home. Went to ... conference in Hartford for training, got sick...chef was cooking chicken & peppers...ambulance to Hartford Hospital and had to be intubated.

| 15 cont | Out of work entire month of November.  R[eturned] T[o] W[ork] 11/29/99.  Struggled that whole week w/ fatigue. Couldn't tolerate cigarette smoke.  Perfume sensitive--would lost voice and have problems with breathing.  12/6/00 while at work went to cafeteria for bagel...Started itching head to tow.  By time left work, whe was "sick as a dog."  Never returned to work.<br><br>Noticed that back In October when she moved to new office, she couldn't go any place.  Can't go any place where there is cooking.  Everything is prepared with paprika and peppers. Odors send her into anaphylactic reaction.<br><br>Had a reaction last week in Florida, was walking outside a restaurant, passing by.  Next thing they were looking for a hospital.<br><br>Plaintiff identified her physicians to Flaherty as:<br><br>    Dr. Sica - PCP treating for allergies & environment.  MD but believes in homeopathic remedies.<br><br>    Dr. Harte 4/99 naturapathic physician - not seeing any more;<br><br>    Buffalol - 2nd opinion on allergies which caused her to become chemically sensitive.<br><br>    Grodosfsky - 2nd opinion asthma;<br><br>    Dr. Jonathan Bell, allergies - nothing more he could do;<br><br>Plaintiff described her contemporaneous daily activities as:<br><br>    Sits and knits or reads.  Gone to beach a couple of times...a lot of sleeping.  "Very tired."<br><br>Plaintiff described the duties and requirements of her occupation:<br><br>    Clinical Auditor for 4 years.  Before this she was registered nurse on the floor.  Stopped that because she was injured on the floor by a patient.  Herniated 2 discs and SI joint.  Did not |  |

| | require surgery. Flaherty "Explained elimination period. Clmt's response was that she 'will be disabled for many years.'" | |
|---|---|---|
| 16 | On February 29, 2000, Flaherty requested plaintiff's medical records from Dr. Harte, Dr. Buffalol, Dr. Sica, Dr. Grodofsky, and Dr. Bell | 051-52 |
| 17 | Dr. Sica provided Unum with the same records as plaintiff submitted in the plaintiff's application for benefits. | 65-79 |
| 18. | On March 22, 2000, Flaherty spoke with plaintiff and was told that plaintiff was going to Dallas, Texas to treat with Dr. William Rea at the Environmental Health Center. | 83 |

| 19 | Unum received reports and records from Elyssa Harte, ND. In those records was:<br><br>A letter dated January 19, 2000 from Harte to Steven Levy, Esq. of Torrington, CT in which Harte wrote: | 85- 104 |
| | I believe the toxicity generated by the anaphylactic episodes and the medications needed to remedy those episodes has overwhelmed the body's ability to clear toxins. If toxins cannot be cleared in normal amounts of time, she will become more sensitive to certain foods; | 85 |
| | A letter dated July 5, 1999 to Atty. Levy in which Harte wrote: | |
| | Mrs. Laura Neeb is under my care for anaphylaxis triggered by contact of any kind to a wide variety of foods. Skin contact as well as ingestion triggers the reaction. The worst reactions seem to be caused by pepper and shellfish. A wide variety of foods cause a less severe response: an inflammation and swelling of the mucous membranes mouth and throat, cough, hoarse voice, itching, tearing and redness of eyes.<br><br>During the course of treatment since April 20, 1999 there have been many exacerbations of the allergic response.... Because of the extreme amount of inflammation in the digestive system after an anaphylactic response, the cells of small intestine become hypermeable....food particles get past the normal GI lining and are attacked by the immune system. this creates a repetitive inflammatory response to foods that did not cause a response prior to an anaphylactic response....[therefore] foods eaten at the time of the anaphylactic response to peppers onboard the cruise now cause severe inflammation [but less than anaphylaxis.] While less severe than anaphylaxis, these reactions are uncomfortable and frightening and interfere with Mrs. Neeb's ability to work and otherwise carry on a normal life. | 86 |
| 20 | Unum also received notes of 34 office visits with Harte from 4/1/99 to 10/26/99. | 96-104 |

| 21 | Unum also received notes and reports from Dr. Marshall Grodofsky, of the Connecticut Asthma and Allergy Center, LLC. | 110-120 |
|---|---|---|

In a report Dr. Grodofsky wrote to Dr. Alexis Gopal on November 29, 1999, Dr. Grodofsky summarized his observations, as follows:

> I evaluated Laura Neeb....at the request of Dr. Gottlieb, the Medical Director for Foundation Medical Insurance for the employees at Danbury Hospital....[she] reports a long history of environmental intolerance...seasonal allergy symptoms and mild asthma symptoms in the past that motivated her evaluation by Dr. Jonathan Bell and Dr. Jeffrey Miller. She had worked in [their] office before starting work at Danbury Hospital.

> The Initial episode of anaphylaxis occurred in March of 1998. She was served some red peppers and developed some hives and respiratory distress.....Four days later she ate a salad that had red peppers in it and had more severe respiratory distress with a drop in blood pressure requiring an emergency room. ...She, unfortunately, took a cruise and on this cruise was exposed to the ingestion of peppers with steak and peppers in her food on three separate occasions leading to sever anaphylactic reactions. Repeated episodes occurred not necessarily associated with ingestion of peppers.  She reports a reaction following ingesting of a hotdog...and...shrimp.  She feels that the reaction ...might... have been triggered by inhalant exposure to pepper antigen from cooking of food on the ship.  Recently, reactions occurred with exposure to cooking peppers where she feels that she had difficulty breathing and swallowing apparently associated with exposure to the fumes of the peppers at a conference event where she ate no food.

