## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

------------------------------------------------------------

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| **LAURA NEEB,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION NO.** |
| | : | |
| **303CV0307(AVC)** | : | |
| **v.** | : | |
| | : | |
| | : | |
| **UNUM LIFE INSURANCE COMPANY OF AMERICA,** | : | |
| **October 19, 2004** | | |
| | : | |
| **Defendant.** | : | |
| | : | |

------------------------------------------------------------

## PLAINTIFF"S MEMORANDUM IN RESPONSE TO THE DEFENDANT"S MOTION FOR JUDGEMENT ON THE ADMINISTRATIVE RECORD
## &
## IN SUPPORT OF HER MOTION FOR JUDGEMENT ON THE ADMINISTRATIVE RECORD

The Plaintiff, Laura Neeb, moves that the Court enter judgment awarding her payment on her insurance policy for benefits contracted under a long term disability insurance policy issued by the UNUM Life Insurance Company of America.  As this case arises under the Employee Retirement Income Security Act, the court may consider information from outside of the administrative record if it believes that good cause exists for admitting such evidence.  As the Court is to review the matter at hand de novo, it should review the administrative record in its entirety and base its decision based on all of the evidence

contained in the administrative record.  The Plaintiff does not object to this court"s review being based primarily on the complete administrative record compiled by UNUM.

## Summary of the Claim

## 1.    Background " The Illness

The Plaintiff, Laura Neeb, filed a claim for long term disability due to anaphylactic reactions brought on by exposure to Red Peppers.  A quick scan of an encyclopedia will reveal that Anaphylaxis was first documented in a scientific monograph in 1902.  Anaphylaxis was first identified when two scientists were attempting to develop a vaccine to Sea Anemone stings. The text of the monograph detailed how a dog died from respiratory failure after being exposed to a Sea Anemone a second time ---curiously, the dog suffered very little in the way of ill effects on its first exposure.  The mechanism of the dog"s death was that the dog"s own immune system somehow became trained to react violently to a substance which was on first exposure almost harmless.

Anaphylaxis is a form of hypersensitivity to a substance which is acquired over some period of time.  It can be as fatal to a human as it was to the dog that perished in 1902.

To describe the symptoms of Anaphylaxis, we offer the following tract from the National Jewish Medical and Research Center:

*Symptoms of Anaphylaxis*

*In Anaphylaxis, cells of the immune system release massive amounts of chemicals " particularly histamine. As a result, blood vessels dilate and begin to leak fluid into surrounding tissues, producing swelling. Several organs can be affected:*

- *The skin frequently shows symptoms first. Hives, itching, swelling, redness or a stinging or burning sensation may develop.*
- *The loss of fluid from blood vessels causes a drop in blood pressure and the individual may feel light-headed or even lose consciousness.*
- *Anaphylaxis can cause obstruction of the nose, mouth and throat. Individuals may first notice hoarseness or a lump in the throat. If the swelling is very severe, it shuts off the air supply and the individual experiences severe respiratory distress.*
- *The airways in the lungs can constrict, causing chest tightness, shortness of breath and wheezing " the classic symptoms of asthma.*
- *The person may experience nausea, vomiting, cramping and diarrhea.*
- *The gastrointestinal tract often reacts, especially if the allergen is something that was swallowed.*
- *Women may experience pelvic cramps due to contractions of the uterus.*

There are numerous other sources of encyclopedic information on this topic available on the Internet. Each one of these web-sites notes that most common form of exposure to a substance which induces anaphylactic shock is a "sting" from an animal such as a jellyfish, bee, or a wasp. These encyclopedic sources also note that it is possible for exposure to be based on inhaling a substance and that recent case of inhalant driven anaphylaxis had been noted with anaphylactic reactions to latex rubber gloves and to peanuts. It is possible that an inhalant exposure may induce anaphylaxis from other substances as well.

## Background " The Administrative Record

The Plaintiff, Laura Neeb, was a registered Nurse who lived in New Milford, Connecticut and was employed in nearby Danbury in that community"s hospital. Like countless other people in America, Ms. Neeb suffered from modest allergies and asthma and was treated by an Allergist. Ms. Neeb"s primary allergist was Dr. Jonathan Bell of Danbury who conducted a number of tests on the Plaintiff between 1988 and 1991. During these tests, Dr. Bell found that Ms. Neeb had allergies to the following substances:

(a) Ragweed;

(b) Maple Tree Pollen;

(c) Dust Mites.

Ms. Neeb had a couple of minor episodes with her allergies.  In 1991, the Plaintiff had some minor complaints about dust and dust mites.  Dr. Bell, her allergist, prescribed the use of an air filter.  In 1993, Ms. Neeb has a minor problem with her Asthma.  Throughout this period, she is seen by Dr. Bell or his Staff for most matters relating to her allergies and she is repeatedly shown to have 3 primary allergies.

In 1996, Ms. Neeb suffered from some problems with her Asthma and was treated by her Primary Care Physician, Dr. Alexis Gopal.  Dr. Gopal treats the Plaintiff with a fairly aggressive regime including the use of the steroid Prednisone.  Her progress with her asthma is also monitored by Dr. Bell.

On July 4, 1998, the Plaintiff becomes itchy and flushed while cutting red peppers for a holiday event.  She doesn"t report this matter initially to Doctor Bell.  Some five days later, on July 9th, Ms. Neeb suffered from an allergic reaction unlike any other that she had previously experienced.  Almost immediately after tasting a salad that had been garnished with red peppers " her face became flushed, her tongue extremely swollen, her throat tightening severely, sores erupting, a lump in her throat that made breathing exceptionally difficult, and she was having trouble breathing.   Ms. Neeb self-administered the anti-histamines Benedryl and Proventil almost immediately to stop the allergic swelling from cutting off her respiration.  Almost immediately after she had this strong reaction to eating the red pepper-garnished salad, Ms. Neeb was taken to the

Hospital in nearby Danbury.  At the hospital, she was examined by Dr. Patrick Broderick, M.D., of the Emergency Medical Staff was diagnosed with severe allergic reaction possibly brought on by the exposure to red peppers.

A brief list of the symptoms complained of by Ms. Neeb and those listed in ordinary medical reference such as mentioned supra, would suggest that this episode may well have been anaphylaxis.  It has many of the same attributes: (1) lump in the throat; (2) flushing; (3) chest tightening; (4) difficulty breathing; (5) sores in the mouth; (6) hoarseness; and, (7) swelling of the tongue.

On the day after her first visit to the emergency room, the Plaintiff"s regular allergist, Dr. Bell, is notified of the allergic episode at Danbury Hospital.  Dr. Bell takes immediate action and prescribes a self-injecting syringe in a pen filled with the powerful anti-histamine epinephrine.  On July 17th, 1999, Dr. Bell examines the patient and concludes that her episode was likely an anaphylactic event triggered by an exposure to red peppers.  After making this diagnosis, Dr. Bell prescribes a plan for avoiding red peppers.

On August 11th, 1998, the Plaintiff is exposed to red peppers and has an anaphylactic reaction when a jar is opened in presence.  She takes the anti-histamine benedryl after this episode.  On August 13th, 1998, she is again exposed to red peppers when a second jar is opened in her presence and again takes the anti-histamine benedryl.

On March 13th, 1999, the Plaintiff and her husband Robert Neeb go on a cruise with Royal Caribbean Lines.   During the cruise, the Plaintiff is treated by ship"s medical staff for no less than 3 episodes of anaphylactic shock.  During each of these episodes, the Plaintiff was required to spend the night in the ship"s infirmary and was placed on a

respirator.  After returning from the cruise, her files are examined by Dr. Bell who

determines that the Plaintiff has suffered severe anaphylactic shock brought on by

exposure to red peppers.

In May of 1999, the Plaintiff becomes concerned that the chest tightness,

dizziness, lump in the throat may not be anaphylaxis as had been previously diagnosed

but may symptomatic of something else such as heart disease.  She is examined by two

cardiologists at Danbury Hospital, Dr. Johns and Dr. Cabral.  Dr. Johns and Dr. Cabral

examine the Plaintiff exhaustively and then refer their materials to Dr. David Copen of

the Yale University School of Medicine. These examinations find that the Plaintiff does

not have a heart problem; however, the Plaintiff"s food allergies are listed as a cause of

the chest tightness that she has been experiencing.

The Plaintiff has six episodes of anaphylaxis between September of 1999 and

October of 1999.  She believes that the episodes are caused by the cooking of red peppers

in the hospital"s cafeteria which is located directly beneath her office.

On October 28th, while the Plaintiff is on a business trip to Hartford, Connecticut,

she suffers another episode of anaphylaxis and is treated at Hartford Hospital.

Following this episode, she asks her allergist, Dr. Bell, to see Dr. Adrienne Buffaloe,

MD, in New York.  Dr. Buffaloe"s specialty is "new age" medicine and the much

questioned "Leaky Gut" syndrome.  Dr. Buffaloe"s medical examination is not contained

in the administrative record and none of her findings have any bearing on the matter at

hand.  The file is mentioned by reference in the administrative record as being present

but it has apparently been lost by the Defendant.

Upon hearing of the Plaintiff"s desire to see Dr. Buffaloe, the Plaintiff was informed by her health insurer that Dr. Buffaloe was out of network and that her suggestions would not be considered without a second opinion from a Doctor with similar expertise.   The Doctor that appears to have been suggested for this second opinion was Dr. Marshall Grodofsky of West Hartford, Connecticut.