>     *                    *                    *

> It is difficult to quantify the frequency of these "allergy spells" with complaints of mouth inflammation because it does not appear to be documented by physicians and again there was some inconsistency in history in figuring out whether there is a specific trigger that seems to set off the reaction although Mrs. Neeb reports significant chemical sensitivity with a variety of fumes causing dramatic irritation and discomfort for her that seems to be a recent problem at her work environment.

She was referred in to see us to try and clarify the extend of the reactions particularly in light of the multiple episodes of anaphylaxis.

     *            *              *           *

On exam I found her to be a perfectly healthy appearing adult who was in no distress...She had clear chest findings with no sign of airway inflammation and no wheezing or lung consolidation.  She had a normal cardiac and abdominal exam...Clear skin.

Lung function tests done in the office showed a vital capacity of 112% predicted, an FEV1 of 111% predicted, and a FEF 25-75 of 100 % predicted with a flow volume loop that really showed no evidence of any airflow obstruction.  We later repeated her spirometry tests because she started complaining of mouth swelling although I was not able to observe any noticeable change in her lips or tongue and the lung function tests were essentially unchanged with an increase in the FEF 25-75 to 107% predicted.

Scratch testing was done of a variety of inhalant and food allergens...Skin tests... showed reaction to ragweed pollen only.  Skin test to tomatoes, potatoes, milk, egg, wheat, corn, soy, peanut, brazil nut, almond, shrimp, lobster and scallops were all unreactive arguing against a IgE-mediated reactivity to these specific food antigens. She was quite anxious and would not allow us to do scratch testing to peppers because of her insistence that pepper fumes cause problems.

My impression after reviewing the history is that it is clear that Mrs. Neeb is quite anxious about these recurring spells. The apparent spells of anaphylaxis have not been clearly defined or explained....The history of recurrent reactivity...suggested to me the possibility of a non-IgE-mediated mechanism. Specifically, I am suspicious that a mastocytosis type syndrome might be present. I requested that blood be drawn and sent to Dr. Larry Schwartz at University of Virginia [for measurement and analysis].

We will reevaluate in six weeks' time and we will review our findings at that point, making recommended plans for the future.  Ruling out clear pathophysiologic patterns that could be causing some of the symptoms will allow us to address the anxiety related complaints as well in the future.

| 22 | Dr. Grodofsky provided Unum with the results of the analysis Dr. Larry Schwartz performed on plaintiff's blood.  Dr. Grodofsky wrote "these are normal results-no sign of mast cell increases" on that report | 112 |
|----|----|----|
| 23 | Dr. Jonathan Bell provided Unum with his office notes describing his treatment of plaintiff between May 1990 and November 1999. | 161-189 |
| 24 | Unum received reports of plaintiff's May 3, 1999 admission to the Danbury Hospital Emergency Room with complaints of substernal chest discomfort. | 196-206 |
| 25 | Unum received reports of plaintiff's July 9, 1998 admission to the Danbury Hospital Emergency Room.  The report indicates she had an allergic reaction to red peppers, was observed and released after two hours. | 263 |
| 26 | Unum received reports of plaintiff's June 14, 1999 admission to the Danbury Hospital Emergency Room.  The report indicates plaintiff ate shellfish and "she thinks she may have developed an allergic rash, complains of throat tightness and difficulty in breathing." Plaintiff exhibited "stable" vital signs, "Pulse oximetry 97% on room air...Oropharynx is clear.  Uvula is midline, no soft tissue hypopharyngeal swelling.  Lungs are clear on auscultation, occasional expiratory wheeze." | 265-66 |
| 27 | Plaintiff provided Unum with a completed Nurses' Education and Employment History form.  In completing that form, plaintiff stated that she left her job as a Clinical Staff Auditor "due to my severe allergic reactions to food and food odors."  She received an associates degree in nursing in 1983, worked as a nurse in an intensive care unit and then for Drs. Bell and Miller, allergists in Danbury.  Then she took a job on a floor at Danbury Hospital until she injured her back at work which led to her employment as a Clinical Staff Auditor.  She stated that she attended many educational seminars over the years. | 303-09 |
| 28 | Plaintiff also provided Unum with a 9 page summary dated March 16, 2000 of the history of her symptoms and her condition.  In concluding the summary, plaintiff wrote "Being home is a very control [sic] environment I did much better." | 312-321 |

| 29 | Plaintiff also provided Unum with a March 31, 2000 letter from Dr. Sica to her health insurer, USI Administrators, in which Dr. Sica wrote:<br><br>Over the past year her allergic reaction to red pepper and the pepper family have escalated.  These anaphylactic reactions have required numerous ER visits and brief hospitalizations...It is medically necessary that she be desensitized asap as her reactions may be life threatening.  My office is not set up to handle this type of severe reaction, so I have referred her to Dr.  William Rea of the Environmental Health Center/Dallas for this treatment....It is urgent that she receives this treatment. | 326 |
|----|----|----|
| 30 | On or about April 10, 2000, Unum reassigned the plaintiff's case to Shannon Haskell, another Disability Benefits Specialist. | 343 |
| 31 | On April 10, 2000, Haskell spoke with an on-site medical consultant, Sharon Davenport, RN.  Davenport informed Haskell that she was going to refer the medical portion of the plaintiff's claim to William McBride, MD. | 344 |