Marshall Grodofsky operates a medical practice dedicated to treating people for all manner of allergies.  Dr Grodofsky, also, is a television personality on KSL-TV in Salt Lake City, Utah. The Plaintiff went to consult with Dr. Grodofsky on November 17th, 1999 at her own expense not knowing what to expect.  She had received no communications from Dr. Grodofsky prior to her scheduled visit and had not stopped taking the anti-histamines that Dr. Bell had earlier prescribed for her.  Dr. Grodofsky has substantively commented that it made very little difference to him if the Plaintiff was taking substances which would invalidate his test results.

Prior to her visit with Dr. Grodofsky, the Plaintiff had not received any requests that she provide medical records. Nevertheless, Ms. Neeb brought her medical records to her appointment and was rebuffed that such records were not needed.   By Dr. Grodofsky"s very own admission, he did not use medical records or medical history in his examination of the Plaintiff.

Upon her arrival at Dr. Grodofsky"s office, the Plaintiff was given a very terse entrance interview of which lasted a couple of minutes.  The recorded notes for this interview are barely a few sentences long.  An explanation for this terseness can be found in the administrative record, when the Plaintiff attempted to describe her symptoms to Dr. Grodofsky " she was rebuffed.  Dr. Grodofsky stated that the Plaintiff was not the

doctor and knew nothing of medicine.   When questioned about the brevity of this interview, Dr. Grodofsky intimated that he really did not need to interview his patients in any great detail.   Dr. Grodofsky"s position stands in opposition to his published opinions elsewhere and from guidelines recommended by the American Medical Association for interviewing patients for the treatment of allergies and anaphylaxis.

After his very terse initial interview, Dr. Grodofsky proceeded to conduct scratch tests on the Plaintiff to test for allergic reactions in spite of the fact that she was taking anti-histamines at the time of the testing.  The manufacturers of the Scratch tests available on the market uniformly state that the tests simply will not work if the subject is taking anti-histamines and will provide inaccurate results.   It is because of this indifference to the instructions on the products that he was using that Dr. Grodofsky was unable to detect the Plaintiffs well established record of more than 10 years for allergies to Dust Mites and Maple Pollen.  Interestingly and perhaps as proof of the old adage that even a broken clock can be right twice a day, Dr. Grodofsky was able to successfully document Plaintiff"s well documented allergy to ragweed.

After conducting his scratch tests, Dr. Grodofsky then moved on to conducting a blood test.  He draws a sample of the Plaintiff"s blood and orders tests for the following substances:

(a) Potato;

(b) Tomato;

(c) Shrimp;

(d) Cayenne pepper;

(e) Green pepper.

Dr. Grodofsky does not order a blood test for red peppers, which was the substance at issue. Furthermore, Dr. Grodofsky chose not to order a standard RAST Test. A RAST test is a blood test that indicates the level of histamine reaction to certain substances. Instead, Dr. Grodofsky chooses to use a modified RAST test. A modified RAST test is a test which attempts to show not a standard histamine reaction, but instead is used to provide a diagnosis of "new age" diseases such as the highly controversial "leaky gut" syndrome and the highly controversial multiple chemical sensitivity disorder. Modified RAST tests have been extensively criticized by the Defendant as inaccurate. British Medical Authorities have found the Modified RAST test so inaccurate that they have restricted the use of this test severely and have criticized the results yielded by such tests for the high level of inaccuracy.

Even though, Dr. Grodofsky did not even conduct a blood test for red peppers and used a test of poor integrity " he went a step further in casting doubt on his blood testing by loosing the blood samples.

The administrative record shows that Dr. Grodofsky received the results of his blood tests back before the blood sample was mailed to a laboratory in Richmond, VA.. Dr. Grodofsky received the blood test results on December 8th 1999 from an ordinary commercial laboratory in the Washington, DC, area. Dr.Grodofsky"s records include a receipt for the sample of the Plaintiff blood that was sent to the Medical College of

Virginia in Richmond on December 9th.

When Doctor Grodofsky was later questioned about where he sent the blood samples, he stated that he sent the samples to the Medical College of Virginia in Richmond on December 9th, 1999.   But if Dr. Grodofsky sent the blood sample to Richmond on December 9th, how could he have already received the results on December 8th from a lab in a different city?  The administrative record offers no information on this question.

　　　　Interestingly, these test results do not appear to have had any bearing on Doctor Grodofsky"s opinion letter, which was written nearly two weeks prior to the arrival of the blood test results and is dated on November 29th, 1999.

Based on the fact that he wrote his opinion so far in advance of the arrival of the test results, it appears that Dr. Grodofsky wrote his opinion on the results of these blood tests without the faintest idea of what the test results would be.

　　　　Whether or not Dr. Grodofsky"s examination rises to the level of malpractice is not an issue before this Court " however, the credibility and arbitrary nature of Dr. Grodofsky"s examination are the central factual issues to this matter.  The Plaintiff was so unimpressed with Dr. Grodofsky"s performance that she walked out of his office after little more than 45 minutes had transpired and refused to pay for his services.

Although, Dr Grodofsky does not substantiate this specific point " Dr. Grodofsky began to seek to peddle his opinions from the Plaintiff"s visit to his office to a secondary interested customer. Dr. Grodofsky does plead ignorance to how the opinion was marketed. Dr. Grodofsky confirms that shortly after his appointment with the Plaintiff, he was engaged by the Defendant to provide it with opinion and counsel on the matter presently before this Court. Additional proof of this relationship exists between Dr. Grodofsky and the Defendant, albeit out of the administrative record and as a result has not been introduced.

Grodofsky wrote a three page memorandum and dated it November 29th, as the Plaintiff has already documented - this memorandum was written with the following attributes:

(1)  It was written for the "benefit" of a patient who would not pay for this opinion;

(2)  It was written without the benefit of prior medical history;

(3) It was written without any serious Doctor-Patient interview;

(4) As a result of Dr. Grodofsky"s failure to interview the Plaintiff, he failed to realize that any scratch test that he performed would be worthless;

(5) Dr. Grodofsky did not test the Plaintiff for the substance which introduced her anaphylaxis;

(6) Dr. Grodofsky used a testing procedure of dubious integrity;

(7) Dr. Grodofsky can not account for the chain of custody on his blood samples;

(8) Dr. Grodofsky received results for his blood samples prior to mailing the blood samples out;

(9) Dr. Grodofsky wrote his opinion prior to having even faulty results.

When asked about why he wrote the opinion at all, Dr. Grodofsky stated that he regarded it as "possibly irrelevant".

Following her appointment with Marshall Grodofsky, the Plaintiff took a leave of absence from her job and informed her employer Danbury Hospital that she was going on disability leave at the end of February 2000.

During her leave of absence, the Plaintiff is treated by Dr. Robban Sica, MD.  Dr. Sica has performed his residency in psychiatry and practices environmental medicine. She examines the Plaintiff for multiple chemical sensitivity disorder but finds evidence to suggest that the Plaintiff has indications of severe allergy and anaphylaxis.

On February 23, 2000, the Plaintiff is hospitalized at the Lower Keys Hospital in Key West after being exposed red peppers. The hospital records indicate that emergency medical technicians had to use several shots of the highly powerful anti-histamine "epi-pen" to keep her from suffocating.  She is hospitalized and subsequently examined by Dr.

Roger Stratt. Dr. Stratt diagnosis is a reaction to red peppers. The Plaintiff is, also, ordered to avoid red peppers.

In February of 2000, the Plaintiff filed a claim with the Defendant for long term disability benefits. The Plaintiff"s medical record and other documents that appear in the administrative record were sent to the Defendant for purposes of review. The Defendant operates a large enterprise and has assigned responsibilities to different people. Two "Disability Specialists" (Shannon Haskell & Jeanne Flaherty) apparently gathered information for inclusion in the file and then forwarded materials to a registered Nurse, Sharon Davenport. Nurse Davenport purportedly read the documents and digested these documents for further review by medical doctors. On her initial reading of the files, Nurse Davenport concluded that there was a need for additional information from Dr. Grodofsky and that the amount of information provided by Dr. Grodofsky was inadequate. Nurse Davenport never received any additional information from Dr. Grodofsky but she issued a six page memorandum anyway which purportedly digested the medical records gathered by UNUM up to that point in time. In this memorandum a subtle misstatement occurs: (a) the cause of the Plaintiff"s anaphylaxis is changed from red peppers to include green peppers and cayenne peppers. Whether or not this is an intentional change or a clerical error is not apparent " however, this expansion of the cause of the Plaintiff"s anaphylaxis to include two wholly unrelated additional substances did make Marshall Grodofsky"s faulty modified RAST test with the lost blood samples more relevant. In fact, it made the faulty modified RAST test with the lost blood samples look like very solid evidence against the Plaintiffs claim.

Nurse Davenport"s digestion of the administrative record complete with her changes was forwarded to Dr. Robert McBride for review.   Dr. McBride reviews Nurse Davenport"s digestion of the administrative record in a four page memorandum.

Over the course of his memorandum, Dr. McBride changes "modified RAST test", which UNUM and British Medical Authorities consider to be inaccurate, to the more respectable "RAST test".  Dr. McBride additionally introduces a completely new theory as to the nature of the Plaintiff"s illness, he states that he does not believe that the patient is suffering from anaphylaxis but believes that she has the "highly controversial multiple chemical sensitivity syndrome".  Dr. McBride further admits that neither he nor Dr. Grodofsky have even the smallest shred of proof to support a diagnosis of multiple chemical sensitivity disorder.  Dr. McBride then states that if he can get the Plaintiff to return to Dr. Grodofsky that a chance might exist to diagnose the Plaintiff with multiple chemical sensitivity disorder.  Dr. McBride further observes that multiple chemical sensitivity disorder is sufficiently controversial that may allow the Defendant to evade payment on the Plaintiff"s claim.