| 32 | On April 11, 2000, Davenport prepared a full medical review of the plaintiff's claim.  The review included all of the medical information plaintiff had submitted and Unum had received.  After reviewing all that information, Nurse Davenport wrote: | 349-55 |
|----|----|----|
|    | Conclusions: Clmt with hx [history] of asthma and stated development of respiratory symptoms with exposure to varied substances.  It is unclear if she has received treatment with pulmonologist for her asthma.  Clmt has been seen by multiple physicians with treatments consisting of meds, inhalers, immunosuppressive treatment.  Dr.  Sica has recently also diagnosed with adrenal insufficiency.  It is unknown if she is following with endocrinologist.  At present she is seeking treatment in Texas with Dr.  Rea.  Clmt apparently sought consultation with Dr. Buffalol in NY - stated as "environmental specialist" per Clmt; who according to E. Harte [ND] wanted to r[ule]/o[ut] MCS (?multiple chemical sensitivities)- records not in file.  Clmt was sent to Dr.  Grodofsky for second opinion - she was scheduled to return for follow up visit but did not -- unknown why not.  At the time of medical review, there is no objective verification of R&L's based on diagnostic or other medical information.  Discussed with Dr. McBride-referred for his review. | 349 |
| 33 | On April 20, 2000, plaintiff spoke by telephone with Haskell and told her that she was in Texas, would be there for "a couple of months," and that she would have Dr. Rea fax her treatment records and notes. | 360-62 |

| 34 | Unum had Dr. William McBride perform a medical review of all the information in plaintiff's file. After reviewing those materials, Dr. McBride provided his conclusion: |
| --- | --- |

The information on file suggests to me that Dr. Grodofsky may have been on the right track in addressing the anxiety components in this claim. While we cannot at this distance diagnose conditions, generically, the presentation of this claimant would be clinically consistent with that of the diagnostic label of multiple chemical sensitivities syndrome. This is a controversial entity, which some clinicians feel also resembles and overlaps with other functional somatic syndromes, such as fibromyalgia/chronic fatigue syndrome (note the claimant is also complaining of fatigue and achiness). It characteristically has typical dramatic psychological responses to minimal chemical odor exposure, often at very minute concentrations. Some researchers have invoked the theory that such episodes could reflect examples of a conditioned reflex (i.e. the recognition or detection of an odor triggering a cascade response physiologically but not mediated by physical immune complex triggers normally associated with true immune syndromes).

It is possible or even likely that the claimant actually believes she has and exhibits significant apparent anaphylactic responses, which could be convincing to her family, friends, associates and attending physicians. If present, this clearly could pose a significant dilemma in assessing the actual level of impairment. It is worrisome that the claimant, rather than returning to Dr. Grodofsky, has chosen to be seen by yet another physician in Texas.

I am also concerned that litigation may be having an impact, since we know that it is occurring with respect to the cruise ship incident.

Therefore, Dr. McBride provided the following suggestion to Haskell:

One way of attempting to clarifying all of this would be to speak directly with Dr. Grodofsky who posed the question in the first place of a significant anxiety component. It is likely of significance that the claimant did not return or follow up evaluation with Dr. Grodofsky. Dr. Grodofsky admittedly

| | | |
|---|---|---|
| | has not formally labeled the claimant with MCSS, but he has also not seen the claimant in follow up as planned. | |
| 35 | McBride told Haskell that he would try to reach Dr. Grodofsky and discuss his treatment of the plaintiff. | 370 |
| 36 | On May 5, 2000, Drs. McBride and Grodofsky spoke by telephone, McBride sent a letter to Grodofsky detailing the contents of that conversation, and Grodofsky adopted the contents of that letter as accurate. | 375-76 |
| 37 | In his May 5, 2000 letter, Dr. McBride wrote:<br><br>You confirmed that there has been no physiological or immunological basis uncovered for her reported symptoms and that her primary problem has not been allergies. You confirmed, as well, that all of her testing has essentially been normal and that there are no physical findings of impairment. You further indicated that a possible reason for her discontinuation of follow up with you was that you had explained at some length to Ms. Neeb that there was no objective evidence that there was anything immunologically wrong with her and that she might benefit from a psychiatric assessment/intervention. We also discussed the application of the controversial term multiple chemical sensitivity syndrome, which you acknowledged has not scientifically accepted, objective pathophysiological basis. You indicated that Ms. Neeb now believes that this is in fact her diagnosis and this may explain her search for distant treatment. | 375-76 |

| 38 | On or about May 9, 2000, Unum received a letter from Dr. William Rea of Dallas, Texas regarding his care and treatment of the plaintiff.  In that letter, Dr. Rea wrote:<br><br>Mrs.  Neeb is currently being treated for anaphylaxis with laryngeal edema, fatigue, fibromyalgia, immune deregulation, chemical sensitivity, food sensitivity and asthma....The primary goal of our treatment is avoidance of inciting agents.  When exposed to any inciting agent, the patient experience life threatening anaphylaxis, shortness of breath, fatigue, disorientation, difficulty in concentrating and thinking, and incapacitating fatigue.  Her symptoms and medical condition are very incapacitating both physically and mentally.  Her condition is very unstable and will not be able to engage in any type of work-related activity.  It is in my medical opinion that this patient is still disabled and is unable to engage in any type of work. | 381-83 |
| 39 | Haskell referred Dr. Rea's letter to Davenport for her evaluation.  On May 24, 2000, Davenport  indicated that "disability not appear to be supported, however, Dr. McBride should review [Dr. Rea's] letter and comment on it." | 387 |
| 40 | Haskell referred Dr. Rea's letter to Dr. McBride for his review and comment on the "updated info from Dr. Rea." | 388 |