Ultimately, Dr. McBride will conclude that there is no sense in even bothering with a follow-up visit with Dr. Grodofsky.   Dr. McBride states that he does not believe the Plaintiff and those trivial issues such as facts or proof should not stand in the way of his alternative diagnosis of the Plaintiff"s illness.  Dr. McBride states the following: She (the Plaintiff) is caught up in a belief system conundrum not uncommon to those who present the multiple chemical sensitivity syndrome" this is compounded by the claimant"s

rejection of Doctor Grodofsky"s advice to seek psychiatric assessment after he concluded his scientifically based assessment... this would appear to preclude an effective and practical approach to her situation at this time" there would appear to be"no benefit for attempting to discuss the claimant"s situation"    Given the fact that Dr. McBride relies entirely on Grodofsky"s interview which is recorded in a mere fifty or so words " this seems to the Plaintiff to be an astonishing act of hubris for Doctor McBride to able to infer anything. The Plaintiff also notes only a few days before Dr. McBride issued this statement he had stated that Grodofsky"s purported *scientific* proof did not exist.

A "Roundtable" discussion was ordered but it is not apparent as to what occurred in this roundtable discussion or if anyone attended this conference other than the disability benefit specialist, Shannon Haskell.  There is simply no information available from this proceeding, and the Plaintiff contends that as such a proceeding was at best, outside of the administrative record that it should be ignored.

Following this alleged "Roundtable" discussion; Haskell writes a letter denying the Plaintiff"s claims.  In this letter, Haskell cites the following as reasons for the denial:

(1)     Dr. Grodofsky"s analysis of the patient"s medical history;

>*In his (Grodofsky"s) evaluation, he noted that it was difficult to quantify Frequency of these "allergy spells"".there was some inconsistency in the History*

(2)     Dr. Grodofsky"s scratch tests;

>*Additionally, scratch tests were performed".all were negative"*

The memorandum continues to report:

>*Dr. Grodofsky confirmed that there had been no physiological or immunological basis uncovered for your symptoms"and that it was his (Grodofsky"s) opinion that you had not followed up with him as directed because"he (Grodofsky) informed you"that you might benefit from a psychiatric assessment*

> *Dr. Grodofsy treated you " and found no objective basis for any disabling conditions*

The denial letter continues:

> *Our review has found with Dr. Grodofsky"s opinion and recommendations. Your contract states that you must have the most appropriate treatment for your condition.  Your contract states:*

> *Regular Care Means*

> *- You personally visit a doctor as frequently as is medically required"..*
> *- You are receiving the most appropriate treatment and care"by a doctor*
> *   whose specialty or experience is the most appropriate for your disabling*

> *   condition(s)".*

> *Doctor Grodofsky specializes in the treatment of a treatment of asthma and allergies"You did not follow up with Dr. Grodofsky as recommended"*

Plaintiff contends that even in the most favorable light to Doctor Grodofsky, that it is simply not possible for Dr. Grodofsky to rule any medical cause to the Plaintiff"s condition based on a forty-five minute examination that did not utilize prior medical history.  A dozen scratch tests and a blood test for four substances even in the best of circumstances could not substantiate this opinion.  In the best of circumstances, this opinion is embarrassingly overbroad.  Given the fact that Grodofsky has stated that he utilized no medical history what-so-ever " the first prong of this denial is erroneous.  The second prong of this denial is also erroneous because Dr. Grodofsky"s scratch test results are at best suspicious since these tests were conducted under a circumstance which the tests makers" state will yield inaccurate and worthless results.  Based on these two doubtful positions and Dr. Grodofsky"s compromised faulty blood test with the lost samples, the Defendant concludes that there is <u>no</u> possible medical basis for the

Defendant"s illness.  The Plaintiff disagrees.

During the period that the first evaluation of her file was conducted, the Plaintiff had traveled to Dallas Texas at the advice of her own Doctors and at her own expense to be tested and evaluated under controlled circumstances for her anaphylaxis.  The Plaintiff also sought some ideas for treatment of her illness.  Dr. Rea conducted extensive tests over a period of several months under controlled circumstances.  Doctor Rea thoroughly reviewed the Plaintiff"s medical history in exhaustive detail. Doctor Rea removed the Plaintiff from any anti-histamine and conducted a thorough battery of tests which showed that she had anaphylaxis induced by exposure to Red Peppers, not Green Peppers or Cayenne Peppers.

On July 3rd, 2000, the Defendant"s employee Shannon Haskell asked her Supervisor Sharon Labonte, if Dr. Rea"s information should be examined.  LaBonte instructed Haskell to not worry about this information.  On July 7th, 2000, the Plaintiff telephones Haskell and asks for her file to be reviewed with the addition of the comprehensive examination performed by Dr. Rea.  Haskell informs the Plaintiff that the Defendant does not have this information.

As a result of this exchange, the Plaintiff hires the law firm of Febrello and Conti of Torrington, Connecticut to assist her in filing an administrative appeal. After Febrello and Conti begin to assist the Plaintiff, UNUM is able to find its copy of Dr. Rea"s information on August 2, 2000.

On September 26, 2000, the Plaintiff asks the Defendant for an administrative appeal with new information.  The new information is the one hundred pages of testing data and evaluation performed by Dr. Rea.  The Plaintiff also requests that the materials

prepared by Dr. Sica and from the emergency medical doctors in Danbury, Hartford, and Key West also be considered.

On September 26, 2000, the Plaintiff asks the Defendant for an administrative appeal with new information. The new information is the one hundred pages of testing data and evaluation performed by Dr. Rea. The Plaintiff also requests that the materials prepared by Dr. Sica and from the emergency medical doctors in Danbury, Hartford, and Key West also be considered.

On October 18th, 2000, the Defendant hires Dr. Lawrence Broda to "independently" examine the material offered by Dr. Rea. Dr. Broda manages to cover the enormous amount of information requested for independent evaluation with breathtaking terseness and nearly unintelligible handwriting. A few quotes from Dr. Broda"s review left the Plaintiff with strong doubts as to the quality of the reviews.


The Plaintiff"s Emergency Room data was summarized in the following three sentences:

*She has been experiencing reaction to certain foods  July of 1998 + has had 4 trips to the ER plus trips to a ships medical department while on a cruise.  The ER visits are well documented 6/14/99, 7/9/99, 10/28/99 + 2/23/00 of varying degrees of severity.  Only visit reveal wheezy, none presented a studio + she was treated with standard care for allergic reaction but did not require hospitalization*


This evaluation is not only terse, it is inaccurate. The Plaintiff, as mentioned supra, was hospitalized, both on the ship the *Rhapsody of the Seas* and at the Hospital in Key West, Florida on February 23, 2000.

Dr. Broda then continues to describe the Plaintiff"s visit to Dr. Grodofsky:

*She was seen by Marshall Grodofsky on 11/29/1999, a board certified allergist/immunologist, to whom she gave a history of environmental intolerance manifested by seasonal allergic stints and asthma.*

In this paragraph, Dr. Broda demonstrates that he has not read any of the detail pages in Dr. Grodofsky"s file.  Laura Neeb was examined by Marshall Grodofsky on November 17th , 1999.    November 29th is the date on the three page evaluation letter prepared for the Defendant.  Doctor Grodofsky has stated  in the administrative record that he did not use the Plaintiff"s medical history.

Dr. Broda continues:

*Conversation between Dr. MacBride + Dr. Grodofsky confirmed the absence of immunologic basis for her symptoms and that psychiatric assessment might benefit to the claimant.*

In this sentence Dr. Broda cites an unrecorded conversation between Dr. McBride and Doctor Grodofsky that is outside of the administrative record.  He relies on hearsay from someone else"s conversation to say that there is no immunological basis for the Defendant"s disability.  He also reveals that he is being told the desired results from supposedly independent review from casual sources outside of the administrative record.

Dr. Broda evaluates Dr. Rea"s information as a "Cornucopia" of treatments and tests and therapies.  Dr. Broda then back peddles and begins to say that avoidance of red peppers is not such a bad suggestion. He goes on to say:

*There would be very little difference in environmental make up of a house as opposed to an office setting.  Medical evidenced doesn"t support the reversal of the denial (UACL 563)*

Aside from the fact that this parting note makes very little sense, it ignores the obvious fact that a house would be under the Plaintiff"s control whereas an office would not be.

Because Dr. Broda relied on information that was provided to him orally, it is

unclear if Dr. Broda was able to notice the following deficiencies in Dr. Grodofsky"s files:

(a) That Dr. Grodofsky never tested the Plaintiff for red peppers;

(b) That red peppers were the substance associated with the Plaintiff"s illness;

(c) That Dr. Grodofsky"s scratch test results were invalid due to carelessness;

(d) That Dr. Grodofsky had used a widely criticized blood test;

(e) That Dr. Grodofsky regarded his work as possibly irrelevant;

(f) That Dr. Grodofsky lost his blood samples.

What is apparent is that because he relied on oral information, he did not reverse the Defendant"s denial of the Plaintiff"s long term disability benefits.