| 41 | On June 7, 2000, Dr. McBride provided Unum with an "Updated Medical File Review," in which he wrote:<br><br>I refer as well to my 5/1/00 medical review and my 5/5/00 correspondence to the attending physician documenting our conversation.  A narrative has been received from the claimant's new attending physician, Dr. Rea in Texas dated 5/9/00.<br><br>Dr.  Rea describes  unconventional/controversial treatment and his observations stand in stark contrast to that of Dr. Grodofsky.  Dr.  Grodofsky had concluded that there has been no physiological or immune basis uncovered for this claimant's symptomatology.<br><br>This claimant appears to be caught up in a belief system conundrum not uncommon to those who present as the multiple chemical sensitivities syndrome (i.e. environmental intolerance) - one of the functional somatic syndromes. There appears, from the records on file, to be a significant and continuing iatrogenic component to this clamant's situation and dilemma.  This is compounded by the claimant's rejection of Dr. Grodofsky's advise to seek psychiatric assessment after he concluded his scientifically based assessment of her complaints.  Unfortunately this would appear to preclude an effective and practical approach to her situation at this time.<br><br>There would appear also to be no benefit or indication for attempting to discuss the claimant's situation with Dr.  Rea who appears to have a fixed and unconventional but highly visible approach to such situations backed up by a large clinic devoted to this unconventional treatment regime. | 389 |
| 42 | On July 1, 2000, Unum in writing denied plaintiff's claim for benefits under the Policy.  In that letter, Unum reviewed the plaintiff's claim, her symptoms and the medical documentation available in light of the policy language. | 403-06 |

| 43 | Haskell wrote: | |
| | | |

Haskell wrote:

> You are disabled when Unum determines that: you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

> The occupation of a RN contains many different jobs that require different skills, different levels of physical capacity and are found in multiple environments.  To be disabled from the occupation of a nurse, you need to be unable to perform the duties of any nursing occupation, not just the specific nursing job you performed with Danbury Health Systems. Our review of the medical information in your file has found that you would not be disabled from performing all types of nursing occupations.

> Dr.  Sica indicates your primary diagnosis is allergies.  He noted your restrictions and limitations as "patient should not be exposed to inhalants and volatile chemical odors."  These restrictions and limitations ... would not preclude you from performing all types of nursing occupations.

> On November 29, 1999, Dr.  Marshall Grodofsky who specializes in Asthma and Allergy treatment performed an evaluation.  In his evaluation he noted that 'it is difficult to quantify the frequency of these 'allergy spells' with the complaints of mouth inflammation as it does not appear to be documented by physicians and again there was some inconsistency in history in figuring out whether there is a specific trigger that seems to set off the reactions."

> At that time lung function testing was done which showed no evidence of any airflow obstruction.  It was noted that the testing was repeated due to your complaints of mouth swelling

> Dr.  Grodofsky indicated he was not able to observe any mouth swelling and the repeated testing was essentially unchanged.  Additionally scratch testing was performed to a variety of inhalant as well as food allergens and all except for ragweed was negative.

Dr. Grodofsky recommendation that some specific blood tests be done as well as a peak flow monitor to monitor your breathing. He requested a reevaluation in 6 weeks and noted "ruling out clear pathophysiologic patters that could be causing some of these symptoms will allow us to address the anxiety related complaints as well in the future.

One of Unum's on-site physicians whose specialty is Occupational Medicine contacted Dr. Grodofsky to obtain some additional information from him. During their conversation Dr. Grodofsky confirmed that there had been no physiological or immunological basis uncovered for your reported symptoms. He further indicated that all testing had been essentially normal and there were no physical finding of impairment. It was Dr. Grodofsky opinion that you had not followed-up with him as directed because he informed you that there was no objective evidence that there was anything immunologically wrong and that you might benefit additionally from a psychiatric assessment.

Based on this information, when you stopped working in December of 1999, there was no objective support you were unable to perform the duties of any type of nursing occupation. Dr. Grodofsky treated you just prior to your reported December 6, 1999 date of disability and found no objective evidence for any disabling conditions.

Our review has found that we agree with Dr. Grodofsky opinion and recommendations. Your contract requires that you have the most appropriate treatment for your condition. You contract states:

Regular care means:

- you personally visit a doctor as frequently as is medically required, according to generally accepted medical standards, to effectively manage and treat your disabling condition(s) and

- **you are receiving the most appropriate treatment and care which conforms with generally accepted medical standards, for your disabling condition(s) by a doctor whose speciality or experience is the most appropriate**

| | | |
|---|---|---|
| | **for your disabling condition(s) according to generally accepted medical standards.**<br><br>Dr. Grodofsky specializes in the treatment of asthma and allergies, which is what you were claiming disability for. It is our opinion that the treatment recommendations made by Dr. Grodofsky would be considered the most appropriate for your treatment. You did not follow-up with Dr. Grodofsky as recommended which we feel would have been the most appropriate treatment for your condition. | |
| 44 | Even though Unum denied the plaintiff's claim, it invited her to provide it with further information and told her that it would review her claim in light of that further information. | 404 |
| 45 | Haskell spoke with plaintiff on 7/15/00 and informed her of the denial. Plaintiff claims that her current doctor, Rea, feels that Dr. Grodofsky is a "quack." | 409-10 |
| 46 | Unum thereafter received<br><br>• Medical notes and records from the Environmental Health Center of Dallas, Texas;<br>• Emergency room records of treatment plaintiff received at Danbury Hospital on 7/9/98 and 6/14/99 which were duplicates of records already in the file;<br>• Hartford Hospital Emergency Room records of treatment plaintiff received on 10/28/99 which were duplicates of records already in the file;<br>• Lower Keys Medical Center Emergency Room records of treatment plaintiff received on 2/23/00 which were duplicates of records already in the file;<br>• unsigned medical records from 3/13/99 through 3/19/99;<br>• Laboratory reports provided to Elyssa Harte, ND which were duplicates of records already in the file; and<br>• A narrative report of Dr. William Rea dated September 26, 2000 along with an Estimated Functional Capacities Form Dr. Rea completed. | 419-517<br><br>534-37<br><br>538-40<br><br>522-33<br><br>541-46<br>547-49<br><br>550-54 |

| 47 | In his September 26, 2000 narrative report, Dr. Rea stated: | 552-554 |
|----|------------------------------------------------------------|---------|

Significant medical findings show that the patient had an abnormal cell mediated immunity test (CMI) of only 2+. Her T&B lymphocyte subset profiles were normal. Her ANA was also normal. The patient had undergone a heart rate variability test and a pupillography test, both of which reveal abnormal autonomic nervous system function. Skin testing showed sensitivity to several common foods, molds, pollens and to all of the chemicals that she tested.