On November 7, the Defendant re-issued its first letter of denial with an additional paragraph stating that the Plaintiff"s file had been reviewed and been deemed insufficient.

After this first appeal, there was no real further review of the Plaintiff"s file. On November 7th, the Plaintiff asked for information on how to cure the deficiencies in the information that she provided as is provided in the code of Federal Regulations at 29 C.F.R. 2560.503-1 (f) (1). Haskell responded to this inquiry by stating that she could appeal again and the Plaintiff again sought information on how to cure her defects to which Haskell replied:

   *"I don"t have that answer, I don"t handle appeals, and I don"t know the entire process"*

A second appeal was requested on November 14th, 2000. It is acknowledged by Lead Specialist Sandy Kaszerman who issues a denial letter on January 22, 2001. The denial letter differed from the previous two denial letters in one important respect; it no

longer required a continuing series of visits to Dr. Grodofsky. Instead the denial relied on

Grodofsky"s scratch test and his blood test.

A third appeal was issued to the Defendant on February 10, 2003 in which the

Plaintiff stated in great detail her objections to Dr. Grodofsky"s findings.  The Plaintiff

refused to even read this appeal and issued a letter to the Plaintiff stating that the matter

was closed on February 28, 2003.

## <u>Analysis</u>

The Defendant in its motion for judgment on the administrative record basically in

essence that as insurance company that it is entitled to deferential review.  Under

deferential review, the insurance company asserts that it knew of no problems with this

matter and that it did everything it was required to do. The defense establishes that in

order to sustain its position that it must offer the following:

(a)  Proof of its position, that is greater than a scintilla of evidence but less than a

    preponderance of the evidence, <u>Celardo v Greater New York Auto Dealers</u>

<u>Health & Welfare Trust</u>, 318 F.3d 142, at 146 (2d Cir 1995).

(b) That the position taken by the Defendant must be supported by facts contained

in the Administrative Record, <u>Miller v. United Welfare Fund</u>, 72 F.3d 1066, 1071 (2d Cir

1995).

(c) That the review taken by the Defendant is rational, appropriate and based on

    substantial factual evidence, <u>Pagan v. NYNEX Pension Plan</u>, 52 F.3d, 438, 442

(2d  Cir 1995).

The Plaintiff argues that the Defendant fails to meet the following standards to

assure that its position is upheld:

(1) the Defendant did not operate within the procedural guidelines governing the processing of long term disability claims as authorized by Congress and promulgated by the Secretary of labor in the Code of Federal Regulations; 29 CFR 2560-503-1;

(2) the Defendant did not abide by the common law standards of fiduciary duty as they have been applied to Plan Administrators operating under ERISA, Firestone Tire and Rubber v. Bruch, 489 U.S. 101, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989), Varity Corp. v. Howe, 516 U.S. 489, 512, 134 L. Ed. 2d 130, 116 S. Ct. 1065 (1996 );

(3) the Defendant did not possess proof of its position which is greater than a scintilla of evidence but less than a preponderance of the evidence, Celardo, infra;

(4) The Defendant lacked substantial evidence of its position and did not pursue a rational review of the claim supported by substantial evidence.

For these reasons, the Plaintiff maintains that the Defendant failed to provide full and fair review of the Plaintiffs file as required by ERISA, that the Plaintiff pursued its fiduciary duty owed to the Plaintiff in bad faith, and lacked sufficient evidence to support its position.

Because of the extensive deficiencies both in the Defendant"s evidence used in support its position and Defendants defective procedural handling of the Defendant"s case, the Plaintiff argues that the Defendant"s administration of this matter is defective and should be overruled.

## I.   The Defendant"s Claims Processing fails to meet minimum standards of Care as Established in Federal Regulations.

At a very minimum, the Defendant must comply with regulations. These regulations were authorized by the United States Congress in creating the Employee Retirement Income Security Act of 1974. These regulations were created for the express purpose of creating a minimum standard of conduct for wealthy and powerful insurance companies such as the Defendant. The Defendant must at least try to comply with these regulations. Brogan v. Holland, 105 F. 3d 158, 161 (4ᵗʰ Cir. 1997). Failure to even try to meet the minimum standards of conduct established by the Code of Federal Regulations is significant and may strip the Defendant of its deferential status or may result in a lack of a full and fair review as required under ERISA. Woo v. De Luxe Corp., 144 F.3d 1157 (8ᵗʰ Cir. 1998) Cook v. New York Times, 2004 U.S. Dist. LEXIS 1259, (S.D.N.Y 2004), The Court noted that a Defendant"s actions will only be deemed reasonable when they comply with the Code of Federal Regulations.

Should a finding

The Defendant is also under an obligation to be truthful in its disclosure of information. Deliberate deception and misrepresentation of evidence (i.e a Defendant insurance company may not lie to a claimant) failure to abide by this duty may trigger a less deferential review. Varity Corp v. Howe, 516 U.S. 489; 116 S. Ct. 1065 (1996) "To knowingly deceive a claimant for the purpose of saving money is inconsistent with the duty of loyalty owed by a fiduciary under ERISA and may create liability where none existed before"

The Defendant maintains that as the Plaintiff"s contract for long term disability

insurance grants the Defendant discretionary authority, that this courts scope of review is limited in scope to a very narrow field of view.  The Plaintiff maintains that the matter of the contract is somewhat academic since UNUM did not conduct its claims adjudication process in accordance with the code of federal regulations.  It is well established that the Defendant must comply with the minimum standards set forth in the Code of Federal Regulations before the Defendant is entitled to deferential review.  Failure to comply with the procedural standards established in the code of Federal Regulations shall constitute a failure to conduct a full and fair review and shall be deemed to be an abuse of discretion. Soron v. Liberty Life, 318 F. Supp. 2d 19 (ND NY 2004).  Cook v. N.Y. Times Co. Group Long Term Disability Plan, 2004 U.S. Dist. LEXIS 1259  (S.D.N.Y. January 27, 2004), Juliano v. Health Maintenance Organization of New Jersey, Inc., 221 F.3d 279, 287 (2d Cir. 2000).

The Plaintiff contends that the Defendant failed to meet the following duties under the Code of Federal Regulations:

(1)  The Defendant may not prescribe a series of medical treatments or fees as pre-condition to receiving benefits under a long term disability insurance policy 29 C.F.R. 2560.503(b)(3);

(2)  The Defendant may not provide deference to a physician who has provided an initially adverse opinion and include that physician in the claims adjudication                     process. 29 C.F.R. 2560.503-1(h)(2)

(3) The Defendant must treat information consistently when adjudicating a claim, it must treat all information in a similar manner, 29 C.F.R. 2560.503(b)(5) & materials

relied upon by a plan administrator must be sufficiently well documented in writing so as to be able to be reviewed impartially upon appeal 29 C.F.R. 2560.503(f)(3)

(4) The Defendant must review impartially any new information offered to it in an administrative appeal completely and impartially " should the Defendant find the new information unpersuasive, it must provide the following under 29 C.F.R. 2560.503-1 (f) (1):

> (a) Information on which the Defendant relied in rejecting the administrative appeal;
>
> (b) Information on how objection raised by the Defendant could be cured.

The Plaintiff will discuss each of these breaches separately.

### The Defendant may not prescribe a series of fees or medical treatments under the supervision of one its physicians as a threshold requirement to receiving benefits under a long-term disability insurance policy. 29    C.F.R. 2560.503(b)(3)

The Defendant steadfastly maintains that Doctor Marshall Paul Grodofsky was one of the Plaintiff"s Doctors.   However the Defendant"s position stands in stark contrast to statements made by Dr. Grodofsky in the administrative record.   When Doctor Grodofsky was asked if he worked for the Defendant (referred to as Provident), he answered affirmatively and conceded that his own files contained a written letter verifying his employment that was issued by the Defendant.  Additional correspondence in the administrative record shows Dr. McBride offering to compensate Dr. Grodofsky for his work on the Defendant"s behalf.  In fact, Doctor Grodofsky was employed by

UNUM for much of this proceeding.

As Doctor Grodofsky was one of the Defendant"s employees, the Defendant may not insist that the Plaintiff be treated at her own expense by a physician controlled by the Defendant as a pre-condition to receiving benefits.  Yet the language in the Defendant"s first two denial letters clearly states that the Plaintiff was being denied benefits because she failed to continue her treatments with Dr. Grodofsky at her own expense.  The text is identical in the first two rejection letters and it is as follows:

> *- You personally visit a doctor as frequently as is medically required"..*
> *- You are receiving the most appropriate treatment and care"by a doctor*
>   *whose specialty or experience is the most appropriate for your* disabling
>
>   *condition(s)".*
>
> *Doctor Grodofsky specializes in the treatment of a treatment of asthma* and         *allergies"You did not follow up with Dr. Grodofsky as* recommended"

Because Dr. Grodofsky is a UNUM employee, the Defendant is seeking to impose its own medical treatment on the Plaintiff.  Because Dr. Grodofsky was not a participant in the Plaintiff"s health insurance, this course of treatment under the Defendants direct supervision was to be at the Plaintiff"s direct expense.  This alone would appear to show that the Defendant is not in compliance of the regulation which forbids a series of fees or medical treatments at the Plaintiff"s expense as a pre-condition to receiving benefits.