Her skin testing endpoints for the suspected incitants, which were the night shade family, were extremely high showing that the patient is extremely sensitive, especially to the green peppers. Her progress notes reveal that the patient also suffers from pre-anaphylactic symptoms from the mere smell of peppers.

My diagnosis for this patient are chronic asthma, anaphylaxis, anaphylaxis to foods, inhalant sensitivities, fibromyalgia, fatigue, immune deregulation, dysautonomia and chemical sensitivity.

Ms. Neeb's chemical sensitivities impose substantial environmental restrictions upon her. Specifically, the customary chemicals and other environmental agents found in almost every work setting such as carpeting, particle board, cleaning chemicals, perfumes, deodorizers, dusts and mites, photocopier chemicals and supplies, vinyl and upholstered furniture, foam padding cigarette smoke, pesticides and insecticides, minimal variations in heat and cold, clothing and fabrics, unfiltered air and unfiltered water all cause severe and disabling hypersensitivity reactions in the patient. These reactions in turn produce severe and disabling physical limitations.

The primary goal of our treatment is strict and total avoidance of inciting agents...Her condition is very unstable and will not be able to engage in any type of work-related activity. It is in my medical opinion that this patient is still disabled and is unable to engage in any type of work.

| 48 | In the Functional Capacities Evaluation, Dr. Rea stated that plaintiff could lift 1-10 lbs occasionally; bend, kneel, crawl, climb stairs and reach above shoulder occasionally; she had 3 hrs sedentary work capacity "with non-toxic environment" and 1 hr light activity per day. He continued:<br><br>    The patient suffers from debilitating fatigue and life threatening anaphylaxis when exposed to specific food odors, petrochemicals, solvents, pesticides, perfumes, fragrances from laundry detergent or fabric softeners, cigarette smoke, cleaners, disinfectants, inks, etc. | 550-51 |
| 49 | On September 26, 2000, plaintiff wrote to appeal Unum's denial of her application for benefits under the Policy. | 555-60 |
| 50 | On October 7, 2000 Unum referred plaintiff's file to another medical consultant, Laurence Broda, M.D., for his independent review of its contents. | 562 |

| 51 | On October 18, 2000 Dr. Broda provided file review.  He wrote as follows:<br><br>52 yo RN clinical auditor O[ut] O[f] W[ork] since 12/7/99 with chronic asthma, anaphylaxis to "foods," inhalant sensitivity, fibromyalgia, immune deregulation, chemical sensitivity. Seen by several allergists, immunologist and a "naturopathic" physician...has been on several meds for chronic treatment of her asthma which appears controlled and has not required hospitalization....only 1 ER visit revealed wheezing...and she was treated with standard care for allergic reaction w/o hospitalization. ...Her exam, PFT's were normal; scratch testing done to a variety of inhalants and food allergens revealed only reaction to ragweed.  Skin tests to a variety of foods including tomatoes/potatoes, peanuts, shrimp, scallops were all non reactive indicating and arguing against IGE mediated reactivity.  Non IGE mediated reactivity usually causes GI symptoms and not resp problems....<br><br>Conversation previously between Dr. MacBride and Dr. Grodofsky confirmed the absence of immunologic basis for her symptoms and that psychiatric assessment might benefit...subsequently evaluated by several other doctors, most notably Dr. William Rea....he found skin reactions to several foods, molds, pollens and "chemical" and has prescribed a cornucopia of treatment....most of which is out of the mainstream therapy for allergic reactions.  While avoidance therapy is reasonable she has not required ER eval or hosp evaluation except for the previously mentioned ER visits and these were after ingestion or touching peppers. The finding of + skin testing doesn't prove nor correlate with symptomatic food allergies.  Certainly she hasn't required excessive treatment for other inhalants, irritants or foods. There would be also very little difference in environmental make up of a house as opposed to an office setting.  Medical evidence doesn't support reversal of the denial. | 563-64 |
| 52 | Unum determined that it would not reverse its prior decision, and Haskell wrote to plaintiff on November 7, 2000 to inform her of that fact. | 569-71 |

| 53 | Haskell's November 7, 2000 letter adopts the findings and conclusions of Unum's June 1, 2000 decision, and specifically addressed the new information provided by Dr. Rea, as follows: | 569-71 |
| | You have recently submitted a letter appealing the original denial along with medical records from Dr. William Rea as well as various Emergency Room reports.  This additional information has been reviewed by our medical department and determined to be insufficient to reverse our prior decision.  In terms of the Emergency Room visits, three out of four of those took place prior to your date of disability, indicating that you were able to maintain the performance of your occupational duties.  Although we understand that you have undergone significant treatment with Dr. Rea, a majority of which is out of the mainstream therapy for allergic reactions, this does not reverse our pinion that as of your last day of work there was no objective evidence to support your inability to continue working. | 569 |
| 54 | Unum thereafter forwarded plaintiff's file to its Quality Review Section for an impartial review of the claim. | 569 |
| 55 | Sandy Kaserman, Lead Appeal Specialist, took over responsibility for reviewing the claim on November 14, 2000 | 574 |
| 56 | On December 12, 2000, plaintiff through counsel requested an appeal of Unum's decision. | 577 |