This problem could have been prevented by simply not bringing Grodofsky into the claims adjudication process or by simply allowing the Plaintiff to go to a "neutral" Doctor.  The reason why the Defendant demanded that the Plaintiff see Grodofsky is

because it admittedly had no evidence to support its own theories as to the nature of her illnesses.  As Unum"s Doctor McBride stated in his letter analyzing the claim""admittedly there is no proof to this (McBride"s)  position".

Failure to comply with this regulation would be more than enough to deny the Defendant favored treatment under ERISA because it has failed to follow the minimum standards of claims processing demanded under the law.  As noted in a recent case from the eighth circuit, "a provision or practice that requires payment of a fee or costs as a condition to making a claim or appealing an adverse benefit determination would be considered to unduly inhibit the initiation and processing of claims for benefits." Bond v. Twin Cities Carpenters Pension Fund, 307 F.3d 704 ( 8th Cir. 2002).  Failure to comply with the basic procedural requirements expressed in the Code of Federal Regulations may constitute a review that is so flawed that it fails to meet ERISA"s requirement of full and fair review and may be overturned. Steinberg v. Railroad Maintenance and Industrial Health and Welfare Fund, 2004 U.S. Dist. LEXIS 6371; 33 Employee Benefits Cases (BNA) 1564 (ND Ill 2004).  "Full and Fair Review requires that the Defendant comply with all of the relevant regulations embodied in 29 C.F.R. 2560.1.

Failure to comply with these regulations shall be deemed to constitute an abuse of discretion." Soron v. Liberty Life, 318 F. Supp. 2d 19 (ND NY 2004). Juliano v. Health Maint. Org. of N.J., Inc., 221 F.3d 279, 287 (2d Cir. 2000).

**The Defendant may not provide deference to a physician who has provided an initially adverse opinion and include that physician in the**

**claims adjudication process. 29 CFR 2560.503-1(h)(2)**

Dr. Grodofsky played an integral part in the Defendant"s claim"s adjudication process in the following ways:

(1)     Dr. Grodofsky consulted with Dr. McBride and established in conversations that there was purportedly "no immunological basis" for the Plaintiff"s illness

(2)     If the court does not find that Dr. Grodofsky was employed by the Defendant, Dr. McBride"s correspondence strongly suggests that Grodofsky was at least a consulting physician;

(3)     That Dr. Grodofsky was consulted by supposedly impartial "roundtable" panels which were charged with examining the Plaintiff"s claims;

(3)     Dr. Grodofsky"s lack of support for granting the Plaintiff"s claims is listed as a central reason for denying the Plaintiff benefits

At the very least, it can be said that of the more than half a dozen associates who examined the Plaintiff prior to her filing a disability claim that only Dr. Grodofsky was offered any kind of compensation in this matter.   Furthermore, the work that Grodofsky performed under this arrangement is only offered to the Plaintiff on a second hand basis, "based on conversations between Dr. Grodofsky and Dr. McBride""  There is in this light, reason to challenge whether or not Dr. Grodofsky was really all that independent in his opinions and judgments and opinions.

The Code of Federal Regulations in the sections covering the adjudication of

claims for long-term disability benefits recognizes that there is something fundamentally wrong with a physician who is wearing too many hats.  A physician who has wrote the only negative opinion should not be brought into the Defendant"s business and be rewarded with additional work as a consulting physician. **29 CFR 2560.503-1(h) (2)** This practice of the doubtful physician has been considered recently in the case of Steinberg v. Railroad Maintenance and Industrial Health and Welfare Fund, infra, which held that the use of a physician who first issued an adverse opinion, then served further as a consulting physician where he offered more adverse analysis was fatal to the defense of a claim denial.  The opinion in Steinberg points out that at the Supreme Court has stated that the conduct of a Defendant in an ERISA case is to be examined in the light of a trustee.  Firestone Tire and Rubber v. Bruch, 489 U.S. 101, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989) The Court in Steinberg, further goes on to say that a rewarding relationship for a physician who first issues an adverse opinion and then is brought in to provide more adverse information against a claimant simply does not comport with the obligation owed to a claimant by a fiduciary.  The Court goes on to provide a quote from Judge Cardozo regarding the role of a fiduciary:

*Many forms of conduct permissible in a workaday world for those acting at arm's length are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this, there has developed a tradition that is unbending and inveterate.*

Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 546 (N.Y. 1929).

The Plaintiff argues that Dr. Grodofsky"s role as both the physician who wears three hats is fundamentally faulty.  Grodofsky wears the following hats:

(a) As a physician, Grodofsky issued the only adverse opinion, against the Plaintiff"s claim;

(b) As a consulting physician to the Defendant, he is reputed to claim that there is no "possible" immunological basis" for the Plaintiff"s illness;

(c) As a consulting physician to the Defendant, he is only one of two people

To review the claimant"s file (the other was Doctor McBride, who offered him remuneration for his services);

(d)  As a member of the "roundtable" panel decides the fate of the Plaintiff"s

claim by refusing to re-consider or re-evaluate his work.

By wearing these three hats, Marshall Grodofsky"s importance goes far beyond merely providing enormously faulty information " Doctor Grodofsky has managed to effectively muzzle any discourse as to the caliber of his work " which the Plaintiff argues is enormously faulty.

Doctor Grodofsky"s intimate involvement in the Defendant"s claims process should be a reason to examine the entire administrative record and not just the portions relied upon by the Defendant at the time of the decision.  As a consulting physician and a person of sufficient clout to say "yea" or "nay" on the Plaintiff"s claims " Doctor Grodofsky knew all along how he had never used medical history, really never talked to the Plaintiff, bungled his scratch tests by failing to follow the most basic instructions, lost his blood samples, and used tests of dubious integrity.  Doctor Grodofsky knew or should have known in regard to the Plaintiff"s condition, that he could find "no immunological basis" for the Plaintiff"s ailments and that a diagnosis of psychiatric illness based on such bungled testing and a scant forty-five words of recorded conversation was not legally or medically sustainable.  When Doctor Grodofsky was questioned on these issues in his deposition as cited in the administrative record, he conceded the point.

By allowing Doctor Grodofsky to be the investigator and the judge regarding his medical evaluations in the instant claim, the Defendant has blinded itself from the deficiencies in Grodofsky"s work.  The Defendant should not be allowed to assert that it did not know about Grodofsky"s faults at the time that it was making its decisions. The Secretary of Labor has realized that using the same physician as a consulting physician or to place them in the role of deciding the validity of their own work is basically a contradictory position and if sufficiently violated does not comprise "full and fair" review . 29 CFR 2560.503-1(h) (2)-(4) The Northern District of Illinois in <u>Steinberg</u> has also agreed with this position.  The Plaintiff believes that this Court should consider this regulation as well and she hopes that the court will find that she did not receive a "full and fair" review from the Defendant and that her file will be examined de novo. (Emphasis added)

**Defendant"s improperly relied upon undocumented conversations as a primary ground to deny the Plaintiff"s claims.  Reliance upon such undocumented sources violated rules established in the Code of Federal Regulations and constitutes a lack of "full and fair review"**

Could there really be a more doubtful source of proof than a casual conversation that was not even recorded.  In the seventeenth century, restrictions on the use of "hearsay" began to appear throughout the English speaking world as the nations within that group came to grips with the overwhelming judicial excesses of corrupt monarchs and dictators alike.  There was a desire to put undocumented conversation in perspective and to limit its power to certain uses such as "statements made against self interest" and so on.

The Plaintiff contends that there is no place for the use of casual conversation as proof in an ERISA Matter. The Code of Federal Regulations requires consistency in the treatment of

evidence offered before a plan administrator subject ERISA. 29 C.F.R. 2560.503(b) (5). The Plaintiff contends that at the very least that this should require parties relying upon evidence that is written and available for subsequent impartial review during a potential administrative appeal.

Here, even though Unum"s supervising physician in this claim, Dr. McBride, attempts to "document" his alleged conversations with Doctor Grodofsky. Doctor McBride really does little more than to document that the Defendant was employing Doctor Grodofsky. There is not any test data or any statements from Doctor Grodofsky for the Plaintiff to understand or challenge. There is nothing for an independent physician to review upon  administrative appeal because whatever statements made by Grodofsky are given to us second hand and there is no new data or analysis.   Under the Code of Federal Regulations, there must be sufficient factual evidence to allow an impartial reviewer to rely upon facts rather than undocumented evidence. 29 C.F.R. 2560.503(f)(3).

Authority for this argument can be found in a 1996 decision issued in the Southern District of New York, in which a plan administrator informed a claimant that "we have been advised by our representative that your charges were not medically necessary".  The court held that this statement failed 2560.503(f) (3) and ultimately found that the plan administrator failed to provide full and fair review. Alternative Care Sys v. Metropolitan Life Ins. Co., 1996 U.S. Dist. LEXIS 1705 (SD NY 1996). A court held that a when a statement is used as a basis for a decision, and that statement is not a reason but a blanket conclusion that it should be reviewed with skepticism. Wolfe v. J.C. Penney, 710 F.2d 388 (7th Cir. 1983) The Plaintiff believes that the Defendant"s reliance on a blanket conclusion in the statement ""conversations between Dr. McBride and Dr. Grodofsky confirms that there is no immunological basis for your claim" to

fall into this area.  It is an unverifiable position " it is not a statement of a reason for a deficiency in the claim "it is a conclusion that the claim itself is deficient without supporting information.