| 57 | On January 22, 2001, Unum wrote to plaintiff's attorney notifying him of its appellate decision.  In part, Kaserman wrote on Unum's behalf that:<br><br>An independent review of your client's claim has been conducted.  According to the claim file, a medical review was completed on 4/11/00.  It was noted that your client ceased working as a Clinical Auditor Registered Nurse (RN) on 12/7/99 due to allergies.  The attending physician's statement completed by Dr. Sica indicated a diagnosis of allergies with restrictions and limitations that noted your client should not be exposed to inhalants and volatile chemicals.  Symptoms of dyspnea, shortness of breath, hoarseness, anaphylaxis and chemicals were reported.  The conclusion of the review revealed that the objective medical data provided by multiple providers did not support the restrictions and limitations noted.  It was further stated that it was unclear at that time if a pulmonologist or an endocrinologist for the related symptoms was treating your client.<br><br>Additional information was provided, and a subsequent medical review was completed on 5/1/00....The medical data supports care from several allergists over the past 10 years for reported asthma and food allergy symptoms.  It was noted that your client was seen by an allergist, Dr. Grodofsky, for a second opinion.  A thorough assessment was conducted, which included allergy testing, and it was discovered that your client only appeared to have documented allergic reaction responses by skin testing to ragweed.  The RAST testing was also reported as negative.  Dr. Grodofsky recommended a follow-up in 6 weeks, and the records indicate that your client did not follow-up with that recommendation, and instead was being assessed by Dr. Rea in Texas.  The conclusion of the review revealed that based on the complexity of the condition due to various theories regarding a definitive diagnosis and treatment, it was recommended that Dr. Grodofsky be contacted to discuss the results of the assessment. | 579-81 |

| | | A letter was sent to Dr. Grodofsky on 5/5/00 which summarized the telephone contact that took place with our in house medical resource to further clarify the diagnosis, tests results and related restrictions and limitations.  The letter noted that the medical resource noted an interpretations of your client's records suggested that thorough testing had not revealed the presence of an immune basis for the symptoms.  The exceptions was a ragweed sensitivity, which could explain seasonal rhinitis but not her reported ten year history of asthma and life threatening anaphylactic reactions. It was noted that Dr. Grodofsky confirmed that there has been no physiological or immunological basis uncovered for her reported symptoms, and that her primary problem ahs not been allergies.  It was also confirmed that all of the testing has essentially been normal, and there were no physical findings or impariment.  Dr. Grodofsky indicated that the possible reason that your client did not follow up with him was due to the fact that he told your client that there were no objective findings to indicate that there was anything immunologically wrong with her, and that she might benefit from a psychiatric evaluation.  The application of the controversial term of multiple chemical sensitivity syndrome was discussed, and it was agreed that there was no scientifically accepted objective pathophysiological basis.

A letter was sent to Dr. Rea to obtain the results of the assessment and to attempt to understand your client's medical condition and related restrictions and limitations.  A medical review was completed on 6/7/00.  It was noted that the results of Dr. Rea's examination and observations stand in stark contract to that of Dr. Grodofsky.  Further discussion with Dr. Rea was not done as it was noted that Dr. Rea appeared to have a fixed and unconventional but highly viable approach to such situations, backed by a large clinic devoted to this unconventional treatment regimen.

The claim was appropriately denied on 7/1/00 due to the lack of medical evidence to support restrictions and limitations that would prevent work in your client's own occupation.

Subsequent to the denial, additional medical information was provided and a medical review was completed on 10/18/00. The results of the review revealed that the medical data did not support disability, and the previous medical review done | 580 |

|  | Based on a lack of substantive objective medical evidence to support restrictions and limitations to preclude work capacity, the denial will be upheld. | 579 |
|---|---|---|
| 58 | Plaintiff's attorney requested another review of Unum's decision, which Unum undertook. | 587-88; |
| 59 | Sharon Davenport, RN again conducted a review of all medical information in the plaintiff's file. | 774-82 |
| 60 | On May 4, 2001, Kaserman wrote plaintiff's attorney to inform him that:<br><br>We have not received any additional information that would change that [January 22, 2001] determination, therefore, we find that our previous decision to deny further benefits was correct and we are upholding the determination.<br><br>This represents the final review of your file, and therefore, you have exhausted all administrative remedies in regard to your appeal for disability benefits. | 591 |
| 61 | On February 10, 2003, plaintiff through other attorneys submitted further information and materials which they claimed were in "appeal" of Unum's prior decisions. | 592-697 |
| 62 | On February 28, 2003, Unum through Sandy Kaserman responded to that materials that, "as noted in the correspondence dated May 4, 2001, that review represented the final appellate review of the claim denial, and all administrative remedies in regard to the appeal for disability benefits were exhausted at that time.  No further appellate reviews will take place, and the correspondence dated February 10, 2003, as well as any future correspondence submitted, will be filed in the claim file, and no response will be completed. | 698 |
| 63 | The Policy contains the following language:<br><br>This policy is delivered in and is governed by the laws of the governing jurisdiction and to the extent applicable by th Employee Retirement Income Security Act of 1974 (ERISA) and any amendments.  When making a benefit determination under the policy, Unum has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy. | 748 |

| 63 | The Policy contains the following language: | 741 |
|---|---|---|
| | You are disabled when Unum determines that : | |
| | •     you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to **sickness or injury;** and | |
| | •     you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury | |
| 64 | The Policy contains the following language: | 741 |
| | **Limited** means what you cannot or are unable to do. | |
| 65 | The Policy contains the following language **Material and substantial** duties means duties that: | 741 |
| | •     are normally required for the performance of your regular occupation; and<br>•     cannot be reasonably omitted or modified | |
| 66 | The Policy contains the following language | 741 |
| | **Regular occupation** means the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location | |
| 67 | The Policy contains the following language | 740 |
| | **Sickness** means an illness or disease. Disability must begin while you are covered under this plan | |
| 68 | The Policy contains the following language | 740 |
| | **Injury** means a bodily injury that is the direct result of an accident and not related to any other cause. Disability must begin while you are covered under the plan. | |

| 69 | The Policy contains the following language<br><br>REGULAR CARE means:<br><br>•     you personally visit a doctor as frequently as is medically required, according to generally accepted medical standards, to effectively manage and treat your disabling condition(s) and<br><br>•     you are receiving the most appropriate treatment and care which conforms with generally accepted medical standards, for your disabling condition(s) by a doctor whose speciality or experience is the most appropriate for your disabling condition(s) according to generally accepted medical standards | 714 |

## II.    PROPOSED CONCLUSIONS OF LAW

1.    This court has jurisdiction over the plaintiff's complaint pursuant to the provisions of the Employee Retirement Income Security Act ("ERISA") 29 U.S.C. §1001 *et seq.* as the dispute arises out of an employee welfare benefit plan, 29 U.S.C. §1002(1).