Another fairly recent case from the 9th Circuit holds that at a minimum a document relied or other information relied upon by a plan administrator must be several requirements in order for the court to sustain "full and fair" review under 29 C.F.R. 2560.503(g)(1).  These requirements are as follows:

(1)   Be in a form that they can be reviewed by the Plaintiff to submit an administrative appeal;

(2)   Be in a form that they may be reviewed impartially during an administrative appeal;

(3)   The document or information must be written.

The Court also goes on to add that these documents must be included in the administrative record as well.  If the information relied upon by the Defendant can not meet this very basic standard of "written and recorded", the Defendant has not provided full and fair review.  <u>Russo v Hartford Life Insurance</u>, 2002 U.S. Dist. LEXIS 26566 (SD CA 2002).  Further, the Plaintiff contends that at the very least, Doctor Grodofsky"s statements as a consulting physician fail the standard enunciated in <u>Russo</u>.  The Plaintiff further contends that the contents of the two roundtable discussions, which are also not recorded in the administrative record, fail the standard enunciated in <u>Russo.</u>

The Plaintiff also argues that all of these failings taken together show that the Defendant is not treating information in a consistent manner.  At the very least, it is not holding itself to a standard of using written information and documenting this information.  The Plaintiff believes

that this inconsistency is sufficiently egregious to argue that the Defendant is breaching its duty

to treat information consistently under the Code of Federal Regulations. 29 C.F.R. 2560.503(b)

(5)

Additionally, the Plaintiff contends that any further determinations made from such

declaratory remarks should be ignored.  Defendant argues that the Plaintiff must be mentally ill

because Dr. Grodofsky has commented off the record and without any apparent basis that "no

immunological basis" exists for her claim.  Plaintiff contends that if the premise for an

argument is impermissible as is the case here, that a predicate argument based solely on that

premise should also be regarded as impermissible.

**Plaintiff was not provided with full and fair review because the Defendant
never provided her information needed to cure deficiencies in her claim.  29
CFR 2560.503-1(f)(3)**

Putting aside the fact that virtually every basis cited by the Defendant in their rejection

letters for denying the Plaintiff"s claims is procedurally lacking, the form of notice offered by

the Defendant in the four (4) claim rejection letters fails to meet the minimum standards for

claims review enunciated in the Code of Federal Regulations.  None of the rejection letters

provide adequate notice to the Plaintiff of the standards of review relied upon by the Defendant

and how the Plaintiff might cure any deficiencies in her claim.  Furthermore, the Plaintiff is

recorded in the administrative record as asking for them and was simply told "I don"t know" by

UNUM"s disability specialist, Shannon Haskell, and was rebuffed without any further

correspondence.

Recently, the District Court in the Southern District of New York offered some

guidance as to what constitutes notice on how to cure a defect under 2560.503-1(f)(3).
The Court stated that at the very least, the plan administrator must communicate and
make available without charge the standard on which it relied to determine whether the
claimant suffered from the disease.  Cook v. New York Times, 2004 U.S. Dist. LEXIS
1259 (SDNY Jan. 30, 2004).  In Cook, the issue was a denial of long-term benefits for
Chronic Fatigue Syndrome.  In Cook, the Defendant communicated that the Defendant"s
consulting physician"s had examined the Plaintiff"s record and did not support a
determination of benefits and included a demand for psychological review " as this case
in the instant matter.  In Cook, the Defendant and the plan administrator, Metropolitan
Life Insurance, never provided the claimant with any information in their denial letters or
upon request as to the standards that the plan administrator relied upon in making its
determination that the Plaintiff did not suffer from a disability.

The Court for the Southern District of New York held in Cook, that the plan
administrator failed to provide full and fair review because it never communicated the
standards for reviewing a claim for Cook"s illness either in rejection letters or upon
request.   The standards were made known to the court and included the following:

    a. a full review of medical history

    b. a thorough and uncompromised physical examination

    c. and specific physical condition such as enlarged spleen.

The Court then over-ruled the plan administrator"s determination for this lack of full and
fair review.

In the instant case, the Defendant has never communicated the standards on which it has relied in rejecting the Plaintiff"s claim in any of its correspondence.  The administrative record does not contain any such standards  Furthermore, the Plaintiff specifically asked for guidance on what she needed to do in order to meet these minimum standards of review and was simply rebuffed on page 572 of the Defendant"s claim file.

Cook is not the first case in this Circuit to affirm the Code of Federal Regulations notice requirement as found at 29 C.F.R. 2560.503-1(f) (3).  Juliano v. Health Maintenance Organization of New Jersey, Inc., 221 F.3d 279, 287 (2d Cir. 2000).  Dawes v. First Unum Life Ins. Co., 1992 U.S. Dist. LEXIS 17426 (S.D.N.Y. Nov. 13, 1992).  Dawes, further holds that the standards of review employed by a plan administrator must be stated succinctly and in manner designed to be easily understood by a claimant.  Ambiguous or opaque communication of review standards is insufficient to satisfy notice requirements under ERISA and thus will not comprise full and fair review.

Under the minimum standard established in Cook, the Defendant did not meet its obligation to provide adequate notice to the Plaintiff by simply informing her of what criteria the Defendant was relying upon in reviewing her condition.  Because the Defendant did not provide such notice, it did not provide full and fair review as required by ERISA and that the instant matter should be reviewed de novo.

**The Defendant failed to provide impartial review of the evidence both at the time of assembling the administrative record and upon administrative appeal.**

Under the Code of Federal Regulations, the Defendant is obliged to provide the Plaintiff with an impartial review of the file both in the processing of the initial claim and upon

administrative appeal.  29 CFR 2560.503-1(f)

Here, the Plaintiff has only been granted one cursory review of her file.   The
Plaintiff contends that upon administrative review, that Dr. Lawrence Broda could not
have read the actual source data and instead relied upon casual unrecorded conversations
to which Dr. Broda was not a party and digestions of the data in this matter that were
prepared by a nurse.  Dr. Broda missed out on vast amounts of important factual data
such as 4 hospitalizations that the Plaintiff endured during the course of her illness.
Doctor Broda missed out on Dr. Grodofsky"s admitted neglect to use medical history, or
to find well established allergies with his tests.  Doctor Broda never noticed the correct
date when Doctor Grodofsky examined the Plaintiff and misstated on the basis of a
memorandum that Dr. Grodofsky wrote his opinion letter before he had his test results
and that he got his test results before he sent out his blood samples.  The reason why Dr
Broda had all of these failings with his review is because he did not review the actual
source data but relied on digestions prepared by a nurse and UNUM"s disability
specialists. Not only does Dr. Broda"s failure to review these files result in the omissions
that are listed above, it also constitutes a lack of full and fair review under federal
regulations. 29 CFR 2560.503-1(f).

A case recently affirmed by the 8th Circuit examines the whole matter of the
sloppy independent examiner in an ERISA Appeal.  Shaw v. McFarland Clinic, 231 F.
Supp. 2d 924 (S.D. IA 2002) aff"d Shaw v. McFarland Clinic, 2004 U.S. App. LEXIS
6408 (8th Cir. Iowa, April 5, 2004)   In Shaw, the matter involved the last person in Iowa
to be stricken with Polio.  Shaw was initially denied benefits for her polio by the plan
administrator. In response to an appeal by Shaw"s for benefits governed by ERISA, the

physician charged with impartial independent review chose not to fully review the file but instead to read a letter and memoranda and not the claim file. The Court held that such an incomplete review did not constitute full and fair review and held that the conduct of the examiner was arbitrary and capricious.

The situation that arose in <u>Shaw</u> is analogous to the matter of Dr. Broda. Dr. Broda simply did not choose to read the file and chose instead to read a letter and a digestion of the matter. In issuing his review, Dr. Broda pushes the envelope further and relies upon undocumented declaratory remarks "conversation between Dr MacBride + Dr. Grodofsky confirmed the absence of immunological basis for her (Plaintiff"s) symptoms"

Dr. Broda takes it a step further than the Doctor in <u>Shaw</u>, who was merely lazy and did not read his files. Dr. Broda cursorily reads memoranda " gets the information wrong and then relies on somebody else"s undocumented conversation. Furthermore, it is highly suspect as to how Dr. Broda learned of the dialogue of this conversation without being told it by one of the participants. The conversation is not recorded in the administrative record.

Authority available from the Third Circuit holds that when a plan administrator makes a decision that is speculative and unsupported by information in the administrative record " which such a decision may be found to be arbitrary and capricious. <u>Carney v. IBEW Local 98</u>, 66 Fed. Appx. 381; 2003 U.S. App. LEXIS 9467 (3d Cir May 16 2003) <i>cert denied</i> <u>IBEW v. Carney</u>, 2003 U.S. LEXIS 9008 (December 8, 2003).

The Plaintiff argues that Dr. Broda in not adequately reviewing her file did not provide the Plaintiff with full and fair review because he failed to read her file and

instead relied upon being told the results based on an undocumented conversation. Furthermore, the Plaintiff believes that the Court in Shaw"s holding that such conduct is arbitrary and capricious should be weighed in the instant matter.

## The Defendant breached its Fiduciary Duty owed to the Plaintiff

The Supreme Court has stated in Firestone v. Bruch, infra, and in Varity Corp. v. Howe , infra, that the Defendant as trustee owes the Plaintiff a duty as a trustee.  Among the duties that the Plaintiff is owed, is that her records will not be tampered with or lost as a result of lending them out.  Additionally the Defendant is charged with a responsibility not to lie to the Plaintiff in an effort to save money or effort.