2.    Prior to December 6, 1998, plaintiff was an employee of Danbury Health Systems, Inc.  as a Nurse Auditor.

3.    At all relevant times, Danbury Health Systems, Inc. provided its employees, including the plaintiff, with long-term disability insurance covered under a policy (the "Policy) issued by Unum Life Insurance Company of America ("Unum").

4.    Unum is the administrator of the Policy.

5.    Under the Supreme Court decision in Firestone Rubber Company v. Bruch, 489 U.S. 101, 115 (1989), a decision of an ERISA appeals committee is to be reviewed *de novo* unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  See also, Celardo v. Greater New York Auto. Dealers Health & Welfare Trust, 318 F.3d 142, 145 (2d Cir. 2003); Short v. Unum Life Insurance Company of America,  2003 U.S. Dist. LEXIS 22327 (D. Conn. 2003).

6.      In light of the language contained in the Policy, Unum when making a benefit determination has discretionary authority to determine an applicant's eligibility for benefits and to interpret the terms and conditions of the Policy.

7.      Where the written benefit plan documents give the administrator discretionary authority to determine eligibility for benefits, a court will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious. Pagan v. NYNEX Pension Plan, 52 F.3d 438, 441 (2d Cir. 1995).

8.      Unum bears the burden of proving that the arbitrary and capricious review applies, since the party claiming deferential review should prove the predicate that justifies it. Sharkey v. Ultramar Energy, Ltd., 70 F.3d 226, 230 (2d Cir. 1995). Unum has satisfied its burden of proof.

9.      The language of the Policy defining Unum's authority to determine an applicant's eligibility for benefits and to interpret its terms and conditions are sufficient to invoke a court's deferential review of Unum's decision. Pulvers v. First Unum Life Insurance Company, 210 F.3d 89, 92 (2d Cir. 2000) (language granting administrator "discretionary authority to determine ... eligibility for benefits and to interpret the terms and provisions of the policy" is of a kind that "generally prompts the arbitrary and capricious standard of review."); Maniatty v. UNUM Provident Corporation, et al., 218 F. Supp. 2d 500, 502-3 (S.D.N.Y. 2002), aff'd 2003 U.S. App. LEXIS 9383 (2d Cir. 2003), cert. den. __ U.S. __, 157 L. Ed. 2d 310, 124 S. Ct. 431, 2003 U.S. LEXIS 7719, 72 U.S.L.W. 3280 (2003); ; Short, 2003 U.S. Dist. LEXIS, *17; (quoting identical language); Rosenthal v. First Unum Life Insurance Co., 2002 U.S. Dist. LEXIS 8365, *15-*16 (S.D.N.Y May 9, 2002)(interpreting identical language);Kocsis v. Standard Insurance Company, 142 F.Supp. 2d 241,251-52 (D. Conn. 2001) (reservation of right to determine eligibility for insurance, entitlement to benefits, amount of benefits and sufficiency of amount of information triggers discretionary review).

10.     In reviewing an ERISA claim in which the administrator's conduct is judged by the arbitrary and capricious standard, the court's examination of the facts of the case is limited to reviewing the administrative record compiled below. Miller v. United Welfare Fund, 72 F.3d 1066, 1071 (2d Cir. 1995).

11.     The scope of review is "very narrow." See Celardo, 318 F.3d at 146; Peterson v. Continental Casualty Co., 282 F.3d 112, 117 (2d Cir. 2002).

12.     In a deferential review case such as this, "a district court reviewing an ERISA denial of benefits is effectively functioning in an appellate capacity because it is precluded from considering new evidence" Larsen v. The Prudential Insurance Company of America, 151 F.Supp. 2d 167, 172 (D.Conn. 2001).

13.     A court may overturn an ERISA administrator's decision to deny benefits "only if the decision to deny benefits was without reason, was unsupported by substantial evidence, or was erroneous as a matter of law." Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442 (2d.Cir. 1995).

14.     A denial of benefits is "arbitrary and capricious" if the decision to deny benefits was without reason, was unsupported by substantial evidence, or was erroneous as a matter of law. Pagan, 52 F.3d. at 442. "Substantial evidence" means such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision-maker; it requires more than a scintilla, but is less than a preponderance of the evidence. Kocsis, 142 F.Supp. 2d at 252.

15.     "Where both the plan administrator and a spurned claimant offer rational, though conflicting, interpretations of plan provisions, the administrator's interpretation **must** be allowed to control" Pulvers, 210 F.3d 92-93 (emphasis added) because the administrator's determination is entitled to a presumption of correctness. Sullivan v. LTV Aerospace & Defense Co., 82 F.3d 1251, 1258 (2d Cir. 1996)

16.     In a situation where a reviewing court finds it necessary to choose between two competing yet reasonable interpretations of a pension plan, the court **must** accept that which is offered by the administrator. Pagan, supra. at 443. (Emphasis added).

17.     Under the deferential standard, the court is "not free to substitute its own judgment for that of the plan's administrator as if it were considering the issue of eligibility anew." Kocsis at 252. Thus, the court may not upset a reasonable interpretation of the administrator. Jordan v. Retirement Commission of Rensselear Polytechnic Inst., 46 F.3d 1264, 1271 (2d Cir. 1995).