The Plaintiff contends that the Defendant committed the following breaches of fiduciary duty:

A.   Nurse Davenport in her digestion of the Plaintiff"s files expanded the definition of the Plaintiff"s claims to apparently fit the claim to Dr. Grodofsky"s blood tests;

B.    That the Defendant simply lied to the Plaintiff in order to save itself an appeal by stating to the Plaintiff that it had lost records

C.    Dr. Grodofsky who served not only as a consulting physician but was a member of the "roundtable" panel did not reveal his extensive dishonesty and failed testing;

## The Defendant through its agents committed a breach of Fiduciary

**Duty by modifying the Plaintiff"s claim in the hopes of making the illness fit the tests available.**

Nurse Davenport in her digestion of the records of the Plaintiff"s claim expanded the cause of Laura Neeb"s anaphylaxis to include both cayenne peppers and green peppers.  This was may have been done to reconcile the test results offered by Unum"s employee Doctor Grodofsky with the Plaintiff"s claim " as Doctor Grodofsky had never tested the Plaintiff for any kind of reaction to Red Peppers which was the true basis of the claim.  It may have simply been assumed that the cayenne and red peppers were both red in color and are thus "red peppers".  The result of this change was to strengthen the Defendant"s case because it gave the suggestion of scientific proof when in fact there was not any.

Case law exists to show that such a modification can be used to challenge a denial of benefits under ERISA as bad faith. D'Emanuele v. Montgomery Ward & Co., 1987 U.S. Dist. LEXIS 16830 (CD CA 1987). In D"Emanuele, the Court held that a modification of a job description for the purpose of making a claim denial work well was a breach of fiduciary duty if the change was false.  The court further held that there was no need for proof of intent to demonstrate "bad faith."  The simple act of shoe horning the job description was enough. The plan administrator"s decision was then overruled on this basis as equitable relief.

The Plaintiff believes that the same rationale is appropriate in the instant matter. Initially, Nurse Davenport reported that Dr. Grodofsky"s material was incomplete and unfinished.

As in D"Emanuele where the Plaintiff"s job description was changed after a

disability complaint was filed, a minor change occurs in Nurse Davenport"s

administration of the record and the Plaintiff"s anaphylaxis has two new causes listing

green peppers and cayenne peppers as causes to her anaphylaxis.  This alteration, even

though presumably unintentional, serves to give the Defendant the look of science about

their claim- when in fact there was not any.  This  would prove especially troublesome

since Dr. Lawrence Broda apparently read little more than memo"s and did not

investigate the actual record in any detail.

      The Plaintiff believes that as in <u>D"Emanuele</u> that equitable relief should be made

available on this ground and that she should be allowed to seek to have to have the plan

administrator"s decision over-ruled.

## The Defendant breached its fiduciary Duty when it lied to the Plaintiff about its lack of possession offered by Dr. William Rea " dishonesty has been held to be contrary to a fiduciary duty

      Upon learning of her initial denial, the Plaintiff requested that the plan

administrator review her claim again with the inclusion of information sent to the

Defendant by Dr. William Rea.  Despite the fact that there are extensive references to Dr.

Rea"s information prior to the date of the request, the Defendant maintained that it did

not have Dr. Rea"s information and thus could not review it.

      This was not the first instance in which the Defendant had lost records which

included testing data.  In its initial gathering of records, the Defendant had obtained a

fairly lengthy file from Dr. Adrienne Buffaloe of New York.  The Plaintiff herself did not

have a second copy of Dr. Buffaloe"s records and Dr. Buffaloe was unavailable for a

time.  The files prepared by Dr. Buffaloe contained extensive testing data showing that

the Plaintiff had anaphylaxis caused by exposure to red peppers.  Dr. Buffaloe better

known for her treatment of the "leaky gut" syndrome did not continue seeing the Plaintiff

beyond the initial battery of testing and consultation.

Accordingly, as another bit of scientific data had been lost, the Plaintiff felt

compelled to seek the assistance of a law firm, Febrello & Conti, simply to get the

Plaintiff to review Dr. Rea"s material.

The Plaintiff argues that the Defendant breached its fiduciary duty by lying to her

that it did not possess and could not review Dr. Rea"s exhaustive information.  The

Defendant had already decided that Dr. Rea"s material was not worthy of discussion or

even reading. The information offered by Dr. Rea contains more than 100 pages of

testing data that was gathered over several months in controlled circumstances and was

free of the defects that troubled the Information prepared by UNUM"s employee Doctor,

Grodofsky.

The Defendant"s first reaction in responding to Dr. Rea"s information was to say

that it did not have it " perhaps because this had already worked with the testing data

offered by Dr. Buffaloe.  Apparently, the Defendant hoped that by falsifying information,

that the Plaintiff might allow her claim to lapse and save the Defendant not only the

money for the claim itself, but the expense of hiring Dr. Broda.

The Supreme Court has encountered the case of the dishonest plan administrator.

Varity v. Howe, 516 U.S. 489, 134 L. Ed. 2d 130, 116 S. Ct. 1065 (1996) The Court has

found that the dishonest fiduciary who seeks even to reduce his expense is not to be

treated deferentially in their act of dishonesty.  The Court stated that liability may be

found acts of dishonesty and that a Court may grant equitable relief to a Plaintiff who has

been injured by the dishonest acts.  The Plaintiff believes that if the Defendant had

refrained from such conduct and had simply processed the claim under the very simple

guidelines of ERISA that she would not have been obliged to hire Attorney Conti in

2000.

### Dr. Grodofsky never revealed to the plan that he had committed significant acts of dishonesty.

The Plaintiff contends that Dr. Grodofsky, who was involved in all stages of the claims

adjudication process at least to the appellate level, never told the truth about his own

conduct in preparing the Plaintiff"s review.  Dr. Grodofsky was sent medical documents

from the other physicians to review their adequacy. Dr. Grodofsky was the only medical

person who participated in the "roundtable" panel that was charged with deciding the

Plaintiff"s benefits eligibility.

The simple truth of the matter is that Grodofsky has admitted that he did not use

medical records.  Grodofsky has admitted that he really did not interview the Plaintiff.

Grodofsky did not make any effort to determine if the Plaintiff was using anti-histamines

which could contaminate his testing results.  Grodofsky issued his opinion before he had

his test results and his results came back before his samples left. Grodofsky used tests of

dubious integrity. Additionally, Marshall Paul Grodofsky never tested the Plaintiff in any

way shape or form for a reaction to red peppers. (Emphasis added)

Grodofsky was in the position to report on the adequacy of the information

offered by other physicians and to ultimately decide on the Plaintiff"s claim.  Grodofsky

never bothered to report on the shortcomings of his own information.  He knew perfectly

well that his information did not pass the standards for diagnosing Anaphylaxis as recommended by the American Medical Association.  Further, he comments on the necessity of extensive medical history review and carefully controlled circumstances on the Internet.  Dr. Grodofsky knew perfectly well that his work was faulty and even refers to it as "possibly irrelevant" in the administrative record.

The truth of the matter is that Dr. Grodofsky never came forward during the claims adjudication process and admitted that his work was so startlingly sloppy as to be deceitful.  Dr. Grodofsky"s letter and his subsequent "conversations" which are so outrageous that even Dr. Grodofsky did not have chutzpah to record these findings in writing.

Dr. Grodofsky could have spoken up and at least recused himself from the review process.  Dr. Grodofsky"s continuing involvement in the Defendant"s claims adjudication process was of doubtful integrity.  The Plaintiff prays that the Court will consider this when it makes its determination.

## The Defendant"s breaches of Fiduciary Duty should be reviewed in a larger context.

Whether or not the Court finds the Defendant"s breaches of fiduciary duty as significant, the Plaintiff prays that the Court consider these matters in the larger context of the matter. The Plaintiff has already shown that each step of the Defendant"s process was contaminated by significant violations of the minimum procedural requirements for claims adjudication found in the Code of Federal Regulations.  The Defendant"s two breaches of fiduciary duty are in their own right significant but they are more disturbing because they show a pattern of deliberateness in the Defendant"s conduct.  The

procedural failings are not merely haphazard " they are much more substantive.

## The Defendant Lacked Substantive Proof in Support of its Position

Public Policy inherent in ERISA favors claims" processing to be performed administratively within insurance companies when issues such as long-term disability insurance policies arise. This Court has stated that the principal reasons for this public policy favoring administrative regulation are as follows:

(1) To assure that Defendant Insurance Companies behave responsibly in their claims administration processes;

(2) To assure that a clear administrative record is available when matters appear before a federal court such as this one;

(3) To assure that actions brought under ERISA are brought under an abuse of discretion standard.

Linder v. BYK-Chemie, 313 F. Supp. 2d 88 (D. CT March 15, 2004). The Court in Linder, notes that ERISA"s regulations also mandate a full and fair review.