18.     While Unum has the burden of demonstrating that its decision is entitled to deferential review, the plaintiff has the burden of establishing that she is entitled to benefits under the Policy. Abnathaya v. Hoffman-LaRoche, Inc., 2 F.3d 40, 46 (3rd Cir. 1993); Wojciechowski v. Metropolitan Life Insurance Company, 75 F. Supp. 2d 256, 262-63 (S.D.N.Y. 1999); George v. First Unum Life Insurance Company, 1996 WL 701018 (S.D.N.Y. 1996).

19.     It is not arbitrary, capricious or even unreasonable for a plan administrator to demand objective evidence to support the existence and then the nature of claimed restrictions and limitations.  While plaintiff's self-reported symptoms and subjective reports are relevant in considering whether to grant benefits, plan administrators are not obligated to accord special weight to those subjective reports.  Maniatty supra; Boardman v. The Prudential Insurance Company of America, 2003 U.S. App. LEXIS 14672 (1st Cir. July 23, 2003); Coffman v. Metropolitan Life Insurance Co., 217 F. Supp. 2d 715, 732 (D. W.Va. 2002): Wertheim v. Hartford Life Insurance Co., 2003 US. Dist. LEXIS 10807 (E.D. Va. 2003);  Williams v. Unum Life Insurance Company of America, 250 F. Supp. 2d 641, 648 (E.D. Va. 2003); Martin v. Continental Casualty Company, 96 F. Supp.2d 983, 992-94 (N.D. Cal. 2000).

20.     Furthermore, the administrator is not bound or required to accept the diagnosis or opinions of a claimant's treating physician.  The Black & Decker Disability Plan v. Nord, 538 U.S. 822, 123 S. Ct. 1965, 1972, 155 L. Ed. 2d 1034 (2003); Wagner v. First Unum Life Insurance Company, 2004 U.S. Dist LEXIS 14245 *14 (S.D.N.Y. 2003), aff'd 2004 U.S. App. LEXIS 11632 (2004).

21.     The Court has reviewed the administrative record of the proceedings and has determined that Unum's denial of plaintiff's application for long term disability benefits was not arbitrary or capricious and, rather, was supported by substantial evidence.  While plaintiff claimed to be suffering from allergic reactions to various substances and, in turn, was disabled by the allergic reactions she suffered, she did not provide Unum with objective data to support either her claims that the she suffered from the panoply of allergies Dr. Rea identified or with the severity of the symptoms she allegedly suffered on account of those allergies.  Indeed, the Court notes that the treatment plaintiff  received during her four emergency room visits was what would be normally expected to be provided to nn allergy sufferer; she did not require exceptional care or treatment; and she was not hospitalized overnight or for an extended stay on account of the symptoms that brought her to seek treatment.  Furthermore, the Court notes, as did Unum, that while she was being treated by Dr. Grodofsky, a specialist in asthma and allergies, plaintiff claimed to be experiencing an allergic reaction and notified the doctor of that fact, but Dr. Grodofsky was unable to identify any physiological reaction in the plaintiff that would have confirmed an ongoing allergic reaction.  Furthermore, the Court notes that the blood test Dr. Grodofsky ordered which if positive would have confirmed an anaphylactic reaction in the plaintiff was normal, leading Dr. Grodofsky to the conclusion that plaintiff was not actually experiencing anaphylactic reactions.  These factors led to Dr. Grodofsky's opinion that plaintiff's complaints were more psychological than physical, and his

31

imparting that opinion to the plaintiff likely was the primary reason why plaintiff did not follow up with treatment with Dr. Grodofsky.

22.   Plaintiff's failure to provide Unum with the cause of her disability and then to demonstrate that such disability imposed restrictions and limitations on her ability to perform the material and substantial duties of her regular occupation is sufficient basis upon which to uphold Unum's decision.

23.   But Unum's determination that plaintiff did not suffer from a medical disability was not limited to plaintiff's failure to provide sufficient medical data in support of her claim.  Unum referred the data provided by plaintiff and her doctors reviewed by a physician whose speciality is in occupational health and medicine, a nurse, and a vocational expert, and none of them believed that plaintiff was disabled under the Policy definition.  After Unum determined that it would deny the plaintiff's claim for benefits, it sent her a detailed explanation of its reasoning in which it detailed the shortcomings in the claim and provided her with the opportunity to supplement her application.  Once she supplemented the data supporting her claim, Unum reviewed everything she had submitted, determined to uphold its decision, and then forwarded the entire claim to a separate body within Unum for an independent review.  During that review, another Unum employee took over responsibility for the claims decision, another doctor reviewed the data in the file, and Unum issued another decision upholding the initial determination that plaintiff was not disabled on medical grounds.  At plaintiff's request, Unum again reviewed that decision, and determined that its prior decisions were correct.  The process Unum undertook in evaluating plaintiff's claim was not arbitrary and capricious.  Kocsis, supra. 252; Mormile v. Metropolitan Life Insurance Company, et al. 91 F. Supp.  2d 492, 496 (D. Conn. 2000).

24.   Judgment shall enter for the defendant dismissing the complaint, and the clerk is directed to close this file.

RESPECTFULLY SUBMITTED,
UNUM LIFE INSURANCE COMPANY OF
AMERICA


BY:   _____
Alexander H. Schwartz, Esq. (Ct 05773)
3695 Post Road
P.O. Box 701
Southport, CT   06890-0701
203.255.9829
203.255.9839 (Fax)
ITS ATTORNEY


## CERTIFICATION

I hereby certify that a true copy of the foregoing has been mailed this September 17, 2004 to:

Jeffrey R. Heyel, Esq.
68 Main St.
Danbury, CT   06810


_____
Alexander H. Schwartz

33