The Second Circuit Court of Appeals has held that there must be substantial evidence that is greater than a scintilla but less than a preponderance of the evidence in order for the defendant to prevail. Celardo v Greater New York Auto Dealers Health & Welfare Trust, 318 F.3d 142, at 146 (2d Cir 1995). The Defendant relies entirely upon the testimony offered by Dr. Marshall Paul Grodofsky, who became a consulting

physician for UNUM shortly after he examined the Plaintiff.  Dr. Grodofsky, as the Plaintiff has stated numerous times did not:

(a) Utilize the Plaintiff"s medical history;

(b) Seriously interview the Plaintiff;

(c) Conducted his scratch tests with absolute and complete disregard for the proper handling of these tests as directed by its manufacturer;

(d) Employed blood tests that are known to be highly inaccurate and restricted in use in Great Britain because of their inaccuracy;

(e) wrote his opinions before he received his test results back;

(f) received his test results back before he sent his samples out;

(g) never even tested the plaintiff for the substance which caused her anaphylactic reactions

Dr. Grodofsky"s opinions and data to the Plaintiff"s estimation look to be highly unreliable and speculative.  Furthermore, it is difficult for the Plaintiff to assert that it did not know about Grodofsky"s errors when adjudicating this claim.  The defendant brought Grodofsky deeply into the claims adjudication process and permitted him to review other Doctor"s information and to even have the final word at the round table discussion.  This act of involving Dr. Grodofsky is a major procedural error because it necessarily impedes proper review and has been a basis elsewhere to overturn a plan administrator"s denial of benefits

Dr. Grodofsky is not the first Doctor to submit doubtful information that alone was used by a plan administrator to deny benefits.  In a case from the Western District of Pennsylvania, the Court found that a conclusive statement of testimony offered by a Doctor who failed to employ medical history or examine the patient simply was not substantial evidence in support of a claim denial by a defendant plan administrator. Pierce v. American Waterworks Co., 683 F. Supp. 996 (WD PA  1988)   In fact, the Court in Pierce called the reliance on the errant physician"s testimony "irrational".   This element in Pierce was later examined by the Court for the Northern District of Iowa and that court stated that Pierce could be broken down into a three part test to see whether or not it will constitute substantial evidence, which is as follows:

(1) The examining physician did not merely rely on one document and nothing else;

(2) The examining physician relies on states the actual verifiable factual evidence;

(3) The examining physician"s record contains actual verifiable factual evidence of the diagnosis made.

LeStrange v. Fortis Benefits Insurance Co., 2003 U.S. Dist. LEXIS 10045  (ND Iowa June 13, 2003).  Using the test used in LeStrange, the Plaintiff argues that Dr. Grodofsky"s testimony still fails to constitute substantial evidence because it fails to pass muster on the second and third prongs.  Because Marshall Grodofsky did not follow the manufacturer's instructions on his scratch tests or control his blood samples, his factual results are not verifiable.  Because Marshall Grodofsky never tested the Plaintiff in any way shape or form for a reaction to red peppers, his conclusion that she did not suffer

from anaphylaxis based on exposure to red peppers is not supported by actual verifiable factual evidence.

Similarly, Dr. Broda examination fails the first prong under the test enunciated in LeStrange, Dr. Broda based his opinions almost entirely on an undocumented conversation, which he must have been told by either Dr. Grodofsky or Dr. McBride. Based on significant factual errors in Dr. Broda"s review including the following :

1) Missing three documented hospitalizations including the use of a respirator on the ship Rhapsody of the Seas;

2) a severe anaphylactic attack that required multiple shots of epinephrine in an ambulance in Key West Florida to stop the plaintiff from dying of asphyxiation;

3) A fourth hospitalization in Key West;

On the basis that Dr. Broda obviously did not properly review the file alone, Courts have found that the plan administrator"s use of Dr. Broda"s testimony may be found arbitrary and capricious for failing to provide substantial factual review. The plaintiff argues that Dr. Broda"s statements should not be elevated to replacing those of Dr. Grodofsky because Dr. Broda did little more than to read memoranda.

If Doctor"s Grodofsky and Broda may be eliminated from review under the LeStrange test, the Defendant could not sustain its claim denial. The Defendant still can use Dr. McBride"s theory that the Plaintiff has the "highly controversial multiple chemical sensitivity syndrome" but Dr. McBride has already conceded that he does not have any proof to sustain that position.

Without Dr. Grodofsky, the Defendant is left without any substantial evidence to support its claim denial. The evidence offered by Dr. Rea offers nearly 100 pages of testing data that is done in accurate, highly controlled circumstances using the scientific method. The testing was conducted over a period of months. The evidence offered by Dr. Rea clearly and scientifically shows in a verifiable manner that the Plaintiff suffers from anaphylaxis induced by exposure to Red Peppers.

The Defendant asserts that Dr. Grodofsky has criticized Dr. Rea"s methods as being not ordinary medical practice. The Plaintiff argues that Dr. Grodofsky"s very examination of the testimony offered by Dr. Rea is a violation of the minimum standards set forth in the code of Federal Regulations. 29 C.F.R. 2560.503-1(h)(2) The Defendant may not provide deference to a physician acting as a consulting physician who has already provided adverse testimony. Secondly, the Plaintiff has argued that Dr. Grodofsky"s methods such as not using medical records for purposes of treating a patient are not generally accepted practices.

## The Plan Administrator has conducted its Adjudication of the Claim in an Arbitrary and Capricious Manner

The Plaintiff maintains that without any significant proof supporting its position, that the Defendant acted arbitrarily and capriciously. The Defendant must possess factual proof of its position that is greater than scintilla but less than a preponderance of the evidence.

The Plaintiff asserts that Dr. Grodofsky"s testimony is entirely inaccurate because it is severely compromised. Over the course of a fifty-five page deposition, Marshall Paul Grodofsky confirms that his work was highly speculative and was in his mind

"possibly irrelevant". Even the most cursory look at the records offered by Dr. Grodofsky show that Dr. Grodofsky never tested the plaintiff for Red Peppers.  A more penetrating look shows that Dr. Grodofsky really did not examine the Plaintiff and lost what little information he had to work with.

The Defendant chose to flaunt the basic requirements of the Code of Federal Regulations governing the adjudication of ERISA claims and involved Grodofsky first as a consulting physician and then later as an arbiter of the claims decision itself. 29 CFR 2560.502-1(h).  This level of extensive involvement of a physician who offered adverse testimony has been highly criticized in the Northern District of Illinois earlier this year and has led to a reversal of plan administrator"s denial of benefits.

Grodofsky"s intimate involvement in the claims adjudication process shielded the Defendant from any serious consideration of the flaws inherent in his work.  As time progressed , Grodofsky"s very word became the authority on this claim " even though Dr. Grodofsky only made oral statements and which were never recorded in writing. Grodofsky made declarations such as "there is immunological basis for the symptoms" which the Defendant treated as law without asking itself what proof did Grodofsky offer.

Nevertheless, the Defendant should not be allowed to assert that its examiners and consultants never knew of Grodofsky"s errors.  The Defendant broke the procedural guidelines established in the Code of Federal Regulations and brought Grodofsky into its enterprise at the most intimate level.  The plan administrator should not be allowed to shield itself from liability because it failed to apply basic minimum standards. Grodofsky knew that his proof was dubious.

The plaintiff asserts that the reliance on statements from Grodofsky such as there is no immunological basis for symptoms was irrational.  Grodofsky had only spoken to the Plaintiff for a couple of scant sentences and conducted about a dozen total allergy tests " tests that were severely compromised at that.  Does anyone really think that you can rule out every medical condition possible in minutes?

Ultimately, Grodofsky"s involvement in this matter and the support he received from individual actors within the Defendant"s organization was not in the best interests of the plan itself.  The involvement of Grodofsky impeded the plans goal of efficient and impartial review of claims for the following reasons:

(1) By being allowed to hide obvious weaknesses in his testimony, Grodofsky created false proof that was relied upon detrimentally by the plan;

(2) By being allowed to hide obvious weakness in his testimony, Grodofsky assured expensive and slow litigation.

In many respects the plan was as much injured by Grodofsky"s actions as anyone.  After all, the plan paid Grodofsky for his services.

The plan administrator also cut corners to the detriment of the plan and its goal of efficient and impartial review of the claims before it.  Nurse Davenport"s alteration of the claim to include substances that were tested by Grodofsky but not at issue in the claim " unnecessarily exposed the plan to liability for breach of fiduciary duty.  Dr. Broda"s indifferent and lazy review of the files given to him was not the kind of service that the plan bargained for when it contracted for a review.  The plan did not bargain for a review

that was so sloppy that its decision could be overturned because the reviewing Doctor never bothered to read basic source material for such failure to review as was the case in McFarland.

Based on the following reasons that the plaintiff has reviewed in this motion, the plaintiff asserts that the plan administrator acted arbitrarily and capriciously:

(a) Lack of substantial evidence;

(b) Failure to abide by minimal procedural requirements found in Federal Regulations;

(c) Breach of fiduciary duty;

(d) Behavior by the plan administrator that was not in the best interest of the plan;

(e) Behavior by the plan administrator that was at odds with the goals of the plan.

The Plaintiff prays that the court will agree with her and additionally will spare her the burden of a remand to the plan administrator for benefits to which she has had to forego because of the need to litigate this matter.  The Court may forego any additional review by the plan administrator should it decide that it is pointless for this matter to be remanded. Miller v. United Welfare Fund, 72 F.3d 1066, 1071 (2d Cir 1995), Wolfe v. J.C. Penney, 710 F.2d 388 (7th Cir. 1983).

The Plaintiff further prays that the Court will consider the fact that she has waited nearly four years for this review and has invested her own money in Medical Testimony, Depositions, and Attorneys Fees.  The Plaintiff prays that the Court will award her litigation costs. <u>Juliano v</u>. <u>Health Maintenance Organization of New Jersey, Inc</u>., 221 F.3d 279, (2d Cir. 2000).

Laura Neeb,
THE PLAINTIFF

BY: _____
       Jeffrey R. Heyel, Esq.
       68 Main Street
       Danbury, CT  06810
       Fed. Bar No. ct19